# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JANE A. RESTANI, SENIOR JUDGE

| | |
|---|---|
| CANADIAN SOLAR INC. *ET AL.*, | ) |
| Plaintiffs, and | ) |
| CHANGZHOU TRINA SOLAR ENERGY CO. LTD. *ET AL.*, | ) |
| Consolidated Plaintiffs, and | ) |
| JINKO SOLAR CO., LTD. *ET AL.*, | ) Consol. Court No. 19-00178 |
| Plaintiff-Intervenors, and | ) **PUBLIC VERSION** |
| YINGLI GREEN ENERGY HOLDING CO., LTD. *ET AL.*, | ) Business Proprietary Information Removed |
| Plaintiff-Intervenors, and | ) |
| SHANGHAI BYD CO., LTD., | ) |
| Plaintiff-Intervenor, | ) |
| v. | ) |
| UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| SUNPOWER MANUFACTURING OREGON, LLC, | ) |
| Defendant-Intervenor. | ) |

## DEFENDANT'S RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:
PAUL KEITH
Attorney
Office of the Chief Counsel
    for Trade Enforcement and Compliance
U.S. Department of Commerce

December 4, 2020

JUSTIN R. MILLER
Attorney-in-Change
International Trade Field Office
U.S. Dept. of Justice, Civil Division
International Trade Field Office
26 Federal Plaza, Rm. 346
New York, NY 10278
Tel. (212) 264-9241
Fax (212) 264-1916
Attorneys for Defendant

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ...................................................................... 3

    I.    Administrative Determination Under Review ............................................... 3

    II.    Statement Of The Issues .............................................................................. 3

STATEMENT OF FACTS .............................................................................................. 4

SUMMARY OF THE ARGUMENT ............................................................................... 5

ARGUMENT ................................................................................................................. 8

    I.    Standard of Review ...................................................................................... 8

    II.    Commerce Lawfully Used Adverse Facts Available In Determining Whether Canadian Solar And Jinko Used The Export Buyer's Credit Program ........................ 8

        A.    Commerce Appropriately Applied An Adverse Inference As A Result Of The Government Of China's Failure To Cooperate ...................................................... 9

        B.    Commerce Reasonably Determined, Through The Application Of Adverse Facts Available, That Canadian Solar And Jinko Used The Export Buyer's Credit Program ................................................................................................................ 13

    III.    Commerce's Specificity Finding For China's Provision Of Aluminum Extrusions Is Supported By Substantial Evidence And Otherwise In Accordance With Law ........ 16

    IV.    We Respectfully Request A Remand For Commerce To Reconsider The Benchmark For The Provision Of Aluminum Extrusions For LTAR ........................................... 19

    V.    We Respectfully Request A Remand For Commerce To Reconsider Its Reliance On World Market Prices To Determine The Benchmark For Solar Grade Polysilicon ............................................................................................................... 22

    VI.    We Respectfully Request A Remand For Commerce To Reconsider Its Application Of Facts Available With An Adverse Inference For The Finding Of Specificity For The Electricity For LTAR Program ............................................................................ 24

    VII.    Commerce's Determination Not To Make An Entered Value Adjustment To Canadian Solar's Total Sales Is Supported By Substantial Evidence And In Accordance With Law ............................................................................................... 26

VIII.   Commerce's Determination Of The Benchmark For Land Is Supported By Substantial Evidence And Otherwise In Accordance With Law ................................................... 31

IX.   Commerce's Determination That Certain Canadian Solar Affiliates Were Uncreditworthy In 2016 Is Supported By Substantial Evidence And Otherwise In Accordance With Law ............................................................................................... 36

X.   Commerce's Determination Of The Margin For Separate Rate Respondents Is Supported By Substantial Evidence And Otherwise In Accordance With Law ........ 40

CONCLUSION ..................................................................................................................... 40

## TABLE OF AUTHORITIES

### Cases

*Archer Daniels Midland Co. v. United States*,
  917 F. Supp. 3d 1331 (Ct. Int'l Trade 2013) ................................... 13, 38

*Atl. Sugar, Ltd. v. United States*,
  744 F.2d 1556 (Fed. Cir. 1984) ................................................................. 8

*Baroque Timber Indus. (Zhongshan) Co., Ltd. v. United States*,
  925 F. Supp. 2d 1332 (Ct. Int'l Trade 2013) .................................... 20, 21

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
  61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015) ...................................... 14, 15

*Canadian Solar Inc. v. United States*,
  2020 WL 898557 (Ct. Int'l Trade Feb. 25, 2020) (Slip Op. 20-23) ...... 23, 28, 29, 30
  2020 WL 6129754 (Ct. Int'l Trade Oct. 19, 2020) (Slip Op. 20-149) ...... 17, 18, 21, 26

*Changzhou Trina Solar Energy Co., Ltd. v. United States*,
  195 F. Supp. 3d 1334 (Ct. Int'l Trade 2016) ....................................... 11
  352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) (Slip Op. 18-166) ...... 10, 16, 21, 23, 25
  2019 WL 5856438 (Ct. Int'l Trade Nov. 8, 2019) (Slip Op. 19-137) ...... 13, 19, 23, 24
  466 F. Supp. 3d 1287 (Ct. Int'l Trade 2020) (Slip Op. 20-108) ...... 21, 26

*Clearon Corp. v. United States*,
  359 F. Supp. 3d 1344 (Ct. Int'l Trade 2019) ....................................... 11

*Consol. Edison Co. of New York v. NLRB*,
  305 U.S. 197 (1938) ..................................................................................... 8

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ..................................................................................... 8

*Essar Steel Ltd. v. United States*,
  678 F.3d 1268 (Fed. Cir. 2012) ....................................................... 19, 20, 31

*Fine Furniture (Shanghai) Ltd. v. United States*,
  748 F.3d 1365 (Fed. Cir. 2014) ............................................................... 15

*Guizhou Tyre Co., Ltd. v. United States,*
    348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) ........................................................ 11
    399 F. Supp. 3d 1346 (Ct. Int'l Trade 2019) .................................................. 11, 12

*Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States,*
    405 F. Supp. 3d 1317 (Ct. Int'l Trade 2019) ........................................................ 9

*KYD, Inc. v. United States,*
    607 F.3d 760 (Fed. Cir. 2010) ............................................................................ 15

*Maverick Tube Corp. v. United States,*
    857 F.3d 1353 (Fed. Cir. 2017) .................................................................... 15, 23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.,*
    463 U.S. 29 (1983) .............................................................................................. 23

*Mukand, Ltd. v. United States,*
    767 F.3d 1300 (Fed. Cir. 2014) .......................................................................... 12

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed Cir. 2006) ............................................................................. 8

*RZBC Grp. Shareholding Co. v. United States,*
    2016 WL 3880773 (Ct. Int'l Trade June 30, 2016) ............................................ 11

*Saarstahl AG v. United States,*
    984 F. Supp. 616 (Ct. Int'l Trade 1997), *aff'd in part and rev'd in part on other grounds*, 177
    F.3d 1314 (Fed. Cir. 1999) .................................................................................. 38

*SKF USA Inc. v. United States,*
    254 F.3d 1022 (Fed. Cir. 2001) ................................................................ 20, 23, 25

*United States v. Eurodif S.A.,*
    555 U.S. 305 (2009) .............................................................................................. 8

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951) ............................................................................................ 35

*Usinor v. United States,*
    342 F. Supp. 2d 1267 (Ct. Int'l Trade 2004) ...................................................... 35

*Yama Ribbons and Bows Co. v. United States,*
    419 F. Supp. 3d 1341 (Ct. Int'l Trade 2019) ...................................................... 12

**Statutes and Regulations**

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................................................. 8

19 U.S.C. § 1677(5) ............................................................................................................. 25

19 U.S.C. § 1677(5)(A) ....................................................................................................... 25

19 U.S.C. § 1677(5)(A)-(B) ................................................................................................. 16

19 U.S.C. § 1677(5)(E) ........................................................................................................ 19

19 U.S.C. § 1677(5A)(D)(iii)(I) ..................................................................................... 16, 17

19 U.S.C. § 1677(33) ........................................................................................................... 39

19 U.S.C. § 1677e ................................................................................................................ 30

19 U.S.C. § 1677e(b) .............................................................................................................. 9

19 U.S.C. § 1677m(d) .................................................................................................... 28, 30

19 C.F.R. § 351.102(b)(23) .................................................................................................. 39

19 C.F.R. § 351.307(d) ........................................................................................................ 14

19 C.F.R. § 351.308(c) ........................................................................................................... 9

19 C.F.R. § 351.502(b) ........................................................................................................ 16

19 C.F.R. § 351.505(a)(4) .................................................................................................... 38

19 C.F.R. § 351.505(a)(4)(i) .................................................................................... 36, 37, 38

19 C.F.R. § 351.505(a)(4)(i)(B)-(C) .................................................................................... 38

19 C.F.R. § 351.505(a)(4)(ii) ......................................................................................... 37, 38

19 C.F.R. § 351.511 ................................................................................................. 19, 22, 31

19 C.F.R. § 351.511(a)(2) .................................................................................................... 19

19 C.F.R. § 351.511(a)(2)(i) ............................................................................ 19, 20

19 C.F.R. § 351.511(a)(2)(ii) ........................................................................... 19, 33

19 C.F.R. § 351.511(a)(2)(iii) .......................................................................... 19, 20

19 C.F.R. § 351.525(a) ..................................................................................... 26

19 C.F.R. § 351.525(b)(6)(vi) .......................................................................... 39

## Other Authorities

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Final Affirmative Countervailing Duty Determination,*
    75 Fed. Reg. 59, 212 (Dep't Commerce Sept. 27, 2010) .......................................... 27

*Certain New Pheumatic Off-the-Road Tires from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2014,*
    82 Fed. Reg. 18,285 (Dep't Commerce Apr. 18, 2017) ........................................... 13

*Chlorinated Isocyamurates from the People's Republic of China: Final Affirmative Countervailing Duty Determinations; 2012,*
    79 Fed. Reg. 56,500 (Dep't Commerce Sept. 22, 2014) ........................................... 14

*Chlorinated Isocyamurates from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review; 2015,*
    82 Fed. Reg. 57,209 (Dep't Commerce Dec. 4, 2017) ........................................ 13,13

*Countervailing Duties,*
    63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1988) ...................................... 22, 23

*Countervailing Duty Investigation of 1,1,1,2 Tetraflouroethane from the People's Republic of China: Final Affirmative Countervailing Duty Determination,*
    79 Fed. Reg. 62,594 (Dep't Commerce Oct. 24, 2014) ........................................... 14

*Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination,*
    83 Fed. Reg. 9,274 (Dep't Commerce Mar. 5. 2018) ............................................. 27

*Countervailing Duty Investigation of Certain Amorphous Silica Fabric from the People's Republic of China: Final Affirmative Determination,*
    82 Fed. Reg. 8405 (Dep't Commerce Jan. 25, 2017) ............................................. 10

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China,*
    82 Fed. Reg. 32,678 (Dep't Commerce July 17, 2017) ........................................... 37

84 Fed. Reg. 5,051 (Dep't Commerce Feb. 20, 2019) ............................................................... 5

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review and Recission of Review, In Part; 2016,*
    84 Fed. Reg. 45,125 (Dep't Commerce August 28, 2019) (final results) .............................. 3, 5

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Results of Countervailing Duty Administrative Review; 2016,*
    84 Fed. Reg. 68,102 (Dep't Commerce Dec. 13, 2019) (amended final results) .................. 3, 5

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
    83 Fed. Reg. 8,058 (Dep't Commerce Feb. 23, 2018) ............................................................. 4

*Laminated Woven Sacks from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, in Part, of Critical Circumstances,*
    73 Fed. Reg. 35, 639 (Dep't Commerce June 24, 2008) .................................................. 31, 35

*Laminated Woven Sacks from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination; Preliminary Affirmative Determination of Critical Circumstances, in Part; and Alighment of Final Countervailing Duty Determination with Final Antidumping Duty Determination,*
    74 Fed. Reg. 67,893 (Dep't Commerce Dec. 3, 2007) ......................................................... 31

Uruguay Round Agreements Act, Statement of Administrative Action,
    H.R. Rep. No. 103-316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ...................... 16

USCIT R. 56.2 ............................................................................................................................... 1

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JANE A. RESTANI, SENIOR JUDGE

| | |
|---|---|
| CANADIAN SOLAR INC. *ET AL.*, ) | |
| ) | |
| Plaintiffs, and ) | |
| ) | |
| CHANGZHOU TRINA SOLAR ENERGY CO. ) | |
| LTD. *ET AL.*, ) | |
| ) | |
| Consolidated Plaintiffs, and ) | |
| ) | |
| JINKO SOLAR CO., LTD. *ET AL.*, ) | Consol. Court No. 19-00178 |
| ) | |
| Plaintiff-Intervenors, and ) | **PUBLIC VERSION** |
| ) | Business Proprietary Information |
| YINGLI GREEN ENERGY HOLDING CO., LTD. ) | Removed |
| *ET AL.*, ) | |
| ) | |
| Plaintiff-Intervenors, and ) | |
| ) | |
| SHANGHAI BYD CO., LTD., ) | |
| ) | |
| Plaintiff-Intervenor, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| SUNPOWER MANUFACTURING OREGON, ) | |
| LLC, ) | |
| ) | |
| Defendant-Intervenor. ) | |

## DEFENDANT'S RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States,

respectfully submits this response to the motions for judgment on the administrative record filed

by plaintiffs Canadian Solar Inc., Canadian Solar International, Ltd., Canadian Solar
Manufacturing (Luoyang) Inc., Canadian Solar Manufacturing (Changshu) Inc., CSI Cells Co.,
Ltd., CSI Solar Power (China) Inc., CSI Solar Power Group Co., Ltd., CSI Solartronics
(Changshu) Co., Ltd., CSI Solar Technologies Inc., CSI New Energy Holding Co., Ltd., CSI-
GCL Solar Manufacturing (Yancheng) Co., Ltd., Changshu Tegu New Materials Technology
Co., Ltd., Changshu Tlian Co., Ltd., Suzhou Sanysolar Materials Technology Co., Ltd., and
Canadian Solar (USA) Inc. (collectively, Canadian Solar), consolidated plaintiffs Changzhou
Trina Solar Energy Co., Ltd., Trina Solar (Changzhou) Science & Technology Co., Ltd.,
Changzhou Trina Solar Yabang Energy Co., Ltd., and Yancheng Trina Solar Energy Technology
Co., Ltd. (collectively, Trina), plaintiff-intervenors Jinko Solar Co., Ltd., Jinko Solar Import &
Export Co., Ltd., and Zhejiang Jinko Solar Co., Ltd. (collectively Jinko), plaintiff-intervenors
Yingli Green Energy Holding Co., Ltd., Baoding Tianwei Yingli New Energy Resources Co.,
Ltd., Tianjin Yingli New Energy Resources Co., Ltd., Hengshui Yingli New Energy Resources
Co., Ltd., Lixian Yingli New Energy Resources Co., Ltd., Baoding Jiasheng Photovoltaic
Technology Co., Ltd.; Beijing Tianneng Yingli New Energy Resources Co., Ltd., Hainan Yingli
New Energy Resources Co., Ltd.; Shenzhen Yingli New Energy Resources Co., Ltd., Yingli
Green Energy International Trading Co., Ltd., Yingli Green Energy Americas, Inc., and Yingli
Energy (China) Co., Ltd. (collectively "Yingli"), and plaintiff-intervenor Shanghai BYD Co.,
Ltd. ("Shanghai BYD").

In their motions, Trina, Canadian Solar, Jinko, Yingli, and Shanghai BYD challenge the
final results issued by the Department of Commerce in the fifth administrative review of the
countervailing duty order covering crystalline silicon photovoltaic cells, whether or not
assembled into modules (solar cells), from the People's Republic of China. As we explain

below, the claims of these respondents are not supported by the record facts or the law.
Accordingly, we respectfully request that the Court deny these motions and enter judgment for
the United States.

## STATEMENT PURSUANT TO RULE 56.2

### I.    Administrative Determination Under Review

The administrative determination at issue is Commerce's determination in *Crystalline
Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic
of China: Final Results of Countervailing Duty Administrative Review and Rescission of Review,
In Part; 2016*, 84 Fed. Reg. 45,125 (Dep't Commerce August 28, 2019) (final results) (P.R.
250),[1] and accompanying issues and decision memorandum (IDM) (P.R. 249), as amended by
*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the
People's Republic of China: Amended Final Results of Countervailing Duty Administrative
Review; 2016*, 84 Fed. Reg. 68,102 (Dep't of Commerce Dec. 13, 2019) (amended final results)
(P.R. 271).  The period of review is January 1, 2016, through December 31, 2016.

### II.    Statement Of The Issues

1.  Whether Commerce's application of facts available with an adverse inference to
determine that Canadian Solar and Jinko benefitted from the Export Buyer's Credit Program is
supported by substantial evidence and in accordance with law.

2.  Whether Commerce's finding of specificity for the less than adequate remuneration
(LTAR) program for aluminum extrusions is supported by substantial evidence and in
accordance with law.

---

[1]  Citations to public and confidential documents from the administrative record are identified as
"P.R. __" and "C.R.__," respectively.

3

3.   Whether the Court should grant Commerce's request for a voluntary remand to reconsider the benchmark for aluminum extrusions.

4.   Whether the Court should grant Commerce's request for a voluntary remand to reconsider the benchmark for polysilicon.

5.   Whether the Court should grant Commerce's request for a voluntary remand to reconsider the application of facts available with an adverse inference to the LTAR program for electricity.

6.   Whether Commerce's determination not to make an entered value adjustment to Canadian Solar's total sales is supported by substantial evidence and in accordance with law.

7.   Whether Commerce's determination of the benchmark for the LTAR program for land is supported by substantial evidence and in accordance with law.

8.   Whether Commerce's finding that certain Canadian Solar entities were uncreditworthy in 2016 is supported by substantial evidence and in accordance with law.

## STATEMENT OF FACTS

On February 23, 2018, Commerce initiated its fifth administrative review of the countervailing duty order on solar cells from China.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 83 Fed. Reg. 8,058 (Dep't of Commerce Feb. 23, 2018).  Commerce selected two mandatory respondents for individual examination:  Canadian Solar and Jinko.  *See* Respondent Selection Memo (P.R. 38).

On April 26, 2018, Commerce issued its initial questionnaire to the government of China, with instructions to forward the questionnaire to the respondent companies Canadian Solar and Jinko.  *See* Countervailing Duty Questionnaire.  On December 12, 2018, Commerce requested

4

additional information from the government of China, which the government of China timely provided on December 19, 2018 (P.R. 156).

On February 20, 2019, Commerce published the preliminary results of the administrative review. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 84 Fed. Reg. 5,051 (Dep't Commerce Feb. 20, 2019) (prelim. results of administrative review and intent to rescind in part), and accompanying issues and decision memorandum (P.R. 160) (PDM).

Following the submission and consideration of case briefs from interested parties, Commerce published the final results. In the final results, Commerce calculated a subsidy rate of 9.70 percent *ad valorem* for Canadian Solar and a subsidy rate of 12.76 percent *ad valorem* for Jinko. 84 Fed. Reg. at 45,126.

Commerce subsequently amended the final results to correct ministerial errors with respect to the calculation of the aluminum extrusions benchmark and the electricity benchmark for Jinko. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China*, 84 Fed. Reg. 68,102 (Dep't of Commerce Dec. 13, 2019) (amended final results). The correction of the ministerial errors reduced the subsidy rate for Jinko to 12.70 percent *ad valorem. Id.* Because Commerce relied on the subsidy rates of Canadian Solar and Jinko to calculate the rate for non-selected companies under review, Commerce corrected the rate for these companies from 11.81 percent *ad valorem* to 11.76 percent *ad valorem. Id.*

## SUMMARY OF THE ARGUMENT

Commerce's application of adverse facts available to find that respondents Canadian Solar and Jinko used the Export Buyer's Credit Program, based on the government of China's

failure to cooperate, is supported by substantial evidence and otherwise in accordance with law because Commerce is unable to verify claims of non-use without the requested information from the Chinese government. Information about the potential involvement of third-party banks and a full understanding of the administrative measures governing the program are necessary for Commerce to know what issues to examine in any attempt to verify. Without such information, Commerce determined that information was missing from the record because of the government of China's failure to cooperate, and appropriately relied on adverse facts available.

Commerce's specificity finding for the provision of aluminum extrusions is supported by substantial evidence because Commerce reasonably determined that aluminum extrusions are limited in use relative to the Chinese economy. Although Commerce acknowledged that aluminum extrusions are used by a wide variety of industries, Commerce explained that applications within those industries are limited.

Commerce reasonably determined not to make an entered value adjustment to Canadian Solar's total sales because Canadian Solar did not satisfy the established criteria for making such an adjustment. Because Canadian Solar did not demonstrate that there was a higher customs value for all of its U.S. sales through its affiliate, Commerce's denial of the adjustment is reasonable and consistent with its practice.

Commerce's determination of the benchmark for the LTAR program for land is supported by substantial evidence and in accordance with law. Commerce reasonably relied on data from Thailand for 2010 to determine the benchmark, rather than a more contemporaneous world market price for land, because Commerce considers geographic proximity and economic comparability to be important factors for selecting a land benchmark. Commerce explained that the average world market price included prices for countries not geographically close or

6

economically comparable to China.  Additionally, Commerce's resort to a tier three benchmark was not inconsistent with its regulations because Commerce explained that land not geographically close to China would not be available to a purchaser in China.

Commerce's determination that certain Canadian Solar affiliates were uncreditworthy for 2016 is supported by substantial evidence because it was based on an analysis of financial indicators.  Commerce reasonably found that commercial loans obtained by Canadian Solar affiliates were not dispositive evidence of creditworthiness because those affiliates were not within the cross-owned entity.

Finally, we respectfully request a voluntary remand for Commerce to reconsider the specificity finding for the provision of electricity and the benchmark determinations for aluminum extrusions and solar grade polysilicon.  This request is substantial and legitimate. There have been five administrative reviews of the countervailing duty order, and several of the issues raised in this review have been raised by the respondents in the prior reviews.  The Court has remanded the prior determinations of Commerce with respect to the specificity finding for the provision of electricity and the benchmark determinations for aluminum extrusions and solar grade polysilicon, and we respectfully request a voluntary remand in this case to allow Commerce to address the Court's prior concerns in the context of the record of this administrative review.

## ARGUMENT

### I.    Standard Of Review

This Court sustains any determination, finding, or conclusion by Commerce unless it is

"unsupported by substantial evidence on the record, or otherwise not in accordance with law."

19 U.S.C. § 1516a(b)(1)(B)(i); *United States v. Eurodif S. A.*, 555 U.S. 305, 316 n.6 (2009).

"Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229

(1938) (citation omitted).  Substantial evidence may also be "less than the weight of the

evidence, and the possibility of drawing two inconsistent conclusions from the evidence" upon

the record does not render Commerce's findings unsupported by substantial evidence. *Consolo

v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  Hence, a party challenging Commerce's

determination under the substantial evidence standard "has chosen a course with a high barrier to

reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation

and internal quotation marks omitted), and the Court sustains Commerce's factual determinations

as long as they are reasonable and supported by the record as a whole, even if some evidence

detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562-

63 (Fed. Cir. 1984) (citation omitted).

### II.   Commerce Lawfully Used Adverse Facts Available In Determining Whether Canadian Solar And Jinko Used The Export Buyer's Credit Program

Commerce decided, through the application of an adverse inference in selecting from

among the facts otherwise available, that respondents Canadian Solar and Jinko benefited from

the Export Buyer's Credit Program.  Canadian Solar and Jinko claim that Commerce's

8

determination was not supported by substantial evidence and not in accordance with law. *See* Canadian Solar Br. at 10-14; Jinko Br. at 9-12.

The Export Buyer's Credit Program, and Commerce's application of an adverse inference, has been the subject of much litigation in the Court. *See* Attachment A (reflecting undersigned counsel's research of this issue). The Court would be understandably fatigued by the recurrence of this issue. However, we must continue to defend the determination to ensure that all rights and arguments are preserved. For the following reasons, we respectfully request that the Court sustain Commerce's determination.

### A. Commerce Appropriately Applied An Adverse Inference As A Result Of The Government Of China's Failure To Cooperate

During a countervailing duty proceeding, Commerce may select a rate with which to countervail a subsidy program by applying an adverse inference from among the facts otherwise available when it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with {its} request for information." 19 U.S.C. § 1677e(b). When applying an adverse inference, Commerce may rely on information derived from any stage of the proceeding, including the petition, a final determination in the investigation, any previous review, or any other information placed on the record. 19 U.S.C. § 1677e(b); *see also* 19 C.F.R. § 351.308(c).

In the context of the Export Buyer's Credit Program, the Court has held that, "to apply an adverse inference that a cooperating party benefited from the {program} based on the GOC's failure to cooperate, Commerce must: (1) define the gap in the record by explaining exactly what information is missing from the record necessary to verify non-use; (2) establish how the withheld information creates this gap by explaining why the information the GOC refused to

9

give was necessary to verify claims of non-use; and (3) show that only the withheld information can fill the gap by explaining why other information, on the record or accessible by respondents, is insufficient or impossible to verify." *Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*, 405 F. Supp. 3d. 1317, 1333 (Ct. Int'l Trade 2019) (citing *Changzhou Trina Solar Energy Co., Ltd. v. United States*, 352 F. Supp. 3d 1316, 1326-27 (Ct. Int'l Trade 2018) (the litigation involving the third administrative review of the solar cells CVD order)).

In the final results, Commerce determined, through the application of an adverse inference in selecting from among the facts otherwise available, that Canadian Solar and Jinko used the Export Buyer's Credit Program. IDM at 38. Commerce applied an adverse inference because the Chinese government refused to provide requested information. *Id.* at 26-40.[2] Specifically, Commerce explained that, although the government of China provided the administrative measures for the Export Buyer's Credit Program that were implemented in 2000, record information indicates that the government of China revised the administrative measure in 2013, and under the revised measures the China Ex-Im Bank may disburse export buyer's credits directly or through third-party partner or correspondent banks. IDM at 28 (citing China Ex-Im Bank Additional Information (P.R. 149)). In addition to the information requested in the

---

[2]  Citing, among other authorities, Memorandum, "Administrative Review of the Countervailing Duty Order on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Placing Information on the Record: China Ex-Im Bank," dated December 12, 2018 (China Ex-Im Bank Additional Information) (P.R. 149); *Countervailing Duty Investigation of Certain Amorphous Silica Fabric from the People's Republic of China: Final Affirmative Determination*, 82 Fed. Reg. 8405 (Dep't Commerce Jan. 25, 2017) (*Silica Fabric Inv.*), and accompanying IDM at 12; PDM at 33-35; GOC June 19, 2018 Questionnaire Response at 69-70, 125-129 (P.R. 74), Exhibits II.F.1 and II.F.2 (P.R. 76); GOC Dec. 19, 2018 Questionnaire Response at 1 (P.R. 156); GOC December 12, 2018 Supplemental Questionnaire at 1 (P.R. 150); Canadian Solar's June 19, 2018 Questionnaire Response Vol. II at 30-31 (C.R. 26); and Jinko Solar's June 19, 2018 Questionnaire Response Vol. II at 27-29 (C.R. 101).

standard questions appendix, Commerce specifically requested the revised administrative measures from 2013, but the government of China did not provide them, claiming that, because the respondents did not use the program, the question was not applicable. *Id.* (citing GOC Dec. 19, 2018 Questionnaire Response at 1 (P.R. 156)). Commerce additionally requested a list of all partner/correspondent banks involved in the disbursement of funds under the program, to which the government of China provided the same response. *Id.*

As we have previously maintained, "only the {government of China}, and in particular the {China} Ex-Im {Bank}, could provide and verify the information needed to determine whether a benefit was conferred to Respondents during the {period of review} from the Export Buyer's Credit Program." *Changzhou Trina Solar Energy Co., Ltd. v. United States*, 195 F. Supp. 3d 1334, 1355 (Ct. Int'l Trade 2016). In addressing the verification of non-use of the Export Buyer's Credit Program in another review following the revision of the program guidelines in 2013, the Court has held that Commerce's finding of non-use, based on the failure of the Chinese government to respond to requests for access to information about the program at verification, was supported by record evidence. *See RZBC Grp. Shareholding Co. v. United States*, 2016 WL 3880773, *4-*6 (Ct. Int'l Trade June 30, 2016).

However, we recognize that, more frequently, the Court has set aside Commerce's determination as being unsupported by substantial evidence. *See, e.g., Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261 (Ct. Int'l Trade 2018) (finding a lack of substantial evidence to support the application of adverse inference regarding the Export Buyer's Credit Program); *Clearon Corp. v. United States*, 359 F. Supp. 3d 1344, 1355-60 (Ct. Int'l Trade 2019) (holding the application of adverse facts available to determine use and benefit was not supported by substantial evidence or in accordance with law); *Guizhou Tyre Co., Ltd. v. United States*, 399 F.

11

Supp. 3d 1346, 1349-53 (Ct. Int'l Trade 2019) (holding application of adverse facts available to determine use and benefit was unsupported by substantial evidence and contrary to law); *Yama Ribbons and Bows Co. v. United States*, 419 F. Supp. 3d 1341, 1345-56 (Ct. Int'l Trade 2019) (finding a lack of evidence in the record sufficient to support determination of use or benefit). *See also* Attachment A (reflecting undersigned counsel's research of this issue).

Canadian Solar and Jinko cite recent cases of this Court remanding Commerce's application of adverse facts available to the Export Buyer's Credit Program and Commerce's finding that non-use of the program is not verifiable. *See* Canadian Solar Br. at 13-14 (citing the Court's remand orders in the litigation involving the final results of the third and fourth administrative reviews of the countervailing duty order on solar cells); Jinko Br. at 14-21 (citing the same as well as several of the cases reflected in Attachment A).

Nevertheless, in this administrative review, record evidence shows that the Chinese government amended the program, and that it failed to provide the amendments that would permit Commerce to understand the functioning of the program after the amendments and to verify use. *See* China Ex-Im Bank Additional Information at Attachment 1 & 2 (Dec. 12, 2018) (P.R. 149). Thus, the Chinese government failed to cooperate by answering Commerce's questions, despite being the sole party in possession of such information, and therefore Commerce's application of an adverse inference in selecting from among the facts otherwise available was reasonable. *See Mukand, Ltd. v. United States*, 767 F.3d 1300, 1306-07 (Fed. Cir. 2014) (adverse inference warranted when "Commerce reasonably concluded that Mukand failed to cooperate to the best of its ability when responding to Commerce's requests for information"). Absent the requested information, the Chinese government's unsubstantiated claim that the companies did not use the Export Buyer's Credit Program was not verifiable. *See* IDM at 31-40.

Therefore, Commerce's appropriate applied an adverse inference as a result of the government of China's failure to cooperate.

**B.   Commerce Reasonably Determined, Through The Application Of Adverse Facts Available, That Canadian Solar And Jinko Used The Export Buyer's Credit Program**

Canadian Solar and Jinko argue that the use of adverse facts available to determine that the mandatory respondents both used and benefitted from the program is not warranted because each respondent offered certifications to the contrary. *See* Canadian Solar Br. at 12; Jinko Br. at 22. The Court has previously held that, "{i}n order to avoid unnecessarily impacting cooperating parties because of the GOC's failure to cooperate, Commerce needs to at least attempt to verify the certifications of non-use . . . ." *Changzhou Trina Solar Energy Co., Ltd. v. United States*, 2019 WL 5856438, \*4 (Ct. Int'l Trade Nov. 8, 2019) (Slip Op. 19-137 at 8-9, citing *Archer Daniels Midland Co. v. United States*, 917 F. Supp. 2d 1331, 1342 (Ct. Int'l Trade 2013) (noting that Commerce should "seek to avoid" adversely impacting a cooperating party)).

We respectfully maintain that Commerce found that not to be possible based on the record of this proceeding. As Commerce explained, the certifications were unverifiable as a result of the Chinese government's refusal to provide the necessary information regarding the Export Buyer's Credit Program and related third-party banks. *See* IDM at 33-38.[3] Commerce

---

[3] Citing, among other authorities, *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2014*, 82 Fed. Reg. 18,285 (Dep't Commerce Apr. 18, 2017), and accompanying IDM; GOC June 19, 2018 Questionnaire Response at 125-129 (P.R. 74); GOC Dec. 19, 2018 Questionnaire Response at 1 (P.R. 156); *Chlorinated Isocyanurates from the People's Republic of China: Preliminary Results of Countervailing Duty Administrative Review; 2015*, 82 Fed. Reg. 57,209 (Dep't Commerce Dec. 4, 2017), and accompanying PDM at 16-17; *Countervailing Duty Investigation of 1,1,1,2 Tetraflouroethane from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 79 Fed. Reg. 62,594 (Dep't Commerce Oct. 24, 2014), and accompanying IDM

explained its verification procedures and why the lack of information regarding the program

from the Chinese government rendered the program unverifiable. *Id.* For example, Commerce

stated,

> Without such explanation and evidence, it would be unreasonably
> onerous for Commerce to comb through the business activities of
> both Canadian Solar's and Jinko Solar's customers without any
> guidance as to how to simplify the process or any guidance as to
> which loans or banks to subject to scrutiny as part of a verification
> for each company. A careful verification of Canadian Solar's and
> Jinko Solar's customers' non-use of this program without
> understanding the identity of these correspondent banks would be
> unreasonably onerous, if not impossible. Because it does not know
> the identities of these banks, Commerce's second step of its typical
> non-use verification procedures (*i.e.*, examining the company's
> subledgers for references to the party making the financial
> contribution) could not by itself demonstrate that the U.S. customers
> did not use the program (*i.e.*, by examining whether there were any
> correspondent banks in the subledger). Nor could the second step be
> used to narrow down the company's lending to a subset of loans
> likely to be the export buyer's credits (*i.e.*, loans from the
> correspondent banks). Thus, verifying non-use of the program
> without knowledge of the correspondent banks would require
> Commerce to view the underlying documentation for *all* entries
> from the subledger *to attempt* to confirm the origin of each loan—
> *i.e.*, whether the loan was provided from the China Ex-Im Bank via
> an intermediary bank. This would be an unreasonably onerous
> undertaking for any company that received more than a small
> number of loans.

*Id.* at 33. The purpose of verification is "to verify the accuracy and completeness of submitted

factual information." 19 C.F.R. § 351.307(d). It is not a fact-finding mission. *Borusan*

*Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1349 (Ct. Int'l

Trade 2015), *aff'd*, *Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2017).

---

at 31; and *Chlorinated Isocyanurates From the People's Republic of China: Final Affirmative
Countervailing Duty Determination; 2012*, 79 Fed. Reg. 56,560 (Dep't Commerce Sept. 22,
2014), and accompanying IDM at 15.

Regarding the customer certifications of non-use, Commerce explained that "neither company explained in detail the steps they took to determine the non-use of the Export Buyer's Credit Program for their customers.  Rather, their responses (specifically Jinko Solar) hinged on their assertions with respect to the operation of the program – information which Commerce needed and sought directly from the GOC."  IDM at 32.  Therefore, because of the Chinese government's failure to provide information about the program, Commerce's limited understanding of the operation of the program did not permit Commerce to verify non-use, even with customer declarations.

We note that Commerce may apply an adverse inference based upon the Chinese government's failure to provide requested information in a countervailing duty proceeding even when the respondent cooperates.  *See, e.g.*, *KYD, Inc. v. United States,* 607 F.3d 760, 768 (Fed. Cir. 2010) (finding that a collateral impact on a cooperating party does not render the application of adverse inferences in a countervailing duty investigation improper); *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1371-73 (Fed. Cir. 2014) (affirming Commerce's application of adverse inferences when the government of China did not provide requested information despite the respondents' cooperation).

Accordingly, Commerce appropriately relied on adverse facts available to find that respondents used the Export Buyer's Credit Program because the Chinese government did not cooperate, and its lack of cooperation directly led to Commerce's inability to verify whether the program was used.  Therefore, Commerce's determination is supported by substantial evidence and otherwise in accordance with law.

15

**III.    Commerce's Specificity Finding For China's Provision Of Aluminum Extrusions Is Supported By Substantial Evidence And Otherwise In Accordance With Law**

To be countervailable, a subsidy must be, among other things, "specific." 19 U.S.C.

§ 1677(5)(A)-(B).  A subsidy will satisfy the specificity requirement when, among other factors,

"{t}he actual recipients of the subsidy, whether considered on an enterprise or industry basis, are

limited in number." 19 U.S.C. § 1677(5A)(D)(iii)(I).  Commerce "is not required to determine

whether there are shared characteristics among the enterprises or industries that are eligible for,

or actually receiv{ing}, a subsidy," 19 C.F.R. § 351.502(b), but rather Commerce reviews only

whether they are, in fact, "limited in number." 19 U.S.C. § 1677(5A)(D)(iii)(I).

In interpreting these requirements, the Court has held that Commerce must "compare the

industries receiving the subsidy to the industry makeup of the country at issue as a whole."

*Changzhou Trina Solar Energy Co., Ltd.*, 352 F. Supp. 3d at 1330 (Slip Op. 18-166 at 17).  "This

is a necessary step in the analysis in order to 'avoid the imposition of countervailing duties in

situations where, because of the widespread availability <u>and use</u> of a subsidy, the benefit of the

subsidy is spread throughout an economy.'"  *Id.* (emphasis in original, quoting Uruguay Round

Agreements Act, Statement of Administrative Action, H. R. Rep. No. 103-316, vol. 1, at 930–31

(1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4242)).

Commerce did so here.  In the final results, Commerce determined that China's less than

adequate remuneration program for aluminum extrusions is specific within the meaning of 19

U.S.C. § 1677(5A)(D)(iii)(I).  IDM at 45 (citing, in part, GOC June 19, 2018 Questionnaire

Response at 80 (P.R. 74); comment 3 from the IDM of the third administrative review of the

order; and Documents for the Record, dated February 12, 2019 (P.R. 215) at Attachment A).

Commerce explained that, although "the GOC indicates aluminum extrusions are used in

a variety of industries and sectors across China, we continue to find, consistent with the most

recently completed review, that the industries within those sectors that actually consume

aluminum extrusions are limited in number." *Id.* In conducting its analysis, Commerce

compared the uses of aluminum extrusions to the Chinese economy overall. As Commerce

explained:

> Despite being used in a variety of industries and sectors across
> China, we find the number and nature of the users (as identified by
> the GOC) are limited compared to the overall structure of the
> Chinese economy. The record of the instant review indicates that
> manufacturers in China produce at least the following products (the
> majority of which do not appear to use aluminum extrusions as an
> input): foods, beverages, tobacco, textiles, apparel, leather products,
> furniture, paper and paper products, recording media, articles for
> culture, education and sports activities, raw chemical materials and
> chemical products, medicines, chemical fibers, rubber, plastics,
> mineral products, and machinery for cultural activity and office
> work, and artwork.

IDM at 45 (citing Documents for the Record, dated February 12, 2019 (P.R. 215) at Attachment

A). Based on this analysis, Commerce reasonably concluded that "users of aluminum extrusions

do not make up something akin to the whole of the Chinese economy, and we continue to find

that the provision of aluminum extrusions for LTAR is *de facto* specific within the meaning of

{19 U.S.C. § 1677(5A)(D)(iii)(I)} because the actual recipients of the subsidy are limited in

number." IDM at 45-46 (citing same).

Notably, this Court sustained a similar analysis and finding of *de facto* specificity in the

prior two administrative reviews of the order. *See Changzhou Trina Solar Energy Co., Ltd. v.*

*United States*, 2019 WL 5856438, *5-*6 (Ct. Int'l Trade Nov. 8, 2019) (Slip Op. 19-137 at 10-

12, judicial review of the third administrative review); *Canadian Solar Inc. v. United States*,

17

2020 WL 6129754, *3-*4 (Ct. Int'l Trade Oct. 19, 2020) (Slip Op. 20-149 at 6-9, judicial review of the fourth administrative review).

Canadian Solar asserts that, in analyzing the industries that purchase aluminum extrusions, "Commerce relied on the {Chinese government's} response from the third administrative review where it set forth that 'six industries consum{ed} aluminum extrusions{.}'" Canadian Solar Br. at 15.  As the final results indicate, however, Commerce did not rely on the "six industries" to find specificity, but rather Commerce analyzed the actual users of aluminum extrusions, despite their use "in a variety of industries and sectors across China." *See* IDM at 45.  Therefore, Canadian Solar's arguments that the record has evolved and the Chinese government no longer included the information relied on by Commerce to find specificity are unconvincing.  Canadian Solar Br. at 16.  Commerce identified the record evidence that supported its analysis. *See* IDM at 45 (citing Documents for the Record, dated February 12, 2019 (P.R. 215) at Attachment A).

Also, despite Canadian Solar's arguments, Commerce did not "ignore the {Chinese government's} statements regarding the scope of the aluminum program." Canadian Solar Br. at 18.  As an initial matter, the government of China's statements that the uses of aluminum extrusions are "vast" and "not limited" are general conclusions, rather than evidence of how aluminum extrusions are used.  IDM at 45 (citing GOC June 19, 2018 Questionnaire Response at 80 (P.R. 74)).  Nevertheless, Commerce addressed these statements, explaining that "{t}he fact that the limited users reported by the GOC happen to be classified within varied sectors of the Chinese economy, while not entirely irrelevant, is not dispositive of whether a subsidy is specific; what matters most is whether or not the users can be considered something akin to the whole of the Chinese economy . . . ." IDM at 45.  Therefore, Commerce reasonably found the

users of aluminum extrusions limited compared to the Chinese economy based on the record

evidence of uses for aluminum within the economy. *See id.* at 45-46.

Because Commerce examined the record evidence and reasonably concluded that the

uses for aluminum extrusions are limited in comparison to the Chinese economy, Commerce's

determination is supported by substantial evidence and otherwise in accordance with law.

**IV.    We Respectfully Request A Remand For Commerce To Reconsider The Benchmark
For The Provision Of Aluminum Extrusions For LTAR**

In the final results, Commerce averaged two data sets, IHS Technology (IHS) and UN

Comtrade (Comtrade), for the benchmarks for aluminum extrusions.  IDM at 46.  When

considering whether a good or service has been provided "for less than adequate remuneration,"

and, thus, whether a benefit has been conferred, Commerce examines "prevailing market

conditions for the good or service being provided," including "price, quality, availability,

marketability, transportation, and other conditions of purchase or sale."  19 U.S.C. § 1677(5)(E).

Commerce measures the adequacy of remuneration by comparing the respondent's actual price

paid for an input to an adjusted benchmark figure that represents the market price for the good at

issue.  19 C.F.R. § 351.511(a)(2).

Commerce's regulations provide a framework for this analysis.  *See* 19 C.F.R. § 351.511.

As explained by the Court of Appeals for the Federal Circuit,

> Commerce's regulations set forth a three-tiered hierarchy to
> identify the appropriate benchmark. {*See* 19 C.F.R. § 351.511.}
> First, Commerce looks for a "tier 1" benchmark, an actual
> transaction price in the country in question, which may, in some
> cases, include sales by competitively-run government auctions.
> § 351.511(a)(2)(i).  If no such transactions exist, Commerce looks
> for a "tier 2" benchmark, a world market price for the goods in
> question.  § 351.511(a)(2)(ii).  If neither of those is available,
> Commerce measures the adequacy of the remuneration by
> assessing whether the price is consistent with market principles.

19

§ 351.511(a)(2)(iii).

*Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1273 (Fed. Cir. 2012).

As reflected by this hierarchy, Commerce prefers to derive a benchmark to measure the adequacy or remuneration for an input from market-determined prices in the country in question, 19 C.F.R. § 351.511(a)(2)(i)—in this case, the prices for aluminum extrusions in China. However, Commerce determined that the Chinese government involvement in the Chinese aluminum extrusion industry significantly distorts the prices in that industry. IDM at 46. As a result, consistent with the above framework, Commerce resorted to a "tier two" benchmark. IDM at 46. Commerce evaluated the data on the record and determined that it was appropriate to adjust and to use both the IHS and Comtrade datasets to calculate the aluminum extrusions benchmark. Thus, Commerce averaged the adjusted annual IHS world price data with the relevant monthly Comtrade world price data to derive a monthly benchmark price for the input. IDM at 46-47.

Canadian Solar argues that Commerce's decision to value the aluminum extrusions benchmark using the average of the IHS and Comtrade data is unsupported by substantial evidence. Canadian Solar Br. at 18-20. Canadian Solar claims that Commerce should have relied solely on IHS data, because of its specificity to aluminum extrusions used in the solar industry. *Id.*

We respectfully request a voluntary remand so that Commerce may reconsider its determination for this benchmark. Commerce "may request a remand, without confessing error, to reconsider its previous position." *SKF USA Inc. v. United States*, 254 F.3d 1022, 1028 (Fed. Cir. 2001). "{I}f the agency's concern is substantial and legitimate, a remand is usually appropriate." *Id.* at 1029. Commerce's concerns are substantial and legitimate when "(1)

20

Commerce supports its request with a compelling justification, (2) the need for finality does not outweigh the justification, and (3) the scope of the request is appropriate." *Baroque Timber Indus. (Zhongshan) Co., Ltd. v. United States*, 925 F. Supp. 2d 1332, 1338-39 (Ct. Int'l Trade 2013) (citation omitted).

The circumstances of our request meet this standard.  Respondents challenged this issue in the litigation challenging the prior two administrative reviews, and for the third administrative review, the Court held that "Commerce's decision to average the Comtrade and IHS datasets without properly considering whether the Comtrade data was too flawed to be probative of the world market price for the input at issue renders the decision unsupported by substantial evidence." *Changzhou Trina Solar Energy Co., Ltd.*, 352 F. Supp. 3d at 1332-33 (Slip Op. 18-166 at 22).  The Court remanded, with instructions to Commerce to either "use solely the IHS dataset in its calculation of the appropriate benchmark or else explain why the inclusion of the Comtrade data does not produce a fatally inaccurate result." *Id.*  Commerce requested a remand of the issue for the fourth administrative review in light of the Court's findings.

Commerce has reconsidered this issue pursuant to the Court's instructions in the prior reviews, and determined to use the IHS data exclusively to calculate the benchmark in the context of those proceedings.  Given these redeterminations, we respectfully request a voluntary remand in this case to also reconsider the benchmark for this proceeding.

We note that the final remand redeterminations for this issue in the third and fourth administrative reviews have been sustained by the Court. *See Changzhou Trina Solar Energy Co., Ltd. v. United States*, 466 F. Supp. 3d 1287, 1293-95 (Ct. Int'l Trade 2020) (Slip Op. 20-108 at pp. 9-10, judicial review of the third administrative review); *Canadian Solar Inc.*, 2020 WL 6129754, *4 (Slip Op. 20-149 at 9-10, judicial review of the fourth administrative review).

21

**V.    We Respectfully Request A Remand For Commerce To Reconsider Its Reliance On World Market Prices To Determine The Benchmark For Solar Grade Polysilicon**

As explained above, Commerce prefers to use market prices from actual transactions to identify the appropriate benchmark.  19 C.F.R. § 351.511.  However, when "actual transaction prices are significantly distorted as a result of {a} government's involvement in the market{,}" Commerce's practice is to "resort to the next alternative in the hierarchy" (*i.e.* a world market price).  *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,377 (Dep't Commerce Nov. 25, 1988) (final rule).

In this proceeding, Commerce declined to use the actual transactions of Canadian Solar, under tier one of the hierarchy, to measure the adequacy of remuneration for solar grade polysilicon.  IDM at 54-55.  Commerce determined, pursuant to the facts available, that China's intervention in China's solar grade polysilicon market leads to significantly distorted prices for solar grade polysilicon in China.  *Id.* (citing PDM at 19-20 and 23-29).  Instead, Commerce relied on tier two, *i.e.*, a simple average of world market solar grade polysilicon prices from Bloomberg, EnergyTrend, and Greentech Media.  *Id.* at 54.

Canadian Solar argues that resort to facts available was unlawful because Commerce did not consider data provided by the government of China related to the overall polysilicon market. Canadian Solar Br. at 38-40.  Canadian Solar further argues that Commerce's use of facts available was unlawful because Commerce inappropriately relied on outdated information and economic inferences, and Commerce had adequate information on the record in the form of Canadian Solar's reported polysilicon purchases as a tier-one benchmark source.  Canadian Solar Br. at 40-42.

Respondents have challenged Commerce's use of world market prices to determine the benchmark for solar grade polysilicon in several of the prior administrative reviews of the order.

22

During the judicial review of the final results of the third administrative review of the order, the Court remanded Commerce's analysis on two separate occasions. *Changzhou Trina Solar Energy Co., Ltd.*, 352 F. Supp. 3d at 1336-37 (Slip Op. 18-166 at 29-31), and 2019 WL 5856438, *9-*10 (Slip Op. 19-137 at 18-21). The record of this proceeding, and Commerce's explanation for its determination, is substantially similar to the record and explanation set forth in the first remand results issued in the third administrative review of the order. *See* first remand results at pp. 36-39 (Docket Entry No. 103-1, Court No. 17-00198). Upon judicial review of that segment, the Court held Commerce's analysis to be unsupportable. *Changzhou Trina Solar Energy Co., Ltd.*, 2019 WL 5856438, *9-*10 (Slip Op. 19-137 at 18-21).

The Court held that "Commerce 'must explain the evidence which is available, and must offer a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 42 (1983) (quotation and citation omitted)); *see also Canadian Solar Inc. v. United States,* 2020 WL 898557, *3 (Ct. Int'l Trade Feb. 25, 2020) (Slip Op. 20-23 at 6-7, holding the same for the final results of the fourth administrative review of the order). The Court observed that, "unless a 'government provider constitutes a majority, or in certain circumstances, a substantial portion of the market,' the effect on the market will normally be minimal." *Id.* (quoting *Preamble*; *Countervailing Duties*; *Final Rule*, 63 Fed. Reg. 65,348, 65,377 (Dep't Commerce Nov. 25, 1998), and citing *Maverick*, 857 F.3d at 1362).

Given the Court's prior instructions, we respectfully request a voluntary remand for Commerce to reconsider its use of world market prices to determine the benchmark for solar grade polysilicon in the context of this proceeding. Our request for a voluntary remand in this case is "substantial and legitimate," *SKF USA Inc.*, 254 F.3d at 1029, because it will allow

Commerce to similarly reconsider the issue for this proceeding, particularly in light of the

Court's prior instructions. *Changzhou Trina Solar Energy Co., Ltd.*, 2019 WL 5856438, *9-*10

(Slip Op. 19-137 at 18-21).

**VI.  We Respectfully Request A Remand For Commerce To Reconsider Its Application Of Facts Available With An Adverse Inference For The Finding Of Specificity For The Electricity For LTAR Program**

In the final results, Commerce decided to apply an adverse inference in the calculation of

the subsidy for the electricity for LTAR program.  IDM at 50-53.  Commerce requested

information regarding the roles of provinces, the National Development and Reform

Commission (NDRC), and cooperation between the provinces and the NDRC in electricity price

adjustments.  Commerce explained that it specifically requested:

> Provincial Price Proposals for the province in which mandatory respondents or any companies "cross-owned" with those respondents are located for applicable tariff schedules that were in effect during the POR; all original NDRC Electricity Price Adjustment Notice(s) that were in effect during the POR; the procedure for adjusting retail electricity tariffs and the role of the NDRC and the provincial governments in this process; the price adjustment conferences that took place between the NDRC and the provinces, grids and power companies with respect to the creation of all tariff schedules that were applicable to the POR; the cost elements and adjustments that were discussed between the provinces and the NDRC in the price adjustment conferences; and how the NDRC determines that the provincial-level price bureaus have accurately reported all relevant cost elements in their price proposals with respect to generation, transmission and distribution.

IDM at 50-51 (citing PDM at 297).

The government of China did not adequately respond to these questions.  *Id.* at 51.

Commerce found that, "{w}hile the GOC provided numerous documents, none of these

documents are helpful in understanding why, exactly, prices vary, nor are they otherwise helpful

in understanding whether preferential prices might be limited to certain industries or

enterprises." *Id.* Consequently, Commerce applied an adverse inference and, for each reported electrical category, it selected the highest rates from the provincial electrical tariff schedules provided by the Chinese government as the benchmarks for the benefit calculations. *Id.* at 51-52

Canadian Solar challenges Commerce's application of an adverse inference.  Commerce may only countervail a program that is specific, *see* 19 U.S.C. § 1677(5), (5A), and Canadian Solar argues that, for the electricity for LTAR program, Commerce improperly relied on adverse facts available to find specificity.  Canadian Solar Br. at 22-31.

We respectfully request a voluntary remand of this issue.  Respondents challenged this issue in the litigation involving the prior two administrative reviews, and the Court held that Commerce "failed to explain the particular facts as to which it was it was drawing an adverse inference and how that analysis subsequently results in a finding of specificity under one of the criteria listed in 19 U.S.C. § 1677(5A)." *Changzhou Trina Solar Energy Co., Ltd.*, 352 F. Supp. 3d at 1341-42 (Slip Op. 18-166 at 38-39, first order remanding the final results of the third administrative review).  The Court remanded the issue with instructions to Commerce to "engage in an analysis of the information on the record and explain how adverse inferences lead to the conclusion that the provision of electricity in China is a countervailable subsidy." *Id.* at 1342. On remand for the prior reviews, Commerce reconsidered the basis for its specificity determination.

Our request for a voluntary remand in this case is "substantial and legitimate." *SKF USA Inc.*, 254 F.3d at 1029.  Commerce's explanation on the record in this proceeding predates Commerce's remand redeterminations in the prior two administrative reviews and is similar to the explanations previously remanded by this Court.  Consequently, we respectfully request a

25

voluntary remand to reconsider this issue in light of the Court's instructions from the prior administrative reviews.

We note that the Court has sustained the final remand redeterminations for this issue in the litigation involving the third and fourth administrative reviews. *See Changzhou Trina Solar Energy Co., Ltd.*, 466 F. Supp. 3d at 1299-1303 (Slip Op. 20-108 at 18-25); *Canadian Solar Inc.*, 2020 WL 6129754, *4-*5 (Slip Op. 20-149 at 10-13).

## VII.   Commerce's Determination Not To Make An Entered Value Adjustment To Canadian Solar's Total Sales Is Supported By Substantial Evidence And In Accordance With Law

In the final results, Commerce determined not to make the entered value adjustment requested by Canadian Solar for its sales through an affiliated company. *See* IDM at 75.  As Commerce explained, "Commerce's practice is to use the FOB sales value for the denominator in its subsidy calculations." *Id.* (citing 19 C.F.R. § 351.525(a)[4]).  "However, in limited circumstances, Commerce has adjusted the calculation of the subsidy rate when the sales value used to calculate that subsidy rate does not match the entered value of the subject merchandise, *e.g.*, where subject merchandise is exported to the United States with a mark-up from an affiliated company, and where the respondent can demonstrate that: 1) the price on which the

---

[4]  19 C.F.R. § 351.525(a) provides, "Calculation of ad valorem subsidy rate.  The Secretary will calculate an ad valorem subsidy rate by dividing the amount of the benefit allocated to the period of investigation or review by the sales value during the same period of the product or products to which the Secretary attributes the subsidy under paragraph (b) of this section.  Normally, the Secretary will determine the sales value of a product on an f.o.b. (port) basis (if the product is exported) or on an f.o.b. (factory) basis (if the product is sold for domestic consumption).  However, if the Secretary determines that countervailable subsidies are provided with respect to the movement of a product from the port or factory to the place of destination (e.g., freight or insurance costs are subsidized), the Secretary may make appropriate adjustments to the sales value used in the denominator."

26

alleged subsidy is based differs from the U.S. invoiced price; 2) the exporters and the party that invoices the customer are affiliated; 3) the U.S. invoice establishes the customs value to which the CVD duties are applied; 4) there is a one-to-one correlation between the invoice that reflects the price on which subsidies are received and the invoice with the mark-up that accompanies the shipment; 5) the merchandise is shipped directly to the United States; and 6) the invoices can be tracked as back-to-back invoices that are identical except for price." *Id.*[5]

These criteria ensure "that the sales value adjustment properly reflects an upward adjustment to the sales value of all merchandise that entered the United States, and on which Customs and Border Protection assessed dutiable value." *Id.* Consistent with this practice, Commerce denied Canadian Solar the adjustment because Canadian Solar did not demonstrate that there was a higher customs value for all of its U.S. sales through its affiliate. *Id.*

Canadian Solar does not deny that the record fails to show that the customs value was higher for each sale made through its affiliate. Rather, it argues that Commerce was wrong to impose such a requirement because Canadian Solar demonstrated a higher overall value for its affiliate's resales. Canadian Solar Br. at 47-49. Canadian Solar asserts that the total sales value includes a markup, and therefore granting an entered value adjustment on such sales is consistent with the purpose of the entered value adjustment to ensure that the value of the goods sold aligns with subsidies received during production. *Id.* at 48-49. Lastly, Canadian Solar argues that, if

---

[5] Citing as examples, *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59,212 (Dep't Commerce Sept. 27, 2010), and accompanying decision memorandum at comment 32; and *Countervailing Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 9,274 (Dep't Commerce Mar. 5, 2018) (*Aluminum Foil from China*), and accompanying decision memorandum at comment 14.

Canadian Solar's entered value adjustment request was deficient, Commerce was required to notify Canadian Solar of the deficiency, consistent with 19 U.S.C. § 1677m(d).  These arguments are unconvincing.

This Court addressed Commerce's decision not to grant Canadian Solar an entered value adjustment for the prior administrative review.  In sustaining Commerce's denial of the adjustment, the Court observed that, "{a}lthough Canadian Solar asks for an {entered value adjustment} on <u>all</u> of its sales through its affiliate {}, it has not proved that in the aggregate all sales entered into the United States include a mark-up." *Canadian Solar Inc.,* 2020 WL 898557, *8 (Slip Op. 20-23 at 20, emphasis in original).  The Court stated that "Commerce is understandably focused on limiting an {entered value adjustment} to the mark-up experienced on U.S. entries as an {entered value adjustment} is granted to avoid overcollection, which has the potential to occur only when Customs assesses duties on merchandise that enters the United States." *Id.*  Further, the Court found that the sample invoice submitted by Canadian Solar demonstrated a lower percentage mark-up than the percentage based on the raw aggregate amounts. *Id.* at *9 (Slip Op. 20-23 at 20).  The Court found that "Canadian Solar may well be correct that a sample invoice could suffice to demonstrate this 'one-to-one' requirement, but here Canadian Solar seeks a mark-up that is not demonstrated to be applied consistently.  Thus, logically a single sample does not suffice." *Id.*

Canadian Solar's assertion that the facts here are distinguishable from those in the prior review is not supported by the record.  As in the prior review, Canadian Solar has failed to demonstrate that the overall mark-up to its export sales reflects a mark-up on its U.S. export sales.

Specifically, Canadian Solar reported that [

]. Canadian Solar's June 19, 2018 Questionnaire Response Vol. II at 9 (C.R. 26). Similar

to the record of the fourth administrative review, the record of this review shows again that

Canadian Solar's U.S. sales through its affiliate [

]. *Compare* Canadian Solar's June 19, 2018

Questionnaire Response Vol. II at 10 (C.R. 26) (requesting an EVA based on the difference

between total sales of all merchandise to [        ] and the total corresponding resales of all

merchandise via [        ]), *with* Canadian Solar Amended Final Calculations (C.R. 345) at

Denominators (showing that, for each of the companies included in Canadian Solar's EVA

request, the [                                                              ], for

example, [                                              ]).  Therefore, similar to the prior

administrative review, "it is possible that the entered value of merchandise to the U.S. was not

higher than the total value of that merchandise assessed prior to any mark-up." *Canadian Solar*

*Inc.,* 2020 WL 898557, *8 (Slip Op. 20-23 at 20).  For example, the overall entered value of

Canadian Solar's U.S. sales could have been marked down, but when combined with marked up

sales to other markets the aggregate sales value could still show a markup.

Moreover, also consistent with the prior review, the single sample invoice and

corresponding customs form submitted by Canadian Solar demonstrates a lower percentage

mark-up than the percentage based on the raw aggregate amounts. *Compare* Canadian Solar's

June 19, 2018 Questionnaire Response Vol. II at Exhibit 8.2 (C.R. 27) (showing a mark-up from

[                                    ]) *with* Canadian Solar's June 19, 2018 Questionnaire Response Vol. II

at 10 (C.R. 26) (showing an overall mark-up from [

]).  As Commerce explained, the reason for Commerce requiring that a respondent meet

29

the six criteria is to ensure that the sales value adjustment properly reflects an upward adjustment

to the sales value for all merchandise that entered the United States.  IDM at 75.  In this case,

because Canadian Solar has submitted only one sample invoice, Commerce reasonably found

that "Canadian Solar has not demonstrated that there is a higher customs value for all of its U.S.

sales."  *Id.*; *see also Canadian Solar Inc.,* 2020 WL 898557, *9 (Slip Op. 20-23 at 20, "logically

a single sample does not suffice.").

      Regarding Canadian Solar's assertion that Commerce was required to seek additional

information from Canadian Solar if Commerce found Canadian Solar's explanation deficient,

Canadian Solar Br. at 51, Commerce correctly explained that 19 U.S.C. § 1677m(d) applies to

requests for information by Commerce, and Commerce did not request the information

concerning the entered value adjustment.  *See* IDM at 75-76.  Moreover, 19 U.S.C. § 1677m(d)

moderates Commerce's application of facts available and adverse inferences.  *See* 19 U.S.C.

§ 1677e (providing that Commerce shall use the facts otherwise available "subject to {19 U.S.C.

§ 1677m(d)").  Here, Commerce is not resorting to the facts available, it is simply finding that

Canadian Solar has not demonstrated that an entered value adjustment is appropriate based on

the information offered by Canadian Solar.  Accordingly, Canadian Solar's argument is not

supported by the law.

      For these reasons, Commerce's determination not to make an entered value adjustment to

Canadian Solar's total sales is supported by substantial evidence and otherwise in accordance

with law.

## VIII.  Commerce's Determination Of The Benchmark For Land Is Supported By Substantial Evidence And Otherwise In Accordance With Law

Commerce has an established hierarchy it uses when selecting among information to value benchmarks.  *See* 19 C.F.R. § 351.511; *Essar Steel Ltd.*, 678 F.3d at 1273.  Commerce does not rely on the use of tier one or tier two benchmarks to assess the benefits from the provision of land for LTAR in China.  IDM at 58-59; PDM 17-18.[6]  Commerce has determined that no usable tier one land benchmarks exist for China because Chinese land prices are distorted by the significant government role in the market.  *Id.*  Commerce has also explained that tier two benchmarks (*i.e.*, world market prices) are generally not appropriate to value land.  *Id.*

In 2018, Commerce completed a memorandum analyzing developments in China's land market since 2007.  PDM at 17-18 (citing Memorandum, "Benchmark Analysis of the Government Provision of Land-Use Rights in China for Countervailing Duty Purposes," dated October 2, 2018 (Land Benchmark Analysis Memorandum) (P.R. 216)).  "The Land Benchmark Analysis was prepared to assess the continued application of Commerce's land for LTAR benchmark methodology, as established in 2007 in *Sacks from China*."  *Id.*

As explained by Commerce in the Land Benchmark Analysis Memorandum,

> although reforms in China's land markets have improved the use-rights of some landholders, such improvements have not been comprehensive, and reforms have been implemented on an *ad hoc* basis.  The reforms to date have not addressed the fundamental institutional factors that underlie the Chinese government's

---

[6]  Citing, *e.g.*, *Laminated Woven Sacks from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination; Preliminary Affirmative Determination of Critical Circumstances, In Part; and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination*, 74 Fed. Reg. 67,893, 67,906-08 (Dep't Commerce Dec. 3, 2007), unchanged in *Laminated Woven Sacks from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, in Part, of Critical Circumstances*, 73 Fed. Reg. 35,639 (Dep't Commerce June 24, 2008) (*Sacks from China*)).

> monopoly control over land-use, which precludes landholders from
> putting their land to its best use and realizing the market value of
> their landholdings.  The GOC still owns all land in China, and
> exercises direct control over the sale of land-use rights and land
> pricing in the primary market and indirect control in the secondary
> market.

PDM at 18 (citing Land Benchmark Analysis Memorandum at 2 (P.R. 216)).

As a result, Commerce determined that it cannot use any first-tier, domestic Chinese land

prices for benchmarking purposes.  PDM at 18; IDM at 58.  Commerce also determined that it

cannot use second-tier world market prices as a benchmark because land is "generally not

simultaneously 'available to an in-country purchaser' while located and sold out-of-country on

the world market{.}"  IDM at 59 (citing Land Benchmark Analysis Memorandum at 27 (P.R.

216)).  In other words, land is unlike other products for which a world market price generally

indicates a price at which the products are available to a given purchaser.

Therefore, Commerce uses third-tier external benchmarks to value land.  *See* Land

Benchmark Analysis Memorandum at 30 (P.R. 216).  Under the tier three framework, Commerce

considers two important factors in determining whether a country's land prices are a suitable

benchmark: (1) the country's geographical proximity to China, and (2) its level of economic

development compared to China.  IDM at 59 (citing Land Benchmark Analysis Memorandum at

30 (P.R. 216)).  Here, consistent with other countervailing duty proceedings involving China,

Commerce relied on benchmark information from "Asian Marketview Reports" by CB Richard

Ellis (CBRE) for Thailand 2010.  PDM at 18-19; IDM at 58.  Commerce stated that, "this

benchmark, appropriately indexed, is a suitable benchmark for valuing land in China after

considering a number of factors, such as national income levels, population density, and

producers' perceptions that Thailand is a reasonable alternative to China as a location for Asian
production." IDM at 58 (citing PDM at 17-19).

Finally, Commerce addressed Canadian Solar's proposed land benchmark: data from
CBRE Research for rents in various major cities around the world. *See* Canadian Solar's Letter,
"Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the
People's Republic of China: Benchmark Submission," dated November 5, 2018, at p. 3 and
Exhibit 5 (P.R. 107-108). Commerce explained that Canadian Solar's proposed benchmark
"contains world market prices from locations such as, *e.g.*, Warsaw, Poland; Stockholm,
Sweden; and Atlanta, Georgia." IDM at 59 (citing P.R. 107-108 at Ex. 5). Commerce found that
such locations "are not reasonable alternatives to China as locations for Asian production." *Id.*
Commerce further explained that Canadian Solar's submission did not include data that would
allow Commerce to evaluate such locations' economic comparability to China. *Id.*

Canadian Solar asserts that Commerce failed to follow its hierarchy in selecting the data
from Thailand over Canadian Solar's world market data. The record shows otherwise.
Regarding the second tier of Commerce's benchmark hierarchy, Commerce's regulations
provide that Commerce "will seek to measure the adequacy of remuneration by comparing the
government price to a world market price where it is reasonable to conclude that such price
would be available to purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii).
Therefore, it was entirely consistent with Commerce's hierarchy not to rely on a tier two
benchmark comprised of land prices for locations that "are not reasonable alternatives to China
as locations for Asian production." *See* IDM at 59.

Canadian Solar asserts that Commerce's reasoning is flawed because land in Thailand is
also not available to a purchaser in China. Canadian Solar Br. at 34. However, this argument

33

overlooks the progression of the hierarchy. Commerce used the Thailand data as a *third tier* benchmark source. It is not inconsistent for Commerce to find the world market prices unusable as tier two benchmarks because they are not available to a purchaser in China, while relying on the Thai benchmark under tier three because of a variety of factors including national income levels and geographic proximity. *See* IDM at 58; Land Benchmark Analysis Memorandum at 30 (P.R. 216). Canadian Solar's argument ignores these factors of Commerce's analysis. As Commerce explained, "{c}onsideration of geographic proximity to China reflects the fact that many countries near China compete as production and export platforms for foreign direct investment, and land cost is one important factor investors consider." Land Benchmark Analysis Memorandum at 30 (P.R. 216). Therefore, Commerce's analysis is reasonably supported by the law and the record.

Canadian Solar argues that Commerce's analysis is flawed because Commerce explained that the CBRE reports do not include data allowing Commerce to evaluate the locations' economic comparability to China. Canadian Solar Br. at 34. Canadian Solar asserts that this explanation is "nonsensical" because two of the countries contained in the report, Mexico and Brazil, are also included in the surrogate country list for China that Commerce provides in antidumping duty cases. *Id.* This argument is misguided. First, the framework for selecting a surrogate value in an antidumping duty proceeding is not applicable to the framework for selecting a benchmark in a countervailing duty proceeding. Second, Canadian Solar is asking Commerce to use the average of the world market data. Therefore, even assuming Mexico and Brazil are comparable economically, the proposed benchmark would include data for other countries, and the record lacks the economic data for Commerce to conduct the analysis.

34

Moreover, Canadian Solar fails to address Commerce's consideration of geographic proximity nor does it argue that geographic proximity is an inappropriate factor to consider. Neither Mexico nor Brazil are geographically proximate to China such that they would be reasonable alternatives to China as a location for Asian production.

Canadian Solar argues that the Thai data from 2010 are "fatally outdated." Canadian Solar Br. at 35. It further asserts that Commerce's decision was "arbitrary and capricious" because during the investigation of *Sacks from China*, Commerce relied on information that was dated one year from the period of investigation. *Id.* This argument, however, fails to show any error in Commerce's analysis. Commerce explained that it intends to follow the *methodology* used in *Sacks from China*, which included consideration of economic comparability, geographic proximity, and other factors. *See* Land Benchmark Analysis Memorandum at 30 (P.R. 216). Although Commerce generally prefers more contemporaneous data, Commerce explained its consideration of other factors, such as national income levels, population density, and producers' perceptions that Thailand is a reasonable alternative to China as a location for Asian production. IDM at 58 (citing PDM at 17-19).

Under the substantial evidence standard of review, the Court may not "displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) (emphasis in original). Thus, the Court "may not reweigh the evidence or substitute its own judgment for that of the agency." *Usinor v. United States*, 342 F. Supp. 2d 1267, 1272 (Ct. Int'l Trade 2004) (citation omitted). Consequently, Commerce's decision to afford greater significance to economic comparability, geographic proximity, and other factors is reasonable.

Moreover, Commerce addressed the contemporaneity of the data by using a consumer price index to inflate the Thai data for the period of review. *See* IDM at 58 ("{T}his benchmark, appropriately indexed, is a suitable benchmark for valuing land in China . . . ."). Canadian Solar challenges this indexing, arguing that it introduces distortion. Canadian Solar Br. at 36-37. This argument is again misplaced. Canadian Solar fails to identify any evidence showing that changes in land prices are out of step with the overall price changes reflected in the consumer price index. *Id.* Because there is no record evidence showing the "calculation bloat" alleged by Canadian Solar, there is no basis to conclude that inflating the Thai land prices renders them unusable. *Id.*

Because Commerce reasonably explained its decision to rely on the tier three benchmark data from Thailand, including why Commerce found Canadian Solar's tier two benchmark inappropriate, Commerce's determination is supported by substantial evidence and otherwise in accordance with law.

## IX.    Commerce's Determination That Certain Canadian Solar Affiliates Were Uncreditworthy In 2016 Is Supported By Substantial Evidence And Otherwise In Accordance With Law

Commerce found five of Canadian Solar's cross-owned affiliates (CS Luoyang; CSI Cells CSI Solar Power; CSI New Energy; and CSI Yancheng) to be uncreditworthy for 2016. Commerce based its finding on an analysis of Canadian Solar's financial indicators, comparing its current and quick ratios to Commerce's typical benchmarks for these ratios. IDM at 67. Commerce also reviewed Canadian Solar's cash flows for 2016. Based on these factors, Commerce concluded that Canadian Solar was uncreditworthy during 2016. *Id.* at 67-68.

Pursuant to 19 C.F.R. § 351.505(a)(4)(i), Commerce "will consider a firm to be uncreditworthy if {Commerce} determines that, based on information available at the time of the

government-provided loan, the firm could not have obtained long-term loans from conventional

commercial sources."  *Id.*  In making the creditworthiness determination, Commerce may

examine, among other factors, the following:

> (A) The receipt by the firm of comparable commercial long-term
> loans;
> (B) The present and past financial health of the firm, as reflected in
> various financial indicators calculated from the firm's financial
> statements and accounts;
> (C) The firm's recent past and present ability to meet its costs and
> fixed financial obligations with its cash flow; and
> (D) Evidence of the firm's future financial position, such as market
> studies, country and industry economic forecasts, and project and
> loan appraisals prepared prior to the agreement between the lender
> and the firm on the terms of the loan.

19 C.F.R. § 351.505(a)(4)(i).

Pursuant to 19 C.F.R. § 351.505(a)(4)(ii), "the receipt by the firm of comparable long-

term commercial loans, unaccompanied by a government-provided guarantee, will normally

constitute dispositive evidence that the firm is not uncreditworthy."

Canadian Solar argues that Commerce should have found Canadian Solar creditworthy

because of commercial long-term loans made to Canadian Solar affiliates in 2016.  Canadian

Solar Br. at 43-45.  Commerce considered this evidence, but ultimately concluded otherwise.

Commerce explained that, based on its past practice, it "cannot rely on these loans to

demonstrate the creditworthiness of Canadian Solar as they were not issued to companies within

the cross-owned entity."  IDM at 67 (citing *Crystalline Silicon Photovoltaic Cells, Whether or*

*Not Assembled Into Modules, From the People's Republic of China*, 82 Fed. Red. 32,678 (Dep't

Commerce July 17, 2017), and accompanying issues and decision memorandum at 44).

Commerce further explained that, "Canadian Solar did not provide any credit rating reports for

2016 for us to consider, so {it} must analyze the company's reported financial indicators as

37

calculated from its financial statements and accounts." IDM at 67 (citing Canadian Solar's

March 26, 2019 Questionnaire Response at Exhibit 2 (C.R. 283), and 19 C.F.R.

§ 351.505(a)(4)(i)(B)-(C)).

      Canadian Solar acknowledges that the loans [

               ], but argues that [

                    ].

Canadian Solar Br. at 44.  Canadian Solar states that 19 C.F.R. § 351.505(a)(4), "does not

specify that the loan must be received by the actual entity under review, and not another related

affiliate, for that entity to be found creditworthy."  Canadian Solar Br. at 45.

      Although the financial health of affiliates may be relevant in certain limited

circumstances, such as when a respondent is a newly-founded company, *see, e.g.*, *Archer*

*Daniels Midland Co. v. United States*, 917 F. Supp. 2d 1331, 1349 (Ct. Int'l Trade 2013), those

circumstances are not present in this proceeding.  Here, consistent with its prior practice,

Commerce focused on whether the loans were issued to companies within the cross-owned

entity.  The record shows that they were not.  "As the regulatory language makes clear,

Commerce has 'flexibility and discretion in determining which factors to consider and weigh in

making its creditworthiness decision.'"  *Archer Daniels Midland Co.*, 917 F. Supp. 2d at 1345

(quoting *Saarstahl AG v. United States*, 984 F. Supp. 616, 620 (Ct. Int'l Trade 1997), *aff'd in*

*part and rev'd in part on other grounds*, 177 F.3d 1314 (Fed. Cir. 1999)).

      Commerce's determination is consistent with its regulation, which provides that

Commerce may consider "comparable long-term commercial loans" to "the firm."  19 C.F.R.

§ 351.505(a)(4)(i) and (ii).  The term "firm" is defined as "the *recipient* of an alleged

countervailable subsidy, including any individual, company, partnership, corporation, joint

venture, association, organization, or other entity." 19 C.F.R. § 351.102(b)(23) (emphasis

added). Consistent with this definition, Commerce viewed the "firm," for purposes of

determining the creditworthiness of Canadian Solar, as the companies within the cross-owned

entity under review.

      Affiliation and cross-ownership are two separate concepts. "Affiliated" or "affiliated

persons" is defined as:

> (A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.
> (B) Any officer or director of an organization and such organization.
> (C) Partners.
> (D) Employer and employee.
> (E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.
> (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.
> (G) Any person who controls any other person and such other person.
>
> For purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.

19 U.S.C. § 1677(33).

      Comparatively, cross-ownership "between two or more corporations" exists "where one

corporation can use or direct the individual assets of the other corporation(s) in essentially the

same ways it can use its own assets." 19 C.F.R. § 351.525(b)(6)(vi) (definition of cross-

ownership). Therefore, it is reasonable for Commerce to view loans received by an *affiliate* as

not being dispositive of whether all companies in the potentially broad web of affiliated

companies are creditworthy.

Canadian Solar speculates that a bank would not issue a loan to an affiliate if the bank has concerns about the creditworthiness of the overall entity, but ultimately provides no authority or record evidence to support the assertion. Canadian Solar Br. at 45. .

For these reasons, Commerce's creditworthiness determination is supported by substantial evidence and otherwise in accordance with law.

## X.    Commerce's Determination Of The Margin For Separate Rate Respondents Is Supported By Substantial Evidence And Otherwise In Accordance With Law

Trina and Shanghai BYD, separate rate respondents in the administrative review, adopt the arguments advanced by Canadian Solar and Jinko. Trina Br. at 9-11; Shanghai BYD Br. at 9-12. Yingli, also a separate rate respondent, adopts the arguments advanced by Canadian Solar. Yingli Br. at 2. As discussed above, Commerce's determinations with respect to Canadian Solar and Jinko are supported by substantial evidence and in accordance with law. Nevertheless, in the event a remand results in changes to Canadian Solar or Jinko's margins, Commerce will revise the rates applied to Trina, Shanghai BYD, and Yingli, accordingly.

## CONCLUSION

For these reasons, we respectfully request that the Court grant our request for a voluntary remand for the three issues discussed above. For the remaining issues, we respectfully request that the Court deny plaintiffs' motions for judgment upon the agency record and sustain Commerce's final results of its fifth administrative review of the countervailing duty order covering solar cells from China.

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

40

                              /s/ Tara K. Hogan
                    By:       TARA K. HOGAN
                              Assistant Director

                              /s/ Justin R. Miller
                              JUSTIN R. MILLER
OF COUNSEL:                   Attorney-In-Charge
PAUL KEITH                    International Trade Field Office
Attorney                      U.S. Dept. of Justice, Civil Division
Office of the Chief Counsel   International Trade Field Office
    for Trade Enforcement and Compliance   26 Federal Plaza, Rm. 346
U.S. Department of Commerce   New York, NY 10278
                              Tel. (212) 264-9241
                              Fax (212) 264-1916
December 4, 2020              Attorneys for Defendant

41

## CERTIFICATE OF COMPLIANCE

I, Justin Miller, Attorney-In-Charge of the International Trade Field Office, Civil Division, Commercial Litigation Branch, state that I am responsible for the Government's response to plaintiffs' motions for judgment on the administrative record, and relying upon the word count feature of the word processing program used to prepare the memorandum, certify that this memorandum complies with the word count limitation under the Court's chambers procedures, and contains 12,140 words.


/s/ Justin R. Miller