## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE THE HONORABLE JANE A. RESTANI, SENIOR JUDGE**

| | |
|---|---|
| **CANADIAN SOLAR INC. ET AL.,** | ) |
| **Plaintiffs, and** | ) |
| **JINKO SOLAR CO., LTD. ET AL.,** | ) |
| **Consolidated-Plaintiffs, and** | ) |
| **v.** | ) **Consol. Court No. 19-00178** |
| | ) **Nonconfidential Version** |
| **UNITED STATES,** | ) |
| **Defendant, and** | ) |
| **SUNPOWER MANUFACTURING OREGON, LLC,** | ) |
| **Defendant-Intervenor.** | ) |

**SUPPLEMENTAL BRIEF PER COURT ORDER OF PLAINTIFFS CANADIAN SOLAR INC. ET AL. AND CONSOLIDATED-PLAINTIFFS JINKO SOLAR CO., LTD. ET AL. RELATED TO EXPORT BUYER'S CREDIT PROGRAM**

Jeffrey S. Grimson
Sarah M. Wyss
Bryan P. Cenko
MOWRY & GRIMSON, PLLC
5335 Wisconsin Ave., NW, Suite 810
Washington, DC 20015
202.688.3610 (ph)
202.595.8968 (fax)
trade@mowrygrimson.com

Andrew T. Schutz
Kavita Mohan
Jordan C. Kahn
GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT
1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

June 9, 2021

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................... ii

ARGUMENT ................................................................................................................................... 2

   I.     BACKGROUND ON THE EBCP ...................................................................................... 2

      A.   Pre-Lending Process................................................................................................ 3

      B.   The Lending Contract............................................................................................. 4

      C.   Disbursement of Funds.......................................................................................... 5

      D.   Post-Lending Management ..................................................................................... 5

      E.   Conclusion.............................................................................................................. 6

   II.    GENERAL VERIFICATION ISSUES ............................................................................. 6

      A.   Number of Transactions Involved and Reliance on a Spot-Check Methodology............ 6

      B.   Number of Companies Involved and the Fact that They May Not be Affiliated with a Respondent .............................................................................................................. 8

      C.   Difficulty of Completing Verification.................................................................. 10

   III.   COMMERCE COULD ACCURATELY VERIFY EBCP USAGE AT THE FOREIGN EXPORTER ....................................................................................................................... 11

   IV.   COMMERCE COULD ACCURATELY VERIFY EBCP USAGE AT THE U.S. CUSTOMERS .................................................................................................................... 18

      A.   How to Generally Verify EBCP at the Customer ................................................ 19

      B.   How to Specifically Verify EBCP at the Customer in this Case ................................... 23

   V.    VERIFICATION AT EX-IM BANK ............................................................................. 25

CONCLUSION.............................................................................................................................. 26

# TABLE OF AUTHORITIES

**Cases**

Bomont Indus. v. United States,
14 CIT 208, 733 F. Supp. 1507 (1990) ...................................................................... 14

Guizhou Tyre Co., Ltd. v. United States,
__ CIT __, 415 F. Supp. 3d 1335 (2019) ................................................................ 25

Micron Tech., Inc. v. United States,
117 F.3d 1386 (Fed. Cir. 1997) ................................................................................. 6

NTN Bearing Corp. of Am. v. United States,
26 CIT 53, 186 F. Supp. 2d 1257 (2002) ............................................................. 7, 14

**Regulations**

31 C.F.R. § 1010.610 .................................................................................................... 21

**Other Authorities**

Certain Frozen Warmwater Shrimp From Thailand: Final Negative Countervailing Duty
Determination, 78 Fed. Reg. 50,379 (Dep't of Commerce Aug. 19, 2013) ............................. 19

Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of
Antidumping Duty Administrative Review; 2016-2017, 84 Fed. Reg. 32,720 (Dep't of
Commerce July 9, 2019) ............................................................................................ 9

Certain Pasta from Italy: Final Results of the Fourth Countervailing Duty Administrative
Review, 66 Fed. Reg. 64,214 (Dec. 12, 2001) ........................................................... 9

Certain Steel Nails From Taiwan: Final Determination of Sales at Less Than Fair Value, 80 Fed.
Reg. 28,959 (Dep't of Commerce May 20, 2015) ..................................................... 9

Chlorinated Isocyanurates from the People's Republic of China: Final Affirmative
Countervailing Duty Determinations; 2012, 79 Fed. Reg. 56,500 (Dep't of Commerce Sept.
22, 2014) .................................................................................................................. 22

Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China: Final
Affirmative Countervailing Duty Determination, 73 Fed. Reg. 70,961 (Dep't of Commerce
Nov. 24, 2008) .......................................................................................................... 21

Countervailing Duty Investigation of Certain Biaxial Integral Geogrid Products From the
People's Republic of China: Final Affirmative Determination and Final Determination of
Critical Circumstances, in Part, 82 Fed. Reg. 3282 (Dep't of Commerce Jan. 11, 2017) ........ 26

ii

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the
    People's Republic of China: Final Results of Countervailing Duty Administrative Review and
    Rescission of Review, in Part; 2016, 84 Fed. Reg. 45,125 (Dep't of Commerce Aug. 28, 2019)
    ................................................................................................................................... 1

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the
    People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review
    and Preliminary Determination of No Shipments; 2016-2017, 83 Fed. Reg. 67,222 (Dep't of
    Commerce Dec. 28, 2018).................................................................................................... 9

Utility Scale Wind Towers From the People's Republic of China: Final Affirmative
    Countervailing Duty Determination, 77 Fed. Reg. 75,978 (Dep't of Commerce Dec. 26, 2012)
    ................................................................................................................................... 2

Plaintiffs Canadian Solar Inc., Canadian Solar International, Ltd., Canadian Solar Manufacturing (Luoyang) Inc., Canadian Solar Manufacturing (Changshu) Inc., CSI Cells Co., Ltd., CSI Solar Power (China) Inc., CSI Solar Power Group Co., Ltd., CSI Solartronics (Changshu) Co., Ltd., CSI Solar Technologies Inc., CSI New Energy Holding Co., Ltd., CSI-GCL Solar Manufacturing (Yancheng) Co., Ltd., Changshu Tegu New Materials Technology Co., Ltd., Changshu Tlian Co., Ltd. and Suzhou Sanysolar Materials Technology Co., Ltd., producers and exporters of the subject merchandise, and Canadian Solar (USA) Inc., an importer of the subject merchandise, (collectively, "Canadian Solar"), and Consolidated Plaintiffs Jinko Solar Co., Ltd., Jinko Solar Import & Export Co., Ltd., Zhejiang Jinko Solar Co., Ltd., (collectively, "Jinko"), submit the following supplemental brief in response to the Court's Order.  See Order (May 19, 2019), ECF No. 109 ("EBCP Order").  The following relates to the determination by the U.S. Department of Commerce ("Commerce") that the respondents benefited from the Export Buyer's Credit Program ("EBCP") based on adverse facts available ("AFA") in the final results of the January 1, 2016 through December 31, 2016 administrative review of the countervailing duty ("CVD") order on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules ("solar cells") from the People's Republic of China.  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review and Rescission of Review, in Part; 2016, 84 Fed. Reg. 45,125 (Dep't of Commerce Aug. 28, 2019) (P.R. 250), and accompanying Issues and Decision Memo. at Cmt. 1 ("Final I&D Mem.") (P.R. 249).  Pursuant to the Court's instructions, Canadian Solar and Jinko set forth how "Commerce could verify non-use of EBCP through information collected from respondents and their customers."  EBCP Order.

1

**ARGUMENT**

## I.   BACKGROUND ON THE EBCP

During oral argument, the Court requested that the parties explain the underlying operation of the EBCP.  Canadian Solar and Jinko continue to respectfully maintain that the operation of the program is irrelevant to Canadian Solar's and Jinko's usage of the program and Commerce's ability to verify the respondents' non-use.  <u>See, e.g.</u>, Mem. of P. & A. in Supp. of Rule 56.2 Mot. For J. on the Agency R. of Pls. Canadian Solar at 10-14 (Aug. 31, 2020) (Nonconfidential Version), ECF No. 96 ("Canadian Solar Br."); Mem. of Law in Supp. of Pl.-Intervenors' Jinko Mot. for J. on the Agency R. at 9-26 (Aug. 31, 2020), ECF No. 72 ("Jinko Br.").[1]  To best assist the Court in resolving this issue, Canadian Solar and Jinko nonetheless provide relevant background on the EBCP as set forth in the initial questionnaire response of the Government of China ("GOC").

Broadly, the Court sought clarification at oral argument on whether the EBCP operates as a loan or more generally as a credit program.  The EBCP is a loan program through which an importer (buyer) receives a loan from China's Export-Import ("EX-IM") Bank to finance the purchase of the certain goods from the Chinese exporter (seller).  <u>See</u> Letter on Behalf of GOC to Commerce re: GOC Initial CVD Questionnaire Response at 128 (June 19, 2018) (Public Version) ("GOC QR") (P.R. 73-76) (reporting that "loans under export buyer's credits are required to be used for buyers making payment at sight for goods to Chinese exporters").  Generally, export

---

[1] As Canadian Solar and Jinko have never used the program, their general knowledge is limited to the information provided by the GOC as developed through their participation in multiple proceedings related to the CVD order on solar cells from the People's Republic of China.  Our knowledge is also based on counsel for Canadian Solar and Jinko's participation in many Chinese CVD cases over the years involving this program, including the very first case – <u>Utility Scale Wind Towers From the People's Republic of China: Final Affirmative Countervailing Duty Determination</u>, 77 Fed. Reg. 75,978 (Dep't of Commerce Dec. 26, 2012).

buyer's credit programs are well known financial tools used throughout the world to finance

international trade; these programs are not limited to China's EX-IM Bank.[2]  Broadly, export

buyer's credits are:

> a short-term loan facility extended to an importer by an overseas lender such
> as a bank or financial institution to finance the purchase of capital goods,
> services, and other big-ticket items. The importer, to whom the loan is
> issued, is the buyer of goods, while the exporter is the seller. Buyer's credit
> is a very useful financing method in international trade as it gives importers
> access to cheaper funds compared to what may be available locally.

Will Kenton, Buyer's Credit, INVESTOPEDIA (May 27, 2021),

https://www.investopedia.com/terms/b/buyers-credit.asp (last visited June 8, 2021).

There is no dispute among the parties that the EBCP involves a loan issued to the importer

that must be repaid with interest, similar to any other loan that has been reported in this case and

investigated by Commerce.   The purpose of the program is to "promote {the} export of goods and

technology services."  GOC QR at Ex. II.F.1, art. 2 (Public Version). [3]

### A.  Pre-Lending Process

As part of the pre-lending process, the exporter (seller) will submit an application that

provides "an overview of the export project, a project feasibility analysis and an economic benefit

analysis as well as the exporter's credit record."  Id. at 128; see also id. at Ex. II.F.2, art. 1.  As

---

[2] The Export Import Bank of the United States has a similar program available where it provides
loans to foreign purchasers.  See Export-Import Bank of the United States, International Buyer,
https://www.exim.gov/who-we-serve/us-product-importer (last visited June 8, 2021).   The
Chinese EBCP operates in a virtually identical manner to the U.S. program.

[3] As corroboration for its description of the EBCP, the GOC submitted The Administrative
Measures of Export Buyer's Credit of EIBC ("Administrative Measures") and The Implementing
Rules for the Export Buyer's Credit of the Export-Import Bank of China ("Implementing Rules")
that govern the overall operation of the EBCP.  See GOC QR at Ex. II.F.1 (Administrative
Measures and Ex. II.F.2 (Implementing Rules) (Public Version) (P.R. 73-76).

part of this application, the loan applicant will also provide "the credit materials and related supported documents of the exporter." Id. at 127; see also id. at Ex. II.F.1, art. 14.  After submitting these initial materials as part of the loan application process, and prior to granting a loan, the "EX-IM Bank must investigate and verify the performance capability of the Chinese exporters in its loan evaluation and approval proceeding." Id. at 127; see also id. at Ex. II.F.1, art. 4; Mem. from Gene Calvert to the File re: Placing Information on the Record: China Ex-Im Bank at Attach I, p. 2 (Dec. 12, 2018) (Public Document) ("China Ex-Im Bank Add. Info.") (P.R. 149) (during a verification of the EX-IM Bank, an official of the EX-IM Bank explained that the "{EX-IM Bank} will sometimes conduct onsite credit checks of the Chinese exporter").

## B.  The Lending Contract

Concerning the lending contract itself, although the sales contract is between the importer (buyer) and the exporter (seller), the lending contract is between the importer (buyer), or its representative bank, and the EX-IM Bank.  See GOC QR at 129 (Public Version) (P.R. 73-76); see also id. at Ex. II.F.1, art. 8 (setting forth that the buyer "handle{s the} credit guarantee in general"); Ex. II.F.2, art. 1 (explaining that "the mortgagor shall be the bank or importer approved by the EIBC").  The borrower, either the importer (buyer) or its representative bank, "should open a loan account in the {EX-IM Bank}." Id. at Ex. II.F.2, art. III.  The buyer (importer), therefore, "is the party responsible for repaying the loan." Id. at 129.  In addition to repaying the loan, the buyer (importer) is also responsible for making the interest payments on the loan.  See id. at Ex. II.F.1, art. 18 ("The borrower should pay the relative fees, repay the loan principal and interest in accordance with {the} loan agreement.  The average loan capital should be repaid semiannually; the loan interest should be paid once every six months."); Id. at Ex. II.F.2 (setting forth that the "{t}he borrower shall repay the loan principal and interest according to repayment table").

4

### C.  Disbursement of Funds

Concerning the disbursement of funds, the exporter is the ultimate entity who receives the funds from the EX-IM Bank.  Id. at 128 (explaining that the "the EX-IM Bank will execute the lending contract by releasing the funds directly to the exporter as payment for the goods" (emphasis added)).  To receive funds from the EX-IM Bank, the exporter must provide the EX-IM bank with the relevant shipping documents thereby confirming receipt of the merchandise by the buyer (importer).  See id. at 129; see also Ex. II.F.1, art. 17-19; Ex. II.F.2, art. 3.  Upon receipt of these shipping documents, the "bank will debit the buyer's account and credit the funds to the exporter's account."  Id. at 128.  Although Commerce is correct in finding, at least according to the GOC, that these funds can be disbursed either by the EX-IM bank or through one of its partner banks, see Final I&D Mem. at Cmt. 1, p. 29 (P.R. 249), the lending contract "stipulates that the borrower . . . must grant the Ex-Im bank authorization to conduct transactions in the account open specifically for this financing."  See China Ex-Im Bank Add. Info. at Attach II, pp. 4-5 (P.R. 149).  Specifically, the "funds are first sent from the Ex-Im Bank to the borrower's (importer) account at the Ex-Im Bank (or other approved partner bank).  The Ex-Im Bank then sends the funds from the borrower's (importer) account to the seller's (exporter) bank account."  Id. at 5.  Regardless of whether the funds go through a middleman partner bank, the funds are still ultimately disbursed to the exporter and the importer is still responsible for repaying the loan with interest in an account opened specifically for this financing.

### D.  Post-Lending Management

After the lending contract is executed, as a part of the post-lending management process, the "EX-IM Bank may supervise and inspect the company to ensure that the usage of the loan is

compliant with the terms."  GOC QR at 128 (P.R. 73-76) (Public Version); see also id. at Ex. II.F.1, art. 22.

### E.  Conclusion

The above outlined description of this program is similar to the operation of other export buyer's credit programs around the world.  The overall operation of the EBCP, and its general nature as a loan program, lends itself Commerce's ability to verify both Canadian Solar's and Jinko's non-use claims by reviewing the records of either the exporter (seller) or the importer (buyer) (or at EX-IM Bank).  Any missing information in the record about some of the more finite details of the operation of this record neither impacts the general nature of this program as a loan program nor Commerce's vast experience in verifying loan programs.  At bottom, none of the GOC's lack of responsiveness countermands the verifiable facts that, regardless of the operational details, the exporter and importer received no funds under the program.  See generally Final I&D Mem. at Cmt. 1 (P.R. 249).

## II.    GENERAL VERIFICATION ISSUES

Like all verifications, Commerce's ability to verify EBCP usage by examining a foreign exporter respondent's or its U.S. customer's (whether or not affiliated) records is dependent on several overarching verification basics.  These include: (1) the use of a spot check methodology; (2) the selection of sample companies to verify; and (3) employing case-specific solutions for facts that are difficult to verify.

### A.    Number of Transactions Involved and Reliance on a Spot-Check Methodology

Commerce normally conducts verification using a "spot check" methodology, which has been consistently approved by the courts.  See, e.g., Micron Tech., Inc. v. United States, 117 F.3d 1386, 1396 (Fed. Cir. 1997) (Commerce need not "trace through every number of the response- a

representative sample is sufficient.") (citations and internal omitted); NTN Bearing Corp. of Am. v. United States, 26 CIT 53, 94, 186 F. Supp. 2d 1257, 1296 (2002) ("A verification is a spot check and is not intended to be an exhaustive examination of the respondent's business.").  For example, in the antidumping duty ("AD") context, Commerce verifies whether product characteristics of subject merchandise are correctly reported by selecting several examples and reviewing the underlying documentation for each example selected.  Respondents often report hundreds (or even thousands) of different products, rendering it impossible to review each and every one.  Thus, Commerce verifies data through spot checks, normally selecting five sales (referred to as "observations") for extensive examination.  If Commerce finds that the spot check is accurate, it concludes that the entire database is accurate.

In the CVD context, similar verification issues come up in numerous ways.  Whether a company purchased electricity, for example, and for which amounts, can only be verified through a review of the underlying electricity bills since usage amounts and rates are not individually recorded in a company's accounting system.  Commerce, however, cannot review every single bill for every single meter at verification – this would be unreasonably onerous.  Instead, to accomplish its task, Commerce randomly selects a small number of representative entries and confirms whether the respondent has reported those entries correctly.  If so, Commerce presumes that all entries have been correctly reported.

Similarly, Commerce verifies whether a company used the program on VAT/import duty exemptions for imported equipment by reviewing the actual import documents.  This is because the exemption of duties or VAT is not recorded in a company's accounting system.  Companies normally purchase hundreds (or even thousands) of pieces of equipment over the course of the entire average useful life period (which was 10 years in this case) and, thus, the only way to verify

use of this program in a non-onerous manner is by using a spot check methodology (*i.e.*, select a number of pieces of equipment and confirm what was reported).  To do this, Commerce first reviews the company's fixed assets ledger.  Very often – if not always – this ledger does not indicate whether a particular purchase is an import.  Next, Commerce selects a particular piece of equipment and review the purchase documentation.  If it is an import purchase, Commerce reviews the import documents which will establish whether duties or VAT was paid.  By relying on this spot-check methodology, and examining underlying documents for transactions selected for extensive examination, Commerce is able to verify the non-use of this program.

As the above examples illustrate, Commerce has an established practice of verifying a myriad of programs through its spot-check verification practice where a review of full records is not feasible.  In the EBCP context, therefore, Commerce can verify the program even if a particular customer has received a high volume of loans.

**B.     Number of Companies Involved and the Fact that They May Not be Affiliated with a Respondent**

Neither the number of customers involved, nor the fact that they are not affiliated with a respondent is an impediment to verification.  Commerce is often faced with many actors in a case and typically selects no more than a handful to verify.  For example, in AD cases involving non-market economy ("NME") countries, Commerce often is faced with numerous companies requesting separate rate status. Commerce normally does not verify any of their responses, or at most one or two companies.

In addition, a mandatory respondent in an AD case may report the use of numerous tollers or other unaffiliated suppliers.   Neither of these circumstances prevents Commerce from conducting a meaningful verification.  See <u>Crystalline Silicon Photovoltaic Cells, Whether or Not</u>

Assembled Into Modules, From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016-2017, 83 Fed. Reg. 67,222 (Dep't of Commerce Dec. 28, 2018), and accompanying I&D Mem. n.14 (referencing "verification of the factors of production of Chint's unaffiliated solar cell supplier"); Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017, 84 Fed. Reg. 32,720 (Dep't of Commerce July 9, 2019), and accompanying I&D Mem. at Cmt. 3 (verifying unaffiliated customers to find absence of affiliation); Certain Steel Nails From Taiwan: Final Determination of Sales at Less Than Fair Value, 80 Fed. Reg. 28,959 (Dep't of Commerce May 20, 2015), accompanying I&D Mem. at Cmt. 11 (verifying several unaffiliated tollers, but not all, to confirm an absence of affiliation).

In a CVD case, a respondent may purchase subject merchandise from numerous unaffiliated producers or export through numerous unaffiliated trading companies. See, e.g., Certain Pasta from Italy: Final Results of the Fourth Countervailing Duty Administrative Review, 66 Fed. Reg. 64,214 (Dec. 12, 2001), and accompanying I&D Mem. at "Attribution" (limiting Commerce's analysis of an exporter's subsidies to only its major unaffiliated producers). Often, because it is time consuming to visit all trading companies, and not necessary to conduct a meaningful verification, Commerce selects only a limited number of companies to verify, or sometimes none at all.

Because Commerce regularly limits verification to a select number of companies involved in the production of subject merchandise, neither the number of customers involved nor the fact that they are not affiliated with a respondent has prevented Commerce from conducting a meaningful verification.

## C. Difficulty of Completing Verification

There often are issues that arise in an AD or CVD case that are difficult to verify, but this does not prevent Commerce from finding ways to verify the issue or from accepting the information.  For example, affiliations are a critical component of both AD and CVD cases but can often be very difficult to verify, depending on the circumstances.  A respondent is required to report if their owners or managers have ownership interest in other companies.  If a respondent that is owned by an individual reports that this individual does not own any other relevant companies, Commerce cannot confirm this fact merely by reviewing the respondent's records.  In that context, Commerce will request that the owner provide information confirming that he does not also own other companies.  It is difficult to verify a "negative," but Commerce will review the information that is available, and reach a conclusion based on all facts and circumstances – including the fact that a party is required to certify as to the accuracy of its submissions.

In the CVD context, it is also difficult to verify a respondent's statement that it has not sold merchandise domestically that was then exported to the United States.  If the respondent did sell to a company who then sold subject merchandise to the United States, the respondent would need to report the subsidies of this unaffiliated exporter.  Other than reviewing the respondent's customer's names, there is no verification procedure Commerce can undertake to confirm that the customers did not export to the United States.  Yet, when faced with this scenario, Commerce does not automatically apply AFA; instead, it verifies the information available and otherwise accepts the statements made by respondents.

The difficulty of verifying a particular issue, therefore, does not render the issue unverifiable, and does not result in the automatic application of AFA.

### III.   COMMERCE COULD ACCURATELY VERIFY EBCP USAGE AT THE FOREIGN EXPORTER

Commerce acknowledged that the "GOC's response indicated that exporters would know whether there was an interaction between the China EX-IM Bank and the borrowers{,}" but it ultimately concluded that "neither the GOC, nor the respondent companies, provided enough information for Commerce to understand this interaction or how this information would be reflected in the respondent companies' . . . records."  Final I&D Mem. at Cmt. 1, p. 35 (P.R. 249). For the reasons described below, the record is sufficiently complete for Commerce to follow its normal procedures when verifying Canadian Solar's and Jinko's claims on non-use of the EBCP.

The record clearly established that use of the EBCP cannot be implemented without the knowledge of the exporter, in this case Canadian Solar or Jinko.  The GOC supported its assertion that "Chinese exporter is in a position to verify and confirm the existence, if any of sales contracts that were supported by the buyer's export credits of the EX-IM Bank," with detailed explanations that it corroborated with supporting documentation.  See GOC CVD QR at 127-28, Exs. II.F.1-2 (Public Version) (P.R. 73-76).  Specifically, the GOC explained how the Chinese exporter is an integral component in the EBCP from the pre-lending management process, to the disbursal of funds, to the post-lending management scheme as summarized in the chart below:

11

| Pre-Lending Management | Disbursement of Funds | Post-Lending Management |
|---|---|---|
| • The exporter (seller) provides the EBCP with documents relating to an overview of the export project (reflected in Article 1 of the Implementing Rules)<br><br>• The EX-IM bank investigates and verifies the performance capability of the exporter (reflected in Article 4 of the Administrative Measures)<br><br>• The importer (buyer) provides the credit materials of the exporter (seller) as part of the loan application (reflected in Article 14 of the Administrative Measures) | • The exporter (seller) ultimately receives the funds under the EBCP<br><br>• The exporter (seller) sends the shipping documents to the EX-IM bank as proof of shipment (reflected in Articles 17 through 19 of the Administrative Measures and Article 3 of the Implementing Rules)<br><br>• Upon receipt of the shipping documents, the EX-IM Bank debits the buyer's account (whether that is at the EX-IM Bank or a third-party partner bank) and credits the funds to the exporter's account (reflected in Articles 17 through 19 of the Administrative Measures and Article 3 of the Implementing Rules) | • The EX-IM Bank may inspect the exporter (seller) to confirm that the usage of the loan is consistent with the terms of the lending contract (reflected in Article 22 of the Administrative Measures) |

See id. at 127-28 (citing to Exs. II.F.1-2) (P.R. 73-76).   In its response to a supplemental

questionnaire in the silica fabric case, relied upon by Commerce here for the proposition that it

cannot verify the respondents' non-use claims, the GOC clarified the role the exporter plays in the

EBCP as follows:

> Ex-Im Bank officials also examine the capability of the Chinese exporter to manufacture the goods, examine evidence supplied by the exporter that the contracted goods are actually being produced and shipped to the customer, and examine the exporter's financial statements and other operational information provided by the exporter that demonstrate the exporter's ability to perform and actual compliance with the contract terms.

China Ex-Im Bank Add. Info. at Attach II, p. 4 (P.R. 149).  As an exporter is heavily involved in the pre and post-lending process, it would have of records of any documents it submitted as part of the loan application and verification process.  <u>See</u> GOC QR at 128 (Public Version) (P.R. 73-76).  Most importantly, an exporter can search its accounts for any funds it may have received as part of the EBCP given that the funds are disbursed "directly to <u>the exporter</u> as payment for the goods."  The exporter, therefore, will have both <u>documentation</u> and accounting records of any loan that its importing customers received relating to the EBCP and is in a strong position to corroborate claims of non-use.  Indeed, both Canadian Solar and Jinko informed Commerce that they were at its disposal for any questions and verification.  <u>See</u> Letter on Behalf of Canadian Solar to Commerce re: Countervailing Duty Questionnaire Response – Section III at Vol. II, p. 31 (June 19, 2018) (Public Version) ("Canadian Solar QR") (P.R. 68-72); Letter on Behalf of Jinko Solar Co., Ltd. et al. to Commerce re: Jinko's Section III Response at Vol. I, pp. 40-41 (June 19, 2018) (Public Version) ("Jinko QR") (P.R. 77-90).  Commerce could have verified Canadian Solar's and Jinko's claims of non-use but choose not to in this review.

Further, Commerce concluded that "without GOC cooperation, usage of the program could not be confirmed at the respondent exporters in a manner consistent with its verification methods." Final I&D Mem. at Cmt. 1, p. 24 (P.R. 249).  Commerce set forth that during a verification it implements "the methods of an auditor, i.e., attempting to confirm usage or claimed non-usage by examining books and records which can be reconciled to audited financial statements, or other documents, such as tax returns, that provide a credible and complete picture of a company's financial activity for the period under examination." <u>Id.</u>  As part of its completeness methodology, Commerce conducts its verifications through the following procedures:

13

1. "{E}xamine the company's balance sheets to derive the exact amount of lending outstanding during the period of examination{;}"

2. "{E}xamine{} the subledgers or bank statements providing the details of all individual loans {;}"

3. "{T}ie the subledgers or bank statements to the total amount of outstanding lending derived from the balance sheets" to ensure that "the subledgers were complete and that it therefore had the entire universe of loan information available for further scrutiny;"

4. "Examine{} the subledgers for references to the state-owned banks{;}"

5. "{S}elect specific entries from the subledger and request to see underlying documentation, such as applications and loan agreements, in order to confirm the accuracy of the subledger details."

Id. at Cmt. 1, p. 25.   According to Commerce, this completeness methodology is necessary to "confirm{} that a complete picture of relevant information is in front of the verification team." Id. Pursuant to its verification process set forth above, Commerce determined that a "review of ancillary documents, such as applications, correspondence, emails, etc., is insufficient for Commerce to verify any bank disbursement or loan amount pertaining to Canadian Solar's, Jinko Solar's, their customers, and/or the GOC's participation in the program." Id. at Cmt. 1, p. 35

In focusing on completeness, **Commerce wrongly equates verification of use of a program with verification of non-use of a program**.  Verifying non-use of a program requires that Commerce look at the supporting documentation regardless of whether it has a list of partner banks.  The only way to confirm usage of the program is to review loan documents stating that the loan is part of the program – identifying a loan from a partner bank or EX-IM Bank is not enough. Commerce can limit the amount of supporting documentation that it needs to review by using its standard sampling methodology.  See NTN Bearing, 26 CIT at 94, 186 F. Supp. 2d at 1296 (2002); see also Bomont Indus. v. United States, 14 CIT 208, 209, 733 F. Supp. 1507, 1508 (1990) ("Verification is like an audit, the purpose of which is to test information provided by a party for

accuracy and completeness. Normally, an audit entails selective examination rather than testing of an entire universe.").  As set forth above, Commerce often relies on a spot-check methodology in the CVD context to verify information in a non-onerous method, such as selecting a sample of electricity bills or import documents to see if VAT duties were paid, as explained above. Specifically, when examining whether a company uses a program on VAT/Import duty exemptions, Commerce very often must examine the underlying documentation as a respondent's ledger will not indicate whether a particular purchase is an import.

Commerce's focus on its inability to verify respondents' claims of non-use based on its completeness methodology misses the mark. The purpose of Commerce's completeness methodology, as Commerce itself acknowledges, is to ensure that it has the full realm of information before it and that this information accurately reflects what is reported in the respondent's accounting system. Here, Commerce conducted verification and examined Canadian Solar's reported sales financial statements, chart of accounts and even bank loans. See Mem. from Gene Calvert to the File re: Verification of the Questionnaire Responses Submitted by Canadian Solar Inc. at 2-3, 5 (July 22, 2019) (Public Version) (P.R. 224).[4]  In fact, in verifying non-use of other programs, Commerce noted that it "reviewed information from the reported affiliates such as income tax returns general ledger accounts, financial statements, and other selected accounts

---

[4] Commerce did not conduct a verification of Jinko in this review.  Having determined that a verification of Jinko was not necessary and that it would accept the facts as submitted, it makes little sense for Commerce to then conclude that non-use of the EBCP cannot be verified when there are no facts on the record contradicting those claims.  Commerce should have accepted Jinko's claims of non-use for the EBCP just as they accepted Jinko's statements of non-use for other programs for which it provided no additional "evidence' of that non-use.  See, e.g., Jinko QR at Vol. II, pp. 22-28 (Public Version) (P.R. 77-89) see also id. (Business Proprietary Document) (C.R. 71-166)  (stating that the company did not use the listed 142 grant programs and not providing any other information confirming that non-use).

15

from the charts of accounts." Id. at 7.  Further, Commerce "examined trial balances and financial accounts such as 'other' and special payables in search of activity that might indicate a write down of grants or other amortized subsidies.  We noted no evidence of unreported subsidies." Id.  In other words, having no information at all about "unreported subsidies," including even the names of programs, Commerce without hesitation conducted a non-use verification by examining the respondent's books and records in this proceeding.  This is precisely the kind of routine non-use verification that Commerce conducts in any verification with respect to unreported subsidies or, in antidumping cases, unreported sales and expenses.  Commerce's feigned inability to verify non-use without full program details is contradicted by its verification of evidence of benefits under unreported subsidies where Commerce had zero information.   Indeed, at no point during its verification did Commerce identify any evidence of discrepancies in Canadian Solar's reported sales, that the full universe of loans reported by Canadian Solar were incomplete, or that there was evidence of non-reported subsidies by Canadian Solar.  See id. at 2-3, 5, 7.

Commerce had all information available to it to examine Canadian Solar's and Jinko's claims of non-use of the EBCP.  During the verification of Canadian Solar, Commerce did not conduct an examination for that specific purpose but did review Canadian Solar's loans reported under other programs.  See id. at 5, 7.  Specifically, Commerce conducted a detailed examination of Canadian Solar's books and records with respect to the Export Seller's Program.  Id. at 5.  During this examination, Commerce –

> asked whether loans for the Export Seller's Program are recorded differently from other loans.  Canadian Solar officials stated that <u>all of the loans are recorded the same way</u>.  We asked how Canadian Solar was able to differentiate loans from the Export Seller's Program from other loans when reporting this information to Commerce.  Canadian Solar official stated that the affiliates do not have many loans from the Export Seller's Program, and they examined each loan contract to note which loans were from the Export-Import Bank of China.  We randomly sampled

> various vouchers in the accounts for Accrued Interest Expense and tied these
> expenses to reported loans.  During these exercises, we noted no discrepancies with
> the loan information that was reported in the questionnaire responses.

Id. (emphasis added).   The foregoing establishes that although Commerce did not intentionally

verify the EBCP, in verifying the Export Seller's Program, Commerce learned that all loans are

recorded in the same way and, in conducting its sampling, Commerce noted no instance where a

loan related to the EBCP.

Although the EBCP operates slightly differently than the Export Seller's Program, as the

exporter is the entity that ultimately receives the funds from the EX-IM Bank and is not the

borrower, the verification process is still analogous.  Much like the verification methodology that

Commerce followed when examining Canadian Solar's non-use of other subsidies, here

Commerce could review a respondent's income tax returns, general ledger accounts, financial

statements, and other selected accounts from its charts of accounts.  As the exporter ultimately

receives the funds as payment for its merchandise, whether it be from the EX-IM Bank or an

intermediate partner bank, any payment would be reflected in the exporter's financial records.

Commerce could then randomly sample the respondent's accounts receivable and ask for the

underlying documentation to confirm the underlying receipt of payment (i.e., whether it be from

sales, receipt of a subsidy, or receipt of payment from the EBCP).  For instance, if the accounting

records reflected the receipt of funds from EX-IM Bank or other banks, Commerce could then

trace that money through the accounting system.  If the funds were for loans taken out by the

respondent (and, thus, not part of the EBCP), Commerce would see the receipt of cash (a debit of

the cash account) and then a credit of the short-term or long-term lending accounts reflecting the

principal received and liability booked.  If the funds were part of the EBCP and received to pay

for goods from a particular U.S. customer, Commerce would see the receipt of cash (a debit of the

cash account) and then a credit of the accounts receivable, rather than the booking of this money as a liability.

Lastly, the exporter would have a record of submitting documents relating to the feasibility of the export project as part of the pre-management process and additional record documentation of any inspection by the EX-IM Bank as part of the post-lending management process.

Canadian Solar and Jinko are willing to work with Commerce to conduct verification but submit that the above path will satisfy Commerce's need for completeness while following Commerce's standard procedures for verifying claims of non-use of a program as compared to actual usage of a program. Indeed, as explained above, Commerce already conducted a non-use verification covering much of the same information within Canadian Solar's accounting system that would have revealed EBCP benefits if any were received.

## IV.   COMMERCE COULD ACCURATELY VERIFY EBCP USAGE AT THE U.S. CUSTOMERS

Respondents in every case before this Court challenging Commerce's application of AFA to the EBCP have argued that usage of the EBCP program can indeed be accurately accomplished at the U.S. customers, notwithstanding Commerce's protestations. Canadian Solar and Jinko outline how this can be accomplished below.

As discussed, there is no dispute that the EBCP is a loan program providing loans at allegedly preferential rates to importers in other countries to purchase Chinese products which must then be paid back in accordance with the loan contract. See Final I&D Mem. at Cmt. 1, pp. 27-28 (P.R. 249); see also GOC QR at 128 (Public Version) (P.R. 73-76). Other than the fact that the loan is provided to someone other than the respondent, this loan program is no different than other loans programs that Commerce has verified in the past: it involves principal and interest and

18

is provided pursuant to a specific program.[5]   Thus, to determine whether a customer used this program, similar to the methodology to verify an exporter as set forth above, Commerce can follow its normal verification procedures when analyzing whether a respondent's loans were provided pursuant to a specific government program.   Commerce can: (1) determine if the customer had any loans, in general, outstanding during the POR; and (2) determine the purpose of those loans and if any were part of the EBCP.

### A.  How to Generally Verify EBCP at the Customer

Based on our law firms' considerable collective experience participating in numerous verifications in CVD proceedings, we believe that Commerce can readily verify this program by reviewing information at a respondent's U.S. customers.   The first place to start is to review the company's loan accounts.   There are several accounts where a company records its loans – the short-term loan account on the balance sheet, the long-term loan account on the balance sheet, and the interest/financial expense account on the income statement.   Commerce can review the trial balances of these general ledger accounts and view the money moving into and out of these accounts.   It can also see the banks from which the customer received loan principals and the banks to which the customer paid interest.   The bank names will be identified in the account.   While there remains uncertainty in how the principal amount is disbursed in the EBCP, whether to the customer

---

[5] See Certain Frozen Warmwater Shrimp From Thailand: Final Negative Countervailing Duty Determination, 78 Fed. Reg. 50,379 (Dep't of Commerce Aug. 19, 2013), and accompanying Issues and Dec. Mem. at Cmt. 6 (verifying non-use of a certain loan program explaining that: "Although lending recorded in the company respondents' accounting systems would identify private lenders, information provided by Thai Union, Thai Union Seafood, and Thai Union Feedmill in their initial questionnaire responses, and verified by {Commerce}, indicates that any long-term loans still outstanding on their books during the POI were loans issued outside this program.  Furthermore, for Thai Union, we confirmed at verification that the company's only long-term loan still outstanding at the end of 2011 was a loan issued after 2008, and thus could not have been provided through the BOT refinancing program.").

or directly to the exporter, **this uncertainty is irrelevant from an accounting and verification perspective**. That is, the actual movement of the funds does not impact the booking of the liability in the customers' accounts. Regardless of how the loan funds are disbursed, the principal would be recorded as a liability in the customer's balance sheet and Commerce would be able to see the name of the bank to which the liability is owed.

Similarly, the payment of interest by the customer to the bank is independent from how the principal funds are disbursed. Commerce can review the accounts where interest payments are recorded and see to which bank the customer's interest payments were made. This can also be confirmed through payment vouchers or wire transfer records.

Once the loans and banks are identified, in many cases it will be readily apparent whether the loans are part of the EBCP. For example, there may be no loans, as small importers may not use loans to operate, or there may be one or two loans that are clearly not part of EBCP, for example, car or property leases.

The next step is to review loan documentation. If the loans and banks are identified and Commerce needs additional information to determine whether the loans are part of the EBCP, then Commerce can review the loan documentation for specific loans. Each loan will have an underlying loan contract or agreement specifying the terms and contracting parties and should describe the nature of the loan. Even if the customer has a loan with EX-IM Bank, Commerce would still be required to review the underlying loan documentation as EX-IM Bank has a number of different loan programs available and only the EBCP is at issue. If the banks identified are not EX-IM Bank, the possibility remains that the banks are acting as an intermediary or correspondent bank for the EBCP loan. However, the underlying loan documentation would spell this out clearly and indicate that the loan originates with EX-IM Bank. It defies credulity that a bank acting as an

20

intermediary would not have an agreement, contract, or, at the very least, correspondence with the customer describing this fact and the nature of the transactions.  Given the extensive regulation and control over financial transactions and banking in the United States, there would be a paper trail explaining the exact nature of these loans – particularly if they originate with a foreign bank.[6]

In the unlikely event that Commerce reviewed the loan documentation and was still not satisfied as to the nature of the loan (an event which would be highly unlikely to take place), Commerce could call the customer's banker during verification.  Commerce has often used this technique during verification when confirmation of documentation is needed.  See, e.g., Circular Welded Carbon Quality Steel Line Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination, 73 Fed. Reg. 70,961 (Dep't of Commerce Nov. 24, 2008), and accompanying I&D Mem. at Cmt. 2 ("{T}he Department verifiers called several of the trading companies to confirm that they operate companies trading in HRS and that they sold HRS to the Huludao Companies during the POI."); see also ANTIDUMPING MANUAL at Chapter 15, p. 6

---

[6] For example, the US PATRIOT Act imposes strict requirements on U.S. banks that offer correspondent banking services.  A "correspondent bank is a bank in one country that is authorized to provide services for another bank or financial institution in a foreign country. The most common services provided by a correspondent bank are currency exchange, handling business transactions and trade documentation, and money transfers." https://www.investopedia.com/ask/answers/071715/what-role-does-correspondent-bank-play-international-transaction.asp (last visited June 8, 2021).  In particular, the U.S. bank must develop a risk profile of the potential customer that assesses the following factors:

- The foreign bank's business and markets
- **The type, purpose and anticipated activity on the account**
- The nature and duration of the relationship with the foreign bank
- The supervisory regime of the jurisdiction in which the foreign bank is licensed

31 C.F.R. § 1010.610, *Due diligence programs for correspondent accounts for foreign financial institutions* (emphasis added).

("Spontaneous phone calls are also an effective and efficient way to corroborate information, particularly if the party is not at the verification site.").[7]

Indeed, Commerce followed this precise verification method to confirm EBCP non-usage in _Chlorinated Isocyanurates from the People's Republic of China: Final Affirmative Countervailing Duty Determinations; 2012_, 79 Fed. Reg. 56,500 (Dep't of Commerce Sept. 22, 2014), and accompanying I&D Mem. at 15.  Commerce there explained that it had "conducted verification on May 22 and July 18, 2014 in the United States of the {unaffiliated} customers of Jiheng and Kangtai, and confirmed through an examination of each selected customers' accounting and financial records that no loans were received under this program." Id.  It also is similar to the paper trail Commerce followed to verify EBCP non-usage in _Certain Vertical Shaft Engines Between 99cc and Up To 225cc, and Parts Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination_, 86 Fed. Reg. 14,071 (Dep't of Commerce Mar. 12, 2021), and accompanying I&D Mem. at Cmt. 2.  In that recent case, the respondent submitted a loan reconciliation identifying all of the loans its only import customer had (_i.e._, showing the universe of all outstanding loans during the period) and then provided the "lending agreements . . . show the purpose of each of {the} debt instruments and the parties involved in the financing' of loans." Id.  In determining non-use based on this documentation, Commerce explicitly "recognize{d} that the court has directed Commerce in numerous decisions to consider whether any available information provided by respondents may be sufficient to fill the gap of missing information in considering claims of non-use in the EBCP." Id.  Such administrative precedent confirms that Commerce can verify, and in fact has verified, EBCP non-usage through its existing

---

[7]   https://web.archive.org/web/20181118194523/http://ia.ita.doc.gov/admanual/index.html   (last visited June 8, 2021).

verification procedures, regardless of whether the 2013 Administrative Measures amendments or the list of partner/correspondent banks are missing.

Finally, the last step that Commerce could take is to verify non-use from a payment perspective, rather than a loan perspective. That is, Commerce could trace the source of the funds that the customer used to pay the respondent, as reflected in the customer's accounts payable accounts and cash accounts. The accounts payable account will reflect the money owed to the respondent for each invoice of goods purchased. Once the invoice is paid, it will be reflected as a debit to accounts payable. Commerce can then trace through the accounting system to see if the funds for that debit came from the company's cash accounts (there will be a one-to-one link) or from some other source. If the payment came from some other source (*i.e.*, EX-IM bank's direct payment to the respondent) this should be reflected as a notation or some other entry in the accounting system to show that it did not come from cash. The customer must be able to trace how it paid the debt owed to its customer in its accounting system or else the company would not be able to pass an audit. Ultimately, by reviewing the accounts payable accounts and tracing the payments, Commerce would be able to verify the non-use of this program and that the funds used to pay the respondent were not from the EBCP.

### B.  How to Specifically Verify EBCP at the Customer in this Case

To help walk the Court through one possible verification process, both Jinko and Canadian Solar contacted their U.S. importer affiliates, both of whom reported non-use of this program in the underlying review. Jinko QR at 40-41 (June 19, 2018) (Business Proprietary Document and Public Version) (C.R. 71-166) (P.R. 77-89); Canadian Solar QR at Vol. II, p. 31 (Public Version) (P.R. 68-72). To corroborate that the above-referenced verification methodology yield verifiable,

23

**NONCONFIDENTIAL DOCUMENT**

**CONFIDENTIAL INFORMATION REMOVED**

accurate results, counsel reviewed the records of Canadian Solar (USA) Inc. ("Canadian Solar US") and JinkoSolar (U.S), Inc.  ("Jinko US"):

- For Jinko US, a review of the principal and interest accounts outlined above showed that the company had multiple loans outstanding during the POR from [ ███████████ ███████████ ].  We then reviewed the underlying loan documents and found that these multiple loans were part of a [ ███████████████ ] with the bank.  The agreement established a line of credit that the company could draw down from when needed.  Because a [ ███████ ] is entirely distinguishable from the EBCP, which is a discrete, individual loan specifically for the purchase of goods as opposed to [ ███████████████ ], Commerce could readily confirm EBCP non-usage for this company.

- For Canadian Solar US, a review of the company's trial balance, ledger of loans, ledger of interest expenses and financial statements showed that the company had [ ███████ ] loans outstanding during the POR and that these loans involved [ ███████ ███████████ ].  Commerce would have little difficulty verifying these loans given the [ ███████████████ ].  Further, Canadian Solar US confirmed that these loans did not originate from the Chinese EX-IM bank and did not relate to the EBCP.  Canadian Solar US' loans are [ ███████ ███████████ ], which are entirely distinguishable from the EBCP.

The above explanation demonstrates precisely how Commerce could verify non-usage of EBCP by reviewing bank documents maintained by the respondents' U.S. customers.  Commerce has verified thousands of companies over the years and has significant experience verifying difficult-to-verify information; this issue is no different.  This fact has led the court to state, when

24

addressing Commerce's protestation that it could not verify EBCP, that "Commerce has more verification tools at its disposal than the Government would have this court believe." Guizhou Tyre Co., Ltd. v. United States, __ CIT __, __, 415 F. Supp. 3d 1335, 1344 (2019).

## V.   VERIFICATION AT EX-IM BANK

In addition to the verification options outlined above for the exporter and the U.S. customer, Commerce also can verify the EBCP program at the EX-IM Bank.  There is no evidence or indication that the transmission of loans from this program through intermediary banks has any impact on Commerce's ability to verify usage at EX-IM Bank; to the contrary, all record evidence indicates that EBCP disbursement would be readily apparent from reviewing EX-IM's database. Yet Commerce, even when issuing a supplemental questionnaire concerning the EX-IM Bank, never asked whether the EX-IM Bank database of users would identify a user if the loan was distributed through another bank.  See Jinko Br. at 28; Letter on Behalf of GOC to Dep't of Commerce re: Supplemental Questionnaire Response (Dec. 12, 2018) (Public Version) (P.R. 156). Since EX-IM Bank operates the program, determines the applicant's creditworthiness, accepts the credit risk, and is the source of the funds, identifying partner or correspondent banks is irrelevant to the usage analysis.  Also irrelevant to the usage verification is the missing revised administrative rules.  All that is required to verify usage at EX-IM Bank is for Commerce to review the usage database and confirm that none of the U.S customers are listed in that database.  Yet Commerce did not even attempt to verify the EX-IM Bank in this review, despite the fact that in recent years the GOC permitted Commerce to query its database in a manner that could readily confirm non-usage.  See Countervailing Duty Investigation of Certain Biaxial Integral Geogrid Products From the People's Republic of China: Final Affirmative Determination and Final Determination of

<u>Critical Circumstances, in Part</u>, 82 Fed. Reg. 3282 (Dep't of Commerce Jan. 11, 2017), and accompanying I&D Mem. at Cmt. 1.

Just as the court has separated the operation and usage of the program with regard to the application of AFA, Commerce's verification of EX-IM Bank can be similarly bifurcated.   While the GOC may not have provided verifiable operational facts concerning the EX-IM Bank which were requested by Commerce, the GOC did provide all necessary verifiable usage information. Thus, there is no reason why Commerce could not undertake a usage verification at EX-IM Bank.

## CONCLUSION

For the reasons set forth above, Commerce has the ability to, and could have, verified Canadian Solar's and Jinko's claims of non-use of the EBCP.  Commerce's reliance on AFA to find that both respondents benefited from the EBCP, therefore, is not supported by substantial evidence or otherwise in accordance with law where Commerce made no efforts to attempt to verify Canadian Solar's and Jinko's claims.   Commerce's refusal to employ its well-honed verification skills to determine non-use of this program in this and many, many other cases has resulted in the unlawful collection of untold millions of dollars of countervailing duties by the U.S. government.  This must stop.  The Court must remand this issue to Commerce to remove the AFA rate assigned to Canadian Solar and Jinko under the EBCP.

Respectfully submitted,

Dated: June 9, 2021                    /s/ Jeffrey S. Grimson
                                       Jeffrey S. Grimson
                                       Sarah M. Wyss
                                       Bryan P. Cenko
                                       Mowry & Grimson, PLLC
                                       5335 Wisconsin Avenue, NW, Suite 810
                                       Washington, D.C. 20015
                                       202-688-3610
                                       trade@mowrygrimson.com
                                       *Counsel to Canadian Solar*

Dated: June 9, 2021                    /s/ Andrew T. Schutz
                                       Andrew T. Schutz
                                       Kavita Mohan
                                       Jordan C. Kahn
                                       GRUNFELD, DESIDERIO, LEBOWITZ,
                                       SILVERMAN & KLESTADT
                                       1201 New York Ave., NW, Suite 650
                                       202.688.3610 (ph)
                                       Washington, DC 20005
                                       (202) 783-6881
                                       *Counsel to Jinko*