Slip Op. 21-114

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CANADIAN SOLAR INC.,** *ET AL.,* | |
| Plaintiffs, | |
| **CHANGZHOU TRINA SOLAR ENERGY CO., LTD.** *ET AL.,* | |
| Consolidated Plaintiffs, | **Before: Jane A. Restani, Judge** |
| **JINKO SOLAR CO., LTD.** *ET AL.,* | **Consol. Court No. 19-00178** |
| Intervenor Plaintiffs, | **PUBLIC VERSION** |
| v. | |
| **UNITED STATES,** | |
| Defendant. | |

## <u>OPINION AND ORDER</u>

Dated: September 3, 2021

[Commerce's Final Results in the Fifth Administrative Review of Commerce's Countervailing Duty Order on crystalline silicon photovoltaic cells from the People's Republic of China are partially sustained and partially remanded for reconsideration consistent with this opinion.]

Bryan P. Cenko and Sarah Wyss, Mowry & Grimson, PLLC, of Washington D.C. argued for Plaintiffs. With them on the brief was Jeffrey S. Grimson.

Robert G. Gosselink, Jonathan M. Freed, and Kenneth N. Hammer, Trade Pacific, PLLC, of Washington, D.C., for Consolidated Plaintiffs.

Jordan C. Kahn, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., argued for Intervenor Plaintiffs Jinko Solar Co., Ltd., Jinko Solar Import & Export Co., Ltd., Zhejang Jinko Solar Co., Ltd. On the brief were Andrew T. Schutz and Kavita Mohan.

Richard L.A. Weiner, Rajib Pal, Shawn M. Higgins, and Justin R. Becker, Sidley Austin, LLP, of Washington, D.C., for Intervenor Plaintiffs Yingli Green Energy Holding Co., Ltd.,

Consol. Court No. 19-00178                                                      Page 2
**Public Version**

Baoding Tianwei Yingli New Energy Resources Co., Ltd., Tianjin Yingli New Energy Resources Co., Ltd., Hengshui Yingli New Energy Resources Co., Ltd., Lixian Yingli New Energy Resources Co., Ltd., Baoding Jiasheng Photovoltaic Technology Co., Ltd., Beijing Tianneng Yingli New Energy Resources Co., Ltd., Hainan Yingli New Energy Resources Co., Ltd., Shenzhen Yingli New Energy Resources Co., Ltd., Yingli Green Energy International Trading Co., Ltd., Yingli Green Energy Americas, Inc., Yingli Energy (China) Co., Ltd.

    <u>Craig A. Lewis</u>, Hogan Lovells U.S. LLP, of Washington D.C., for Intervenor Plaintiff Shanghai BYD Co., Ltd.

    <u>Justin R. Miller</u>, International Trade Field Office, U.S. Department of Justice, of New York, NY argued for the Defendant. With him on the brief was <u>Tara K. Hogan</u>, Assistant Director. Of counsel on the brief was <u>Paul K. Keith</u>, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.


    Restani, Judge: This action is a challenge to the final determination made by the United

States Department of Commerce ("Commerce") in the Fifth Administrative Review of the

countervailing duty order on crystalline silicon photovoltaic cells, whether or not assembled into

modules from the People's Republic of China ("PRC") covering the period from January 1,

2016, to December 31, 2016.

    Plaintiffs Canadian Solar Inc., Canadian Solar International, Ltd., Canadian Solar

Manufacturing (Luoyang) Inc., Canadian Solar Manufacturing (Changshu) Inc., Canadian Solar

(USA) Inc., CSI Cells Co., Ltd., CSI Solar Power (China) Inc., CSI Solar Power Group Co. Ltd.,

CSI Solartronics (Changshu) Co., Ltd., CSI Solar Technologies Inc., CSI New Energy Holding

Co., Ltd., CSI-GCL Solar Manufacturing (YanCheng) Co., Ltd., Changshu Tegu New Materials

Technology Co., Ltd., Changshu Tlian Co., Ltd., Suzhou Sanysolar Materials Technology Co.,

Ltd. (collectively, "Canadian Solar"), Consolidated Plaintiffs Changzhou Trina Solar Energy

Co., Ltd., Trina Solar (Changzhou) Science & Technology Co., Ltd., Yancheng Trina Solar

Energy Technology Co., Ltd., Changzhou Trina Solar Yabang Energy Co., Ltd. (collectively,

"Changzhou"), Intervenor Plaintiffs Jinko Solar Co., Ltd., Jinko Solar Import & Export Co., Ltd.,

Zhejiang Jinko Solar Co., Ltd. (collectively, "Jinko"), Intervenor Plaintiffs Yingli Green Energy

Holding Co., Ltd., Baoding Tianwei Yingli New Energy Resources Co., Ltd., Tianjin Yingli

New Energy Resources Co., Ltd., Hengshui Yingli New Energy Resources Co., Ltd., Lixian

Yingli New Energy Resources Co., Ltd., Baoding Jiasheng Photovoltaic Technology Co., Ltd.,

Beijing Tianneng Yingli New Energy Resources Co., Ltd., Hainan Yingli New Energy

Resources Co., Ltd., Shenzhen Yingli New Energy Resources Co., Ltd., Yingli Green Energy

International Trading Co., Ltd., Yingli Green Energy Americas, Inc., Yingli Energy (China) Co.,

Ltd. (collectively, "Yingli") and Intervenor Plaintiff Shanghai BYD Co., Ltd. request that the

court hold aspects of Commerce's final determination unsupported by substantial evidence or

otherwise not in accordance with law.

The United States ("Government") asks that the court grant remand for some aspects of

Commerce's final determination and sustain other parts of Commerce's Amended Final Results

of its Fifth Administrative Review. [1]

## BACKGROUND

Commerce published a countervailing duty order on crystalline silicon photovoltaic cells,

whether or not assembled into modules ("solar cells") from the PRC on December 7, 2012. See

Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the

---

[1] Consolidated Plaintiffs, Changzhou, and Intervenor Plaintiffs Jinko, Yingli and Shanghai BYD
have adopted the arguments raised in Plaintiffs Canadian Solar's brief, Mem. of P. & A. in Supp.
of Rule 56.2 Mot. for J. Upon the Agency R. of Pls. Canadian Solar, ECF No. 70 (confidential),
ECF No. 71 (public) (August 31, 2020) ("Canadian Solar Br."). See Mem. in Supp. of Mot. for J.
Upon the Agency R. of Consolidated Pls. Changzhou Trina Solar Energy Co., Ltd. et al. at 8,
ECF No. 73-2 (Aug. 31, 2020); Mem. of Law in Supp. of Pl.-Intervenors' Mot. for J. on the
Agency R. at 2, ECF No. 72 (Aug. 31, 2020) ("Jinko Br."); Mot. of Pl.-Intervenors Yingli Green
Energy Holding Co., Ltd. et al. for J. on the Agency R. at 2, ECF No. 66 (Aug. 31, 2020);.Mem.
in Supp. of Rule 56.2 Mot. for J. Upon Agency R. by Pl.-Intervenor Shanghai BYD Co., Ltd.,
ECF No. 67 (Aug. 31, 2020).

People's Republic of China: Countervailing Duty Order, 77 Fed. Reg. 73,017 (Dep't Commerce

Dec. 7, 2012). In February, 2018, Commerce began its Fifth Administrative Review of this

countervailing duty order, covering the period from January 1, 2016, to December 31, 2016.

Initiation of Antidumping and Countervailing Duty Administrative Reviews, 83 Fed. Reg. 8058

(Dep't Commerce Feb. 23, 2018). On April 17, 2018, the U.S. International Trade Administration

selected Canadian Solar, and Jinko as mandatory respondents ("Mandatory Respondents") in this

review. See Respondent Selection Memorandum at 1–2, P.R. 38 (Apr. 17, 2018).[2]

     Commerce published its preliminary results on February 20, 2019, see Crystalline Silicon

Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of

China: Preliminary Results of Countervailing Duty Administrative Review and Intent to Rescind

the Review, in Part; 2016, 84 Fed. Reg. 5051 (Dep't Commerce Feb. 20, 2019), along with the

accompanying Preliminary Issues and Decision Memorandum, Decision Memorandum for the

Preliminary Results of the Countervailing Duty Administrative Review, Crystalline Silicon

Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of

China, C-570-980, POR: 01/01/2016-12/31/2016 (Dep't Commerce Feb. 12, 2019)  ("PDM").

     Commerce published its final determination on August 28, 2019. See Crystalline Silicon

Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of

China: Final Results of Countervailing Duty Administrative Review and Recession of Review in

---

[2] Commerce thereafter issued an initial questionnaire to Canadian Solar, Jinko, and the
Government of China (the "GOC"); Canadian Solar and the GOC submitted responses on June
19, 2018, Canadian Solar Section III Questionnaire Response, P.R. 68–72, C.R. 20–60 (June 19,
2018); GOC Initial CVD Questionnaire Response, P.R. 73–76, C.R. 61–70 (June 19, 2018), and
Jinko filed its response on June 20, 2018, Jinko Section III Questionnaire Response, P.R. 77–90,
C.R. 71–166 (June 20, 2018). Commerce also issued a supplemental questionnaire to the GOC
and the GOC submitted a response on December 19, 2018. GOC Supplemental CVD
Questionnaire Response, P.R. 156 (Dec. 19, 2018).

Part; 2016, 84 Fed. Reg. 45,125 (Dep't Commerce Aug. 28, 2019) ("<u>Final Results</u>"), as amended by <u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Amended Final Results of Countervailing Duty Administrative Review; 2016</u>, 84 Fed. Reg. 68,102 (Dep't Commerce Dec. 13, 2019) ("<u>Amended Final Results</u>"); <u>see also</u> <u>Decision Memorandum for Final Results of Countervailing Duty Administrative Review: Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China</u>, C-570-980, POR: 01/01/2016-12/31/2016 (Dep't Commerce Aug. 19, 2019) ("<u>I&D Memo</u>"). Commerce calculated a subsidy rate of 9.7% <u>ad valorem</u> for Canadian Solar and of 12.7% <u>ad valorem</u> for Jinko. <u>Amended Final Results</u> at 68,103.

**JURISDICTION & STANDARD OF REVIEW**

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2021) and 19 U.S.C. § 1516a(a)(2)(B)(i) (2021). The court will uphold Commerce's determinations in a countervailing duty proceeding unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" <u>Id.</u> § 1516a(b)(1)(B)(i).

**DISCUSSION**

**I.    Commerce's Unopposed Remand Requests on Three Issues**

Commerce requests a remand on three of the issues before the court that are substantially similar to the issues presented in the Third Administrative Review of the order on the merchandise at issue: 1) reconsidering the benchmark for aluminum extrusions, <u>see</u> Def.'s Resp. in Opp'n. to Pls.' Mots. for J. Upon the Agency R. at 19–21, ECF No. 79 (confidential), ECF No. 80 (public) (December 4, 2020) ("Gov. Br."), 2) choosing the benchmark for solar grade polysilicon, <u>see</u> <u>id.</u> at 22–24, and 3) its application of adverse facts available in its specificity finding for the provision

of electricity for less than adequate renumeration ("LTAR"), <u>see id.</u> at 24–26.  Plaintiffs support the Government's requests for remand.[3]

The court concludes that in view of its opinions covering the Third Administrative Review of certain photovoltaic cells from the PRC, <u>see</u> <u>Changzhou Trina Solar Energy Co., Ltd. v. United States</u>, 42 CIT __, __, 352 F. Supp. 3d 1316, 1332–33, 1336–37, 1341–42 (2018) ("<u>Changzhou Remand I</u>"); <u>Changzhou Trina Solar Energy Co., Ltd. v. United States</u>, Slip Op. 19-137, 2019 WL 5856438, at *9–10 (CIT Nov. 8, 2019) ("<u>Changzhou Remand II</u>"); <u>Changzhou Trina Solar Energy Co., Ltd. v. United States</u>, 45 CIT __, __, 466 F. Supp. 3d 1287, 1293–95, 1299–1303 (2020), and the Fourth Administrative Review, <u>see</u> <u>Canadian Solar Inc. v. United States</u>, Slip Op. 20-23, 2020 WL 898557, at *3 (CIT Feb. 25, 2020) ("<u>Canadian Solar I</u>"); <u>Canadian Solar Inc. v. United States</u>, Slip Op. 20-149, 2020 WL 6129754, at *4–5 (CIT Oct. 19, 2020) ("<u>Canadian Solar II</u>"), remand here is appropriate. The administrative records of the Third, Fourth, and Fifth Administrative Reviews and the Government's legal rationales are similar and thus the determination at hand suffers from essentially the same deficiencies that the court noted in these prior opinions. The court remands with instructions for Commerce to consult these prior opinions and reevaluate its decisions on these three issues accordingly.

## II.    LTAR Specificity Finding for Aluminum Extrusions

Commerce may assess a countervailing duty if, after investigating a subsidy, Commerce finds that "an authority 1) provides a financial contribution to a person, 2) a benefit is thereby

---

[3] <u>See</u> Reply Br. in Supp. of Rule 56.2 Mot. for J. on the Agency R. of Pls. Canadian Solar at 4–8, ECF No. 85 (public), (Jan. 26, 2021), ECF No. 90 (confidential) (Feb. 1, 2021) ("Canadian Solar Reply Br."); Reply Br. of Consolidated Pls. Changzhou at 3, ECF No. 86, (Jan. 26, 2021); Pl.-Intervenors' Reply Br. at 7, ECF No. 87 (Jan. 26, 2021); Reply of Pl.-Intervenor Shanghai BYD Co., Ltd. in Supp. of Their Rule 56.2 Mot. for J. on the Agency R. at 4, ECF No. 88 (Jan. 26, 2021).

conferred, and 3) the subsidy is specific." <u>Bethlehem Steel Corp. v. United States</u>, 26 CIT 1003,

1009, 223 F. Supp. 2d 1372, 1378, (2002) (citing 19 U.S.C. § 1677(5)(A)–(B)); <u>see also</u>

<u>Changzhou Remand I</u>, 42 CIT at __, 352 F. Supp. 3d at 1329–30 (reciting same). No party

challenges Commerce's determinations regarding financial contribution or benefit conferred.

Canadian Solar contends that Commerce's specificity determination concerning the provision of

aluminum extrusions for LTAR was unsupported by substantial evidence and unlawful, because

aluminum extrusions were provided widely at LTAR. Canadian Solar Br. at 14–18. Commerce

argues that its specificity finding for the provision of aluminum extrusions for LTAR is supported

by substantial evidence and in accordance with law, because Commerce determined that the

number and nature of users of aluminum extrusions is limited and does not involve the bulk of the

Chinese economy. Gov. Br. at 16–19.

   The GOC's provision of aluminum extrusions for LTAR is a domestic subsidy subject to

Section 771(5A)(D) of the Tariff Act of 1930. <u>See</u> 19 U.S.C. § 1667(5A)(D) (2020); <u>see also</u> <u>I&D</u>

<u>Memo</u> at 45–46. A domestic subsidy is specific, and therefore countervailable, when "[t]he actual

recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in

number." 19 U.S.C. § 1677(5A)(D)(iii)(I). "In determining whether a subsidy is provided to a

group of enterprises or industries, Commerce is not required to 'determine whether there are shared

characteristics among the enterprises or industries' that receive or are eligible for a subsidy: variety

amongst the industries receiving a given subsidy is not the test for specificity." <u>Changzhou</u>

<u>Remand I</u>, 42 CIT at __, 352 F. Supp. 3d at 1330 (quoting 19 C.F.R. § 351.502(b) (2021)).

Commerce must "compare the industries receiving the subsidy to the industry makeup of the

country at issue as a whole[,]" <u>id.</u>, in order "to avoid the imposition of countervailing duties in

situations where, because of the widespread availability <u>and use</u> of a subsidy, the benefit of the

subsidy is spread throughout an economy[,]" Uruguay Round Agreements Act, Statement of

Administrative Action, H.R. Rep. No. 103-316, vol. 1, at 930 (1994), reprinted in 1994

U.S.C.C.A.N. 4040, 4242.

        In its response to Commerce's initial questionnaire, the GOC denied the existence of a

countervailable subsidy for aluminum extrusions and maintained that "no specificity exists in the

provision of aluminum extrusions[]" because "[t]here are a vast number of uses for aluminum

extrusions." GOC Initial CVD Questionnaire Response at 80; see also I&D Memo at 45. The GOC

also denied the existence of any price controls, production level laws or policies, or any export

controls in the aluminum extrusions industry. GOC Initial CVD Questionnaire Response at 94–

96. "While the GOC indicates aluminum extrusions are used in a variety of industries and sectors

across China," Commerce found that "the industries within those sectors that actually consume

aluminum extrusions are limited in number." I&D Memo at 45. Comparing "the industries

receiving the subsidy to the industry makeup of the country at issue as a whole[,]" Changzhou

Remand I, 42 CIT at __, 352 F. Supp. 3d at 1330, Commerce concluded that "the number and

nature of the users (as identified by the GOC) are limited compared to the overall structure of the

Chinese economy." I&D Memo at 45.

        In the Third Administrative Review in 2013, the GOC reported six industries that use

aluminum extrusions: "building and construction, transportation, electrical, machinery and

equipment, consumer durables, and other industries." I&D Memo at 45. The GOC did not provide

any further information on users of aluminum extrusions in this review besides noting that they

are used in a variety of sectors and industries. Id. Relying on a 2007 comprehensive survey from

the China Statistical Yearbook, Commerce examined a list of the types of manufacturers in China

and determined that a significant number and types of manufacturers in China "do not appear to

Case 1:19-cv-00178-JAR   Document 125   Filed 09/03/21   Page 9 of 33

Consol. Court No. 19-00178                                                          Page 9
**Public Version**

use aluminum extrusions as an input[.]" Id.; see Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Documents for the Record at Attachment A, P.R. 215 (Feb. 12, 2019). Based on this record evidence, Commerce found that while there were a number of industries that use aluminum extrusions, there are also comparatively numerous industries that do not. [4] See I&D Memo at 45. Thus, Commerce determined that "the number and nature of the users (as identified by the GOC) are limited compared to the overall structure of the Chinese economy." Id.

Because the GOC failed to submit information about the applications of aluminum extrusions into the record for this review, Commerce's analysis on this issue differed slightly from past administrative reviews because Commerce relied on a generic list of the types of manufacturers in the PRC rather than on information about specific applications of aluminum extrusions. Compare I&D Memo at 45, with Changzhou Remand II, 2019 WL 5856438, at *5–6, and Canadian Solar II, 2020 WL 6129754, at *3–4. The overarching goal of the analysis, however, is the same, and, although not dispositive, this was a reasonable means of determining whether beneficiaries of the subsidy were found throughout the Chinese economy.[5] Here, Commerce

---

[4] Specifically, Commerce found that "manufacturers in China produce at least the following products (the majority of which do not appear to use aluminum extrusions as an input): foods, beverages, tobacco, textiles, apparel, leather products, furniture, paper and paper products, recording media, articles for culture, education and sports activities, raw chemical materials and chemical products, medicines, chemical fibers, rubber, plastics, mineral products, and machinery for cultural activity and office work, and artwork." I&D Memo at 45.

[5] Canadian Solar argues that Commerce erred by relying on information from a past administrative review in its analysis of specificity, by focusing on the sectors that the GOC identified as users of aluminum extrusions in 2013. Canadian Solar Br. at 15–16 (citing Albermarle Corp. & Subsidiaries v. United States, 821 F.3d 1345, 1356–57 (Fed. Cir. 2016)). In the Final Results, Commerce did consider the evidence presented by the GOC in the current review by analyzing "actual users of aluminum extrusions" from the "variety of industries and sectors across China[]" that use aluminum extrusions, as noted by the GOC. I&D Memo at 45; see GOC Initial CVD Questionnaire Response at 80; see also Gov. Br. at 18–19.

properly compared "the number and nature of the users" of aluminum extrusions to the "overall structure" of the Chinese economy in reaching its determination that the provision of aluminum for LTAR is de facto specific as defined in 19 U.S.C. § 1677(5A)(D)(iii)(I). I&D Memo at 45–46.

Although there is some evidence on the record that there are many users of aluminum extrusions across a broad set of sectors in the Chinese economy, there is evidence in the record to support Commerce's determination that "users of aluminum extrusions do not make up something akin to the whole of the Chinese economy." I&D Memo at 45; see also Changzhou Remand II, 2019 WL 5856438, at *6. Accordingly, Commerce's specificity determination regarding the GOC's provision of aluminum extrusions for LTAR is not "unsupported by substantial evidence on the record, or otherwise not in accordance with law," 19 U.S.C. § 1516a(b)(1)(B)(i), and is sustained.

## III.   Land Value Benchmark

Prior to finding a countervailable subsidy, Commerce must establish that a benefit was conferred upon a respondent. 19 U.S.C. § 1677(5)(B). "A foreign government's provision of goods to a respondent for LTAR constitutes a benefit." Changzhou Trina Solar Energy Co., Ltd. v. United States, Slip Op. 18-31, 2018 WL 1649629, at *2 (CIT Mar. 27, 2018) (citing 19 U.S.C. § 1677(5)(E)(iv)). In such circumstances, "Commerce determines the amount of the subsidy by comparing remuneration actually paid" with a market-determined price for the goods or services, under "a three-tiered hierarchy" employed by Commerce "to determine the appropriate remuneration benchmark." Changzhou Remand I, 42 CIT at __, 352 F. Supp. 3d at 1332; see 19 C.F.R. § 351.511(a)(2)(i)–(iii) (2021).[6]

––––––––––––––––––––

[6] Commerce derives a tier one benchmark, "by comparing the government price to a market-determined price for the good or service resulting from actual transactions in the country in

        At issue here is the benchmark set by Commerce in assessing the value of land use-rights.

Canadian Solar argues that Commerce's use of a tier three benchmark, the 2010 Coldwell

Banker Richard Ellis ("CBRE") Asian Marketview Report for Thailand Industrial Land Report

indexed using a Consumer Price Index ("CPI"), was unlawful and unsupported by substantial

evidence because: (1) under the tiered hierarchy Commerce should have used the preferred tier

two benchmark data that Canadian Solar provided, world average prices from the 2016 and 2017

CBRE Global Prime Logistics Rents reports, see Letter from Mowry & Grimson PLLC to Sec'y

of Commerce Pertaining to Canadian Solar Benchmark Submission Ex. 5B at 18, P.R. 107-110

(Nov. 5, 2018) ("CS Land Benchmark Submission"),[7] and (2) Commerce's chosen dataset was

more stale than the data provided by Canadian Solar. Canadian Solar Br. at 32–37. Commerce

maintains that its benchmark determination is lawful, because the nature of land as an in situ

good does not lend itself to use of a tier two benchmark, see I&D Memo at 58–59; Gov. Br. 31–

---

question." 19 C.F.R. § 351.511(a)(2)(i). In the absence of such a benchmark, Commerce turns to
a tier two benchmark "by comparing the government price to a world market price where it is
reasonable to conclude that such price would be available to purchasers in the country in
question." Id. § 351.511(a)(2)(ii). "If there is no world market price available to purchasers in the
country in question," however, Commerce moves on to a tier three analysis and "measures[s] the
adequacy of remuneration by assessing whether the government price is consistent with market
principles." Id. § 351.511(a)(2)(iii); see also Countervailing Duties, 63 Fed. Reg. 65,348, 65,378
(Dep't Commerce Nov. 25, 1998); Nucor Corp. v. United States, 42 C.I.T. __, __, 286 F. Supp.
3d 1364, 1373 & n.13 (2018), aff'd, 927 F.3d 1243 (Fed. Cir. 2019). If Commerce determines
that the government price is not consistent with market principles, it will look to construct an
external benchmark. See Habaş Sinai Ve Tibbi Gazlar Istihsal Endüstrisi A.Ş. et al.v. United
States, 44 CIT __, __, 459 F. Supp. 3d 1341, 1348 n.13 (2020).

[7] The 2016 and 2017 CBRE reports include rents for prime industrial and logistics facilities in
global hubs in the Americas, Asia Pacific, Europe, Middle East, and Africa as of Q4 2015
through Q1 of 2017. See CS Land Benchmark Submission Ex. 5B at 18. Canadian Solar argues
that these properties are "similar to the type of land used by Canadian Solar, because Canadian
Solar engaged in logistics operations involving loading and shipping of containerized finished
products." Id. at 3; see also Canadian Solar Br. at 32. Respondents ask that Commerce use a
global average of the most expensive rents for these facilities as a tier two benchmark. See I&D
Memo at 59; CS Land Benchmark Submission Ex. 5A, Ex. 5B at 14.

32, and its selection of the 2010 Thailand data as a tier three benchmark based on geographic

proximity and economic comparability is supported by substantial evidence on the record, see

Gov. Br. at 32–36. Because Commerce properly conducted a tiered benchmark analysis before

choosing a reasonable benchmark, Commerce's chosen land benchmark is supported by

substantial evidence and is lawful.

   First, Commerce determined that it could not rely on a tier one benchmark due to the

GOC's significant role in domestic land markets and the resulting institutional constraints on

individual land use-rights. See I&D Memo at 58; Land for LTAR Memorandum at 2, 13–27,

P.R. 216 (Feb. 12, 2019) ("Land Use Memo"). Next, Commerce determined that a tier two

world-wide average price would not be appropriate because such a benchmark can be selected

only when it is "reasonable to conclude that such price would be available to purchasers in the

country in question." 19 C.F.R. § 351.511(a)(2)(ii); I&D Memo at 58–59. Commerce considered

the nature and scope of the market for land and reasonably concluded that land, as an in situ

good, is generally not available to an in-country purchaser on the world market and therefore not

suitable for a tier two benchmark. I&D Memo at 59. Accordingly, Commerce's determination

that a tier two benchmark was inappropriate was reasonable and its subsequent rejection of

Canadian Solar's world price benchmark data as a tier two benchmark was lawful.

   Next, Commerce moved through a tier three analysis, and reasonably determined "that

government pricing of land-use rights in China is not consistent with market principles." Land

Use Memo at 30. Substantial evidence on the record shows "there is no meaningful separation

between the government and the land system[]" and "[t]he limited, attenuated market forces

within China's land system . . . are not sufficient to give the market a decisive and systemic role

in resource allocations." Land Use Memo at 27–30 (outlining the impact of such policies on the

market philosophy of the Chinese land market).[8] Finding that the GOC's influence on the land

market rendered the government price not "in accordance with market principles," Commerce

properly determined that a constructed tier three benchmark was appropriate. Land Use Memo at

30–32; see Habaş Sinai, 44 CIT at __, 459 F. Supp. 3d at 1348 n.13.

Commerce said it would "consider data sources submitted by interested parties to the

administrative record, and carefully evaluate the available record evidence based on . . .

comparability factors" on a case-by-case basis for finding an appropriate benchmark. Land Use

Memo at 31. Commerce identified two important factors for its analysis: geographic proximity

and economic comparability. See id. No party challenges Commerce's consideration of

geographic proximity and economic comparability as factors when choosing a benchmark for

land prices. Canadian Solar argues instead that Commerce erred by overemphasizing the

geographic proximity factor over the contemporaneity of the data, resulting in an unlawful

benchmark choice. See Canadian Solar Reply Br. at 19–21; Canadian Solar Br. at 35–37. It is

within Commerce's discretion to weigh the relevant factors. See Nippon Steel Corp. v. United

States, 27 CIT 1856, 1859, 301 F. Supp. 2d 1355, 1360 (2003) (noting that "[i]n conducting its

review, the court's function is not to reweigh the evidence but rather to ascertain whether the

[agency's] determinations are supported by substantial evidence on the record.").

In its reply brief, Canadian Solar also argues that even under tier three, Commerce should

have chosen to use data from the 2016 and 2017 CBRE report that Canadian Solar submitted

because it is more contemporaneous. Canadian Solar Reply Br. at 22.  Arguments not raised in

an opening brief are waived. See SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312,

---

[8] Domestic Chinese industrial land, for example, is not owned in fee simple, but rather is
allocated to nationals for periods of 40, 50, or 70 years; rural land is similarly contracted out in
30-year periods. See Land Use Memo at 21–22.

1319 (Fed. Cir. 2006); see also Sigvaris, Inc. v. United States, 41 CIT __, __, 211 F. Supp. 3d

1353, 1364 (2017). Canadian Solar failed to raise its argument regarding a tier three benchmark

in its opening brief and did not meaningfully develop it in its reply brief, referring to it only in

one sentence. Canadian Solar Reply Br. at 22.  Therefore, Canadian Solar's argument regarding

using data from its land benchmark submission as a tier three benchmark is waived.

      Nonetheless, it was reasonable for Commerce not to use the data submitted by Canadian

Solar as a benchmark due to a lack of geographic proximity and economic comparability. See

I&D Memo at 58–59. Specifically, Commerce noted that the dataset included land prices "from

locations such as, e.g., Warsaw, Poland; Stockholm, Sweden; and Atlanta, Georgia" which it

determined "are not reasonable alternatives to China as locations for Asian production." Id. at

59. While the dataset also included more geographically proximate locations, Commerce

correctly noted that Canadian Solar had not included data in its submission that allowed it "to

evaluate these locations' economic comparability with respect to China," id., and while there

may be some economically comparable countries in Canadian Solar's dataset, (specifically data

from Mexico and Brazil, countries that are on Commerce's surrogate country list for China in the

antidumping context), they are not geographically proximate to China, a factor that Commerce

says it weighed in its analysis and which neither side disputes as unreasonable.

      Based on similarity of geographic location, per capita income, regional population

density, and economic development Commerce's chosen tier three benchmark: land prices for

industrial zones in Thailand from 2010, is supported by substantial evidence. Land Use Memo at

30–31; see PDM at 18–19; I&D Memo at 59. Both countries have similar levels of economic

development, population density (141 and 127 persons per square kilometer), and regional per

capita income levels; China and Thailand have also in the past competed for the same foreign

direct investment opportunities, underscoring the reasonableness of the Thai land benchmark.

Land Use Memo at 30. To address the stale nature of the data, Commerce reasonably chose to

index these prices using the Thailand CPI from the International Monetary Fund.[9] See

Calculations Memorandum for the Amended Final Results at 553, C.R. 344–45 (Dec. 9, 2016).

Commerce's use of an indexed 2010 Thailand industrial land price survey as a tier three

benchmark for land prices in China was reasonable and supported by substantial evidence and is

therefore sustained.

## IV.  **Creditworthiness of Canadian Solar**

In its Final Determination, Commerce concluded that Canadian Solar and certain of its

cross-owned affiliates were uncreditworthy in 2016. I&D Memo at 64–68; see also PDM at 14–

17.[10] Canadian Solar argues that Commerce's determination was unsupported by substantial

evidence and unlawful because certain of its non-cross-owned affiliates received commercial long-

term loans. See Canadian Solar Br. at 43–46; I&D Memo at 67. The Government claims that

Commerce's determination is supported by substantial evidence for two reasons. First, the

Government argues that the commercial loans to affiliated companies in 2016 that Canadian Solar

---

[9] Canadian Solar argues that this indexing created a price bloat that inflated the price of land, because the index included consumer goods. See Canadian Solar Br. at 36–37; Canadian Solar Reply Br. at 21–22. There is no evidence in the record, however, to suggest that land prices cannot be indexed using a typical CPI index. In fact, Canadian Solar recommends using a CPI to adjust the 2016 and 2017 CBRE data it submitted as benchmark data. See CS Land Benchmark Submission at Ex. 5A. Thus, it was within Commerce's discretion to weigh the contemporaneous nature of the data against other factors including economic comparability and geographic proximity and index the data accordingly.

[10] Using the same methodology as Commerce did for Canadian Solar, Commerce reviewed Jinko Solar's submission of financial information and concluded that "Jinko Solar's poor current and quick ratios" indicated Jinko Solar did not have the liquidity to meet debt obligations and therefore, it was uncreditworthy pursuant to 19 C.F.R. § 351.505(a)(4)(i)(2021) in 2015 and 2016. I&D Memo at 69. Jinko Solar does not challenge this finding.

points to were not issued to cross-owned companies in accordance with 19 C.F.R.
§ 351.525(b)(6)(vi) (2021), and therefore, are not dispositive as to Canadian Solar's
creditworthiness. See Gov. Br. at 36–40. Second, the Government contends Commerce's
creditworthiness analysis, and its decision not to consider these loans, was properly based on
"financial indicators as calculated from [Canadian Solar's] financial statements and accounts." Id.
at 37–38 (citing I&D Memo at 67).

Commerce examines the creditworthiness of a company as a means of establishing a
benchmark for measuring benefits from government loans. See 19 C.F.R. § 351.505(a)(4); Nucor
Corp. v. United States, 45 CIT __, __, 494 F. Supp. 3d 1377, 1380–81 (2021). "Commerce must
determine in a creditworthiness analysis whether a company could have obtained long-term loans
from conventional commercial sources." Id. at 1380; see 19 C.F.R. § 351.505(a)(4)(i)
("[Commerce] will consider a firm to be uncreditworthy if [Commerce] determines that, based on
information available at the time of the government-provided loan, the firm could not have
obtained long-term loans from conventional commercial sources."). Regulations enumerate a non-
exhaustive list of factors Commerce may consider in making such a determination, which include
(1) "receipt . . . of comparable commercial long-term loans;" (2) "[t]he present and past financial
health of the firm, as reflected in various financial indicators calculated from the firm's financial
statements and accounts;" (3) "[t]he firm's recent past and present ability to meet its costs and
fixed financial obligations with its cash flow; and" (4) "[e]vidence of the firm's future financial
position[.]" 19 C.F.R. §§ 351.505(a)(4)(i)(A)–(D); "As the regulatory language makes clear,
Commerce has 'flexibility and discretion in determining which factors to consider and weigh in
making its creditworthiness decision.'" Archer Daniels Midland Co. v. United States, 37 CIT 760,
774, 917 F. Supp. 2d 1331, 1345 (2013) (internal citation omitted).

Here, Commerce examined the creditworthiness of five Canadian Solar cross-owned affiliates (CS Luoyang, CSI Cells, CSI Solar Power, CSI New Energy, and CSI Yancheng) from 2014 to 2016, and concluded that Canadian Solar was uncreditworthy in 2016 based on financial indicators that revealed a deteriorating financial position beginning in 2015. I&D Memo at 66–68; PDM at 14–15.[11] Canadian Solar submitted financial data, which Commerce evaluated under the guidelines set out in 19 C.F.R. § 351.505(a)(4). See I&D Memo at 67. Commerce verified this information in its review, and confirmed available data from Canadian Solar's SEC Form 20-F. See Verification of the Questionnaire Responses Submitted by Canadian Solar Inc. at 6–7, P.R. 224 (July 22, 2019).

Commerce then analyzed Canadian Solar's financial data and determined that it did not receive "comparable commercial long-term loans" in 2016 within the meaning of the statute nor did evidence on the record indicate that it issued comparable convertible notes during the period of review. See 19 C.F.R §§ 351.505(a)(4)(i)(A), 351.505(a)(4)(ii); I&D Memo at 67; PDM at 16. Furthermore, indicators[12] of Canadian Solar's past and present financial health and ability to meet

---

[11] Commerce relied on credit rating reports from Fitch, Moody's, and S&P to conclude that Canadian Solar was creditworthy in 2015. The reports concluded favorable long-term prospects for the solar industry and stated Canadian Solar's operating stability and efficiency, financial flexibility and strong market position would enable stability and growth. I&D Memo at 66–67. To find Canadian Solar creditworthy in 2014, Commerce relied on "a previous finding of creditworthiness during the 2014 administrative review." Id. at 66; see also PDM at 15.

[12] Commerce uses quick and current ratios, which measure a company's short-term liquidity, and therefore its ability to pay short-term obligations, to determine creditworthiness under 19 C.F.R. §§ 351.505(a)(4)(i)(B)–(C). Current ratios measure a company's ability to pay current or short-term liabilities with current or short-term assets and are calculated by dividing current assets by current liabilities. Commerce's typical benchmark for a creditworthy company's current ratio is 2; Commerce will normally find companies with current ratios below 2 to be uncreditworthy. I&D Memo at 67; PDM at 16. Quick ratios are a more conservative measure that include only assets that could be converted to cash within 90 days or less. Quick ratios are calculated by adding cash (and cash equivalents), current and account receivables, any short-term investments and dividing all of that by current and short-term liabilities. Commerce's typical benchmark for a

Case 1:19-cv-00178-JAR  Document 125  Filed 09/03/21  Page 18 of 33

Consol. Court No. 19-00178                                                    Page 18
**Public Version**

its costs and financial obligations were unacceptably low, which led Commerce to make an

uncreditworthy determination. I&D Memo at 67–68; PDM at 16; see also 19 C.F.R.

§§ 351.505(a)(4)(i)(B)–(C). Commerce calculated Canadian Solar's current ratio as 1.02 and quick

ratio as 0.38 in 2016, both of which were significantly below the benchmarks (2.0 and 1.0

respectively) Commerce deems as creditworthy. I&D Memo at 67. Commerce also explained that

Canadian Solar's retained cash flow, which measures cash after paying liabilities, continued to

decrease further into the negative, which, combined with the ratio levels, reflected that Canadian

Solar did not have "liquid funds to cover its upcoming obligations." I&D Memo at 67–68.

Canadian Solar does not dispute Commerce's calculation of these ratios, nor the

appropriateness of the benchmarks, but instead argues that commercial loans made to non-cross-

owned affiliates in 2016 indicate its creditworthiness. See Canadian Solar Br. at 43–46; I&D

Memo at 64–67; Canadian Solar Resp. to Ct.'s Order of May 19, 2021 at 11–12, ECF No. 114

(June 2, 2021) ("CS Resp. to Ct. Order"). Commerce explained that it did not consider these loans

in its analysis because they were not provided to cross-owned entities in accordance with 19 C.F.R.

§ 351.525(b)(6)(vi), which would therefore be dispositive evidence of Canadian Solar's

creditworthiness under 19 C.F.R § 351.505(a)(4)(ii) . I&D Memo at 67; see Gov. Br. at 37–39.

Canadian Solar does not dispute that the loans were made to non-cross-owned affiliates. Canadian

Solar Reply Br. at 23. Nonetheless, pointing to its SEC Form 20-F, Canadian Solar argues that its

financial reporting of affiliate financial activity shows it was creditworthy in 2016. See CS Resp.

to Ct. Order at 11–12.

---

creditworthy company's quick ratio is 1. I&D Memo at 67; PDM at 16.  If a company's quick
ratio is below 1, Commerce will normally deem that entity uncreditworthy. I&D Memo at 67;
PDM at 16.

Commerce's decision not to consider affiliate loans was reasonable because of the distinction between cross-ownership and affiliation.[13] Evidence on the record does not indicate that Canadian Solar nor any cross-owned affiliate was party to a commercial loan and therefore, that this activity is dispositive of Canadian Solar's creditworthiness. See Canadian Solar Br. at 45–46; Canadian Solar Reply Br. at 23; CS Resp. to Ct. Order at 11–12. A loan to a non-cross-owned affiliate, as is the case here, may have no financial bearing on the creditworthiness of another simply affiliated entity and it was reasonable in these circumstances for Commerce to conclude so.

Canadian Solar did not submit financial forecasts, market ratings, or other appraisals indicative of the companies' future financial position for 2016 under 19 C.F.R. § 351.505(a)(4)(i)(D). See I&D Memo at 67–68; see also PDM at 17. Accordingly, Commerce's review of the financial information submitted, analysis under the four factors in 19 C.F.R. § 351.505(a)(4)(i), and determination that Canadian Solar was uncreditworthy in 2016 was reasonable and is sustained.

## V.     Entered Value Adjustment

Commerce establishes countervailing duty ("CVD") rates by calculating an "individual countervailable subsidy rate[] for each investigated exporter and producer." Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States, 43 CIT __, __, 405 F. Supp. 3d 1317, 1326 (2019) ("Jiangsu I"); see 19 U.S.C. §§ 1671d(c)(1)(B)(i)(I) (2021), 1671b(d)(1)(A)(i) (2021). The subsidy rate is calculated by dividing the amount of the benefit afforded by the subsidy

---

[13] Cross-ownership "between two or more corporations" exists "where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets." 19 C.F.R. § 351.525(b)(6)(vi). In contrast, an affiliate can be any entity or person with influence or control over another. See 19 U.S.C. § 1677(33); 19 C.F.R. § 351.102(b)(3) (2021).

Case 1:19-cv-00178-JAR   Document 125   Filed 09/03/21   Page 20 of 33

Consol. Court No. 19-00178                                                  Page 20
**Public Version**

during the period of investigation (numerator) by the sales value of the product during the same

period (denominator). 19 C.F.R. § 351.525(a) (2021). CVDs are intended to be remedial rather

than punitive in nature. Chaparral Steel Co. v. United States, 901 F.2d 1097, 1103 (Fed. Cir.

1990). Thus, the CVD must equal the amount of the net countervailable subsidy. 19 U.S.C. §

1671(a) (2021). Furthermore, Commerce has a duty to determine CVD rates as accurately as

possible. Içdaş Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States, 45 CIT __, __, 498

F. Supp. 3d 1345, 1353 (2021).

Ideally, the free on board (F.O.B.) export value upon which the subsidy rate is initially

calculated equals the import value of the merchandise entering the United States upon which duties

are collected. Jiangsu I, 43 CIT at __, 405 F. Supp. 3d at 1326. Thus, in such a case the collection

of duties would equal the net countervailable subsidy as required by 19 U.S.C. § 1671(a). Id.

Sometimes, however, merchandise is marked up between export and import into the United States,

"creat[ing] a mismatch between the previously calculated subsidy rate and the final invoiced price

to which the subsidy rate is applied[.]" Id. at 1327. This situation most commonly occurs when

merchandise is sold by the exporter "in a back-to-back intercompany sales transaction to a foreign

affiliate, which then sells the merchandise to the United States with a mark-up." Id. at 1326. A

mark-up can result in an overcollection of duties, because the mark-up in price already offsets

some of the benefit afforded by the countervailable subsidy. Not accounting for this mark-up

means the CVD rate will not equal the net countervailable subsidy, as required by statute. See 19

U.S.C. § 1671(a). In such a situation, the exporter may request that Commerce adjust the ad

valorem subsidy rate during an administrative review. Jiangsu I, 43 CIT at __, 405 F. Supp. 3d at

1327. This adjustment is known as the entered value adjustment ("EVA").

Commerce has described its granting of an EVA as a "practice," and often emphasizes that such an adjustment is not mandated by statute or regulation. Id. For this reason, Commerce asserts it does not make specific requests regarding EVA in its questionnaires to respondents. Instead, respondents present evidence to Commerce that they believe demonstrates their eligibility for an EVA. Recent changes to Commerce's methodology in calculating the EVA has led to some confusion about what evidence Commerce requires to grant an EVA.

Commerce first outlined the requirements for granting an EVA in Ball Bearings and Parts Thereof from Thailand; Final Results of Countervailing Duty Administrative Review, 57 Fed. Reg. 26,646, 26,647 (Dep't Commerce June 15, 1992). In that case, Commerce adjusted the subsidy rate by calculating the mark-up ratio on U.S. sales and then multiplying that ratio by the original subsidy rate to obtain the adjusted subsidy rate for U.S. sales. Id. In this way, Commerce specifically accounted for the mark-up ratio on merchandise entering the United States. Based on this review, Commerce established six criteria that respondents must demonstrate to qualify for an EVA:

> 1) the price on which the alleged subsidy is based differs from the U.S. invoiced price, 2) the exporters and the party that invoices the customer are affiliated, 3) the U.S. invoice establishes the customs value to which the CVD duties are applied, 4) there is a one-to-one correlation between the invoice that reflects the price on which subsidies are received and the invoice with the mark-up that accompanies the shipment, 5) the merchandise is shipped directly to the United States, and 6) the invoices can be tracked as back-to-back invoices that are identical except for price.

Jiangsu I, 43 CIT at __, 405 F. Supp. 3d at 1327.

In recent reviews, however, Commerce appears to have taken a new approach for calculating an EVA. Commerce seemingly now adjusts a subsidy rate by changing the denominator of the original subsidy rate from the respondent's total worldwide export sales to the affiliate's marked-up total worldwide export sales. See I&D Memo at 72–75; see also Jiangsu I,

43 CIT at __, 405 F. Supp. 3d at 1327–28 (explaining that Commerce adjusted the subsidy rate to include "all sales by Zhongji HK [the affiliate], i.e. the higher valued sales, instead of all sales by Zhongji to Zhongji HK, i.e. the lower valued sales"). This calculation method does not specifically account for a U.S. mark-up and does not require U.S.-specific sales data. Despite not needing U.S. sales data for its EVA calculation, Commerce has not appeared to adjust its evidentiary requirements to reflect this new methodology. Commerce still requires respondents to demonstrate "that there is a higher customs value for <u>all</u> of its U.S. sales." <u>I&D Memo</u> at 75. Commerce asserts that it must be satisfied "that the sales value adjustment properly reflects an upward adjustment to the sales value of all merchandise that entered the United States, and on which Customs and Border Protection assessed dutiable value." <u>Id.</u> In practice, without additional guidance from Commerce regarding their submissions, respondents have typically submitted worldwide sales data showing an aggregate mark-up and a sample U.S. invoice demonstrating Commerce's six criteria, and the existence of a U.S. mark-up. <u>See</u> <u>Canadian Solar I</u>, 2020 WL 898557, at *8–9.

Here, Canadian Solar did just that, submitting data showing that its total sales exported to the U.S. through affiliates were marked-up in <u>the aggregate</u>, and a sample U.S. invoice demonstrating a U.S. mark-up (although the U.S. mark-up is different than the aggregate worldwide markup). <u>See</u> <u>Canadian Solar Section III Questionnaire Response</u>, at 11–12, Exs. 8.1 and 8.2; <u>see also</u> Canadian Solar Br. at 48–49. Canadian Solar stated that an EVA was appropriate because it demonstrated that it met each of the six criteria:

(1) The U.S. invoice is through [[    ]]. The invoice includes a mark-up from the invoice issued from our company to [[    ]]. For example, in the sample sales documentation, our company's invoice No. [[        ]] valued USD [[       ]], and [[    ]] invoice No. [[          ]] valued USD [[       ]].

(2) Our company, the exporter out of China, is affiliated with [[   ]], as is explained in the Affiliated Companies Questionnaire Response.

(3) The U.S. invoice issued by [[      ]] establishes the customs value to which countervailing duties would be applied. Please compare [[    ]] invoice No. [[

*Confidential Information Omitted*

Case 1:19-cv-00178-JAR   Document 125   Filed 09/03/21   Page 23 of 33

Consol. Court No. 19-00178                                                          Page 23
**Public Version**

      ]] totaling [[     ]], with the Customs Form 7501, which lists the same total entry value of [[    ]].

(4) There is a one-to-one correlation between our company's invoice and [[   ]] invoice, as can be seen in the sample sales documentation. Both invoices include the same job numbers and the same quantity of [[  ]] PCS.

(5) The merchandise is shipped directly to the United States. The Bill of Lading indicates the product is shipped from [[       ]]. Both the Bill of Lading and [[   ]] packing list include the same quantity of [[   ]] KGS.

(6) The invoices can be tracked as back-to-back invoices that are identical except for price. Specifically, our company's invoice and [[    ]] invoice include the same job numbers and the same quantity of [[    ]].

<u>Canadian Solar Section III Questionnaire Response</u> at 10. Commerce disputes that the one sample invoice provided by Canadian Solar in this administrative review demonstrates "that the overall mark-up to its export sales reflects a mark-up on its U.S. export sales" because of an inconsistency between the mark-up present in the sample U.S. invoice and the aggregate mark-up present in the worldwide sales data.[14] Gov. Br. at 28–30; <u>see also</u> <u>Canadian Solar I</u>, 2020 WL 898557, *8–9. Canadian Solar avers that Commerce inappropriately denied it an EVA for two reasons. First, it demonstrated that its total sales exported to the U.S. through affiliates were marked-up in <u>the aggregate</u>. Canadian Solar Br. at 48–49. Second, if Canadian Solar was required to demonstrate <u>each U.S. sale</u> was marked up for <u>all</u> of its U.S. sales to qualify for an EVA, Commerce was required to notify Canadian Solar of this deficiency in its submission and give it an opportunity to

---

[14] "[T]he court acknowledge[d] that granting an EVA appears feasible only when a mark-up is added consistently and as a matter of course, given verification concerns." <u>Canadian Solar I</u>, 2020 WL 898557, at *9. This concern is understandable because a respondent could potentially receive an excessive EVA based on a sample U.S. invoice showing a higher U.S. markup that is not consistently applied to all U.S. sales. Nevertheless, a respondent could also be improperly denied an EVA when the U.S mark-up is inconsistent, even though U.S. sales are still marked up as a matter of course, potentially resulting in an inaccurate subsidy rate in violation of 19 U.S.C. § 1671(a).

*Confidential Information Omitted*

provide the necessary additional information pursuant to 19 U.S.C. § 1677m(d) (2020).[15] Id. at

49–52.

Commerce's desire to verify the existence of a U.S. markup is reasonable because an EVA

is intended to prevent the overcollection of duties, which can only occur upon entry of the

merchandise to the United States. Canadian Solar I, 2020 WL 898557, at *8. Nevertheless,

Commerce's current methodology for calculating an EVA, by replacing the denominator of the

subsidy rate with the total worldwide marked up sales value, does not necessarily confirm the U.S.

mark-up about which Commerce is most concerned, and does not require U.S. specific sales data.

The court previously noted this discrepancy between the evidence Commerce requires and its

chosen calculation method in Jiangsu I. See 43 CIT at __, 405 F. Supp. 3d at 1330 (noting

"Commerce does not adequately explain why, given the calculation methodology employed in this

case, the identification of U.S. sales or U.S. customers is relevant to the EVA determination").[16]

---

[15] The only "guidance" Commerce provided regarding an EVA was instructing Canadian Solar to [s]eparately report the value of services sold by your company, if any. In addition, separately report the value of sales by each cross-owned company, as well as the value of sales between your company and the cross-owned company. . . . Please report sales information for all responding cross-owned companies during these years, not only sales information for the recipient of the subsidy.
Canadian Solar Section III Questionnaire Response at 9. In response to the questionnaire, Canadian Solar submitted its sales data and requested Commerce make an EVA. Id. at 10.

[16] On remand, Commerce "agree[d] with the Court" and clarified that "the way that [it] made the adjustment in the Preliminary Determination was incorrect, as any adjustment should have properly been focused on Zhongji's mark-up to its U.S. sales." Final Results of Redetermination Pursuant to Court Order Summary, C-570-054, POR 01/01/2016-12/31/2016 at 6–7 (Dep't Commerce Jan. 27, 2020). Commerce recognized, however, that it failed to communicate the change in calculation methodology before the Final Determination to Zhongji and ultimately granted the EVA. Id. at 8; Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States, Slip Op. 20-39, 2020 WL 1456531, at *1 (CIT Mar. 24, 2020). Nevertheless, Commerce seems to describe this method in cases commenced before this redetermination, including this review, describing an EVA as seeking "an adjustment to [a respondent's] sales denominator[.]" I&D Memo at 75.

Canadian Solar argues that requiring it to demonstrate the six criteria are met for all sales "does not directly correlate with [the] underlying purpose of an EVA to prevent the over-collection of duties." Canadian Solar Br. at 50–51.

Evidence in the record indicates that all of Canadian Solar's shipments entered the U.S. through an affiliate. See Canadian Solar Section III Questionnaire Response at 9; see also Jiangsu I, 43 CIT at __, 405 F. Supp. 3d at 1330. The sample U.S. invoice demonstrates that the shipment in question was marked up when entering the U.S., although the markup is lower than the markup demonstrated in Canadian Solar's aggregate worldwide sales data. See Canadian Solar Section III Questionnaire Response at 10 (showing a mark-up from [[                    ]] in the U.S. and showing an overall mark-up from [[                         ]]). This inconsistency in the markup might present a verification issue and leave a question of whether all U.S. invoices were marked up. Commerce, however, should have requested supplemental information pursuant to 19 U.S.C. § 1677m(d) if it found the information that Canadian Solar submitted deficient to resolve this.

The Government's argument that it is not required to request supplemental documentation from Canadian Solar because Section 782(d) of the Tariff Act only requires Commerce to request additional information where it deems that a response to an initial questionnaire was insufficient is not convincing. See Gov. Br. at 30; I&D Memo at 75–76 (quoting 19 U.S.C. § 1677m(d)). Commerce reviewed and considered Canadian Solar's submissions in its EVA analysis, creating an impression that Canadian Solar's su

bmission was accepted as a response, without providing any notice to Canadian Solar of any deficiencies until the Preliminary Determination. Thus, Commerce must give Canadian Solar an opportunity to correct any deficient information. See

*Confidential Information Omitted*

Shelter Forest Int'l Acquisition, Inc. v. United States, 45 CIT __, __, 497 F. Supp. 3d 1388, 1399

(2021).[17]

      Commerce has two options on remand. It can grant the EVA to Canadian Solar, given that

the evidence provided should be sufficient for completing the EVA calculation and that Canadian

Solar has demonstrated that there is a U.S. mark-up on the sample invoice provided. If Commerce

refuses to grant the EVA because it deems the evidence insufficient to separately verify a U.S.

mark-up, then Commerce must clarify its calculation methodology, explain the evidence it requires

for verification and why that evidence is reasonable given the calculation methodology, give

Canadian Solar an opportunity to submit the additional evidence, and in the case that new

information is submitted, reassess Canadian Solar's eligibility in the light of the supplemental

documentation. In sum, Commerce's stated methodology does not match up with the information

it asserts is needed. Where warranted an EVA prevents an overcollection of duties and Commerce

cannot avoid acting fairly just because there is no statute or regulation specifically addressing

EVA.[18]

**VI.**    **Export Buyer's Credit Program**

    **a.**  **Background**

---

[17] At oral argument, the Government raised new arguments about Canadian Solar's sales data which were not included in the I&D Memo. See Oral Argument at 21:00-25:04, 27:26-27:38. Because these arguments are post-hoc rationalizations, we do not consider them here. See U.H.F.C. Co. v. United States, 916 F.2d 689, 700 (Fed. Cir. 1990) ("Post hoc rationalizations of agency actions first advocated by counsel in court may not serve as the basis for sustaining the agency's determination.").

[18] The court notes that Commerce requested additional information regarding EVA from a different respondent in a recent review, so apparently Commerce does recognize this principle. See Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review of Certain Aluminum Foil from the People's Republic of China; 2017-2018, C-570-054, POR: 8/14/17-12/31/18, at 10 (Dep't Commerce June 17, 2020).

The GOC's Export Buyer's Credit Program ("EBCP") promotes exports by providing

credit at preferential interest rates to qualifying foreign purchasers of PRC goods. See Clearon

Corp. v. United States, 43 CIT __, __, 359 F. Supp. 3d 1344, 1347 (2019). Mandatory

Respondents reported that to their knowledge none of their U.S. customers received assistance

under the EBCP, and that Mandatory Respondents did not assist their customers in participating

in the program. See Canadian Solar Section III Questionnaire Response at 31 (stating "none of

these unaffiliated companies received assistance under the Export Buyer's Credit program" and

"nor did our company. . .provide assistance to any customers in obtaining buyer credits"); Jinko

Section III Questionnaire Response at 40–41 (stating "Jinko did not play any role in assisting its

customers in obtaining buyer credits," and "none of these unaffiliated companies received

assistance under this program [the EBCP]").  Mandatory Respondents also submitted

certifications of non-use of EBCP from their U.S. customers. See Canadian Solar Section III

Questionnaire Response, Ex. 15, (notarized and signed customer declarations from Canadian

Solar's customers); Jinko Solar Section III Questionnaire Response, Ex. IQR-JJ-25, (notarized

and signed customer declarations from Jinko's customers). Furthermore, Mandatory

Respondents indicated that they were available to answer Commerce's questions and would

encourage any customers to similarly cooperate with Commerce's verification attempts. See

Canadian Solar Section III Questionnaire Response at 31; Jinko Section III Questionnaire

Response at 40–41.

Based on information from prior investigations, Commerce determined that administrative

changes in the EBCP in 2013 may have (1) removed the previous requirement that a contract be

worth over $2 million to qualify for credits through the EBCP and (2) allowed unspecified third-

party banks to distribute EBCP funds to importers rather than China Export-Import Bank ("EX-

Consol. Court No. 19-00178                                                    Page 28
**Public Version**

IM Bank"). <u>See</u> <u>I&D Memo</u> at 26–28.  In order to understand the operation of the EBCP,

Commerce requested that the GOC provide (i) the EBCP Administrative Measures that were

revised in 2013, and (ii) a list of all "partner/correspondent banks" involved in the disbursement

of funds under the EBCP.  <u>GOC Supplemental CVD Questionnaire Response</u> at 1; <u>see also</u> <u>I&D</u>

<u>Memo</u> at 28. The GOC declined to provide this information, asserting that these questions were

"not applicable" because no U.S. customers of the Mandatory Respondents used the EBCP. <u>GOC</u>

<u>Supplemental CVD Questionnaire Response</u> at 1. Commerce also requested "a sample buyer's

credit application. . .the application's approval and the agreement between the respondent's

customer and the bank, which established the terms of the assistance provided under the facility."

<u>GOC Initial CVD Questionnaire Response</u> at 126. The GOC did not provide these documents to

Commerce, stating that no such agreements existed because no U.S. customers used the EBCP. <u>Id.</u>

at 126–27. Without this information, Commerce found that its understanding of the program was

incomplete and unreliable and that it was thus unable to verify the customer certifications of non-

use provided by Mandatory Respondents.  <u>Id.</u> at 34–38. Accordingly, Commerce applied adverse

facts available ("AFA") to determine that Mandatory Respondents used the EBCP. <u>Id.</u> at 8, 38–

39.

      Canadian Solar and Jinko objected to Commerce's application of AFA, arguing that there

was no gap in the record regarding the use of EBCP because customers provided verifiable

certifications attesting to their non-use of EBCP and therefore an adverse inference was

impermissible. <u>See</u> Canadian Solar. Br. at 10–14; Jinko Br. at 23–30. In response, Commerce

maintained that its application of AFA was lawful because the GOC failed to cooperate with its

requests for information.  Gov. Br. at 9–13. The Government also noted its position that it was not

possible to verify the customer certifications of non-use. <u>Id.</u> at 13–15.

Following oral argument, the court ordered Mandatory Respondents to file supplemental briefing detailing how Commerce could verify non-use of the EBCP through information collected from Mandatory Respondents and their customers, and for Commerce to explain whether the proposed verification method was feasible. Mandatory Respondents presented multiple avenues for verification, including proposed verification methods at the exporter, importer, and the EX-IM bank. See Suppl. Br. Per Ct. Order of Pls. Canadian Solar Inc. et al. and Consolidated-Pls. Jinko Solar Co., Ltd. et al. Related to Export Buyer's Credit Program, ECF No. 115 (confidential), ECF No. 116 (public) (June 9, 2021). In response, Commerce asserted that verification was unfeasible despite Mandatory Respondents proposed method and argued, in short, that it could not verify the customer certifications of non-use because it did not have the names of partner banks and a sample "paper trail" of documents associated with an EBCP loan that were necessary for verification. See Def.'s Suppl. Br. on the Issue of the Export Buyer's Credit Program at 4–5, 12, ECF No. 121 (July 16, 2021) ("Gov. Supp. Br.").

### b.  Discussion

If "necessary information is not available on the record" or if a responding party "withholds information" requested by Commerce, Commerce shall "use the facts otherwise available in reaching the applicable determination[.]" 19 U.S.C § 1677e(a) (2020). Commerce may use AFA only when information is missing on the record because a party "has failed to cooperate by not acting to the best of its ability to comply with a request for information" from Commerce. 19 U.S.C. § 1677e(b). Although Commerce can apply adverse facts that collaterally impact a cooperating party, "Commerce should seek to avoid such impact if relevant information exists elsewhere on the record." Archer Daniels, 37 CIT at 769, 917 F. Supp. 2d at 1342; see also Guizhou Tyre Co., Ltd. v. United States, 42 CIT __, __, 348 F. Supp. 3d 1261, 1270 (2018) ("To apply

AFA in circumstances where relevant information exists elsewhere on the record — that is, solely to deter non-cooperation or 'simply to punish' — . . . that is a fate this court should sidestep.") (citation omitted). Information submitted by parties is subject to verification by Commerce. 19 U.S.C. § 1677m(i)(1). "Commerce need not consider information submitted by respondents that cannot be verified," but Commerce "must first reasonably show that such information is, in fact, unverifiable." See Changzhou Remand I, 42 CIT at __, 352 F. Supp. 3d at 1327 (citing 19 U.S.C. § 1677m(e)).

As this court has previously discussed, there is no gap in this record as it stands regarding EBCP usage because the Mandatory Respondents have provided evidence of non-use in the form of customer certifications. See Canadian Solar Section III Questionnaire Response at Ex. 15, Jinko Solar Section III Questionnaire at Ex. IQR-JJ-25. The question here is whether Commerce's claim that customer certifications of non-use are unverifiable is supported by substantial evidence. We conclude, as we have in the past, that Commerce has not reasonably shown that the customer certifications are unverifiable on the record before us.  See Changzhou Remand I, 42 CIT at __, 352 F. Supp. 3d at 1326–27; see also Changzhou Trina Solar Energy Co., Ltd. v. United States, Slip Op. 19-143, 2019 WL 6124908, at *1–3 (CIT Nov. 18, 2019).

Despite more generalized complaints, the "missing" information that might potentially impact verification is the identity of the partner banks. Nonetheless, Commerce's arguments that EBCP non-usage is unverifiable without the names of the partner banks lack sufficient support. See I&D Memo at 32. Commerce posits that to verify use of a loan program, it would typically examine the company's subledgers for references to the party making the financial contribution and request underlying documentation from specific entries to confirm the origin of each loan. Gov. Supp. Br. at 10; see also I&D Memo at 32–33. Because it does not know the names of the

partner banks that may disburse loans under the EBCP, Commerce claims it would have to review

underlying documentation for all loans reflected in the subledger to determine whether any loan

was associated with the EBCP. Gov. Supp. Br. at 10. This review would be "an unreasonably

onerous undertaking for any company that received more than a small number of loans." Id. (citing

I&D Memo at 33). Commerce, because it never proceeded to attempt verification, does not indicate

the number of loans in question and does not demonstrate how burdensome verification would be

here, however. The court acknowledges that verification would appear to be easier if Commerce

had access to the names of the partner banks and could review specific entries in a customer's

subledger, and that Commerce is entitled to consider the burden of verification on agency

resources. See Torrington Co. v. United States, 68 F.3d 1347, 1351–52 (Fed. Cir. 1995). But here,

Commerce has provided insufficient evidence to conclude that verification by the usual spot check

of the customer records would be unduly burdensome. This record also suggests that Commerce

would have likely had adequate opportunity to attempt verification as Mandatory Respondents

offered to aid Commerce's verification efforts and indicated that they would encourage

unaffiliated customers to do the same. Commerce made no such attempt and its claims of

unverifiability are unavailing.[19]

   Commerce also argues that the lack of sample EBCP paperwork prevents verification at

the U.S. customer because even if Commerce were to review the underlying documentation of

every customer loan, it would not understand "whether/how that documentation would indicate

China Ex-Im involvement." I&D Memo at 33. Commerce has not provided a reasonable

explanation for why verification is unfeasible without examples of forms. Commerce simply

---

[19] Normally the court does not expect Commerce to attempt to obtain financial records from non-parties. The facts here are unusual because customer cooperation has already been demonstrated to some extent.

Case 1:19-cv-00178-JAR  Document 125  Filed 09/03/21  Page 32 of 33

Consol. Court No. 19-00178                                                                Page 32
Public Version

assumes that documents demonstrating EBCP use would be unidentifiable and incomprehensible

without guidance from the sample paperwork. Having apparently not reviewed or requested any

customer loans records for an inquiry into EBCP, despite apparently having opportunity to do so,

Commerce has a limited basis for this assumption.

Nor has Commerce shown why verification at the respondent is unfeasible. The record

demonstrates that the exporter would be involved in various stages of the EBCP. See e.g., GOC

Initial CVD Questionnaire Response at 127–28 (stating "Normally, if export buyer's credits are

provided by the EX-IM bank, the Chinese exporter is aware of the buyers receipt of the loans and

is involved in the loan evaluation proceeding and, in particular, is involved in post-lending loan

management conducted by the EX-IM Bank.") Commerce argued that it cannot verify usage at

the exporter because Commerce lacks the sample paperwork and information regarding the

disbursing banks requested from the GOC, and it needed a "better understanding of the program

before it could verify it." I&D Memo at 34–35; Gov. Supp. Br. at 8–10. Specifically, Commerce

noted it would be unable to confirm non-use by "examining books and records which can be

reconciled to audited financial statements or other documents, such as tax returns." Id. at 35. But

Commerce does not sufficiently explain why it would be unable to conduct an adequate review

of Canadian Solar and Jinko's accounting records, especially where, as here, the record indicates

that Commerce would likely have Respondent's cooperation in such a review. Commerce failed

to demonstrate that a fuller understanding of the functioning of the EBCP is required to verify

non-use of the program.

Commerce's should "seek to avoid" application of AFA that collaterally impacts a

cooperating party. See Archer Daniels, 37 CIT at 769, 917 F. Supp. 2d at 1342. Here, Mandatory

Respondents have cooperated by attesting they are not involved with the EBCP, providing

customer certifications stating that their customers were not involved in the EBCP, offering to assist in verification of non-use, and stating that they would encourage their customers to do the same. There is no record evidence suggesting that Mandatory Respondents or their customers used this program, and no reason to doubt the legitimacy of the Mandatory Respondents' statements of nonuse or customers' certifications. Commerce's claims that it is unable to verify these certifications without information from the GOC are not supported by substantial evidence. Commerce has not attempted verification and thus far has no basis to claim unverifiability. Its assertion that verification would be overly burdensome did not suffice to justify its use of AFA. On remand, Commerce may attempt to verify Mandatory Respondents' claims of non-use through the means proposed by Mandatory Respondents or any other reasonable procedure at its disposal. Alternatively, Commerce can elect not to extend verification and simply accept Mandatory Respondents' evidence of non-use.

## CONCLUSION

The court sustains Commerce's determination regarding, (1) the specificity finding for the aluminum extrusions for LTAR program, (2) Commerce's chosen benchmark for the land for LTAR program and, (3) Canadian Solar's lack of creditworthiness in 2016. For the foregoing reasons, the court remands to Commerce for a determination consistent with this opinion on the remaining issues. The remand determination shall be issued within 60 days hereof. Comments may be filed 30 days thereafter and any response 15 days thereafter.

                                                        __/s/ Jane A. Restani_____
                                                        Jane A. Restani, Judge


Dated:  September 3, 2021
        New York, New York