C-570-980
5th AR Remand
Slip Op. 21-114
01/01/2016 – 12/31/2016
**Public Document**
E&C/OVII:  CM

***Canadian Solar Inc., et al. v. United States***
**Consol. Court No. 19-00178; Slip Op. 21-114 (CIT September 3, 2021)**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.   SUMMARY

The Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand opinion and order of the U.S. Court of International

Trade (the Court) in *Canadian Solar Inc., et al. v. United States*,  Consol. Court No. 19-00178,

Slip Op. 21-114 (CIT September 3, 2021) (*Remand Order*).  These final results of

redetermination concern the 2016 administrative review of crystalline silicon photovoltaic cells,

whether or not assembled into modules (solar cells), from the People's Republic of China

(China).[1]  The petitioner in the underlying investigation is SolarWorld Americas, Inc.

(SolarWorld).[2]  The respondents selected for individual examination in the review are Jinko

Solar Import & Export Co., Ltd. and its cross-owned affiliates (Jinko Solar) and Canadian Solar

Inc., and its cross-owned affiliates (Canadian Solar).[3]

---

[1] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review, and Rescission of Review, in Part; 2016*, 84 FR 45125 (August 28, 2019) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM), as amended by *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Amended Final Results of Countervailing Duty Administrative Review; 2016*, 84 FR 68102 (December 13, 2019) (*Amended Final Results*).
[2] SolarWorld is now doing business as SunPower Manufacturing Oregon, LLC.
[3] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Preliminary Results of Countervailing Duty Administrative Review and Intent to Rescind the Review, in Part; 2016*, 84 FR 5051 (February 20, 2019) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).

Pursuant to the Court's *Remand Order*, we have clarified or reconsidered the *Final Results* regarding the issues analyzed below.  Based on this analysis, we have:  (1) found the Export Buyer's Credit Program (EBCP) program to be not-used; (2) revised our benchmarks used in the benefit calculations for the provision of aluminum extrusions for less than adequate remuneration (LTAR); (3) offered additional explanation regarding our conclusion that the polysilicon market in China is distorted through the interference of the Government of China (GOC) such that we cannot rely on prices for polysilicon imported into China; (4) offered additional explanation regarding our conclusion that the provision of electricity for LTAR is specific; and (5) granted Canadian Solar's entered value adjustment (EVA).  We have revised the applicable subsidy rates accordingly.

## II.    BACKGROUND

On September 3, 2021, the Court sustained, in part, and remanded, in part, aspects of the *Final Results*.  For the *Final Results*, Commerce relied on adverse facts available (AFA) in finding both respondents benefited from the EBCP given the GOC's failure to cooperate. Specifically, Commerce determined that the program was used, despite certifications from the respondents' U.S. customers claiming non-use, because the GOC failed to provide an adequate explanation of the operation of the program, and the 2013 revisions to the administrative rules regulating the program.[4]  Commerce also countervailed the provision of aluminum extrusions (*i.e.*, the aluminum used to frame completed solar modules), and crystalline polysilicon (the silicon ingots that are sliced into wafers that form solar cells) for LTAR.  In measuring the benefit from the provision of aluminum extrusions, Commerce averaged monthly Comtrade data and an annual value taken from an IHS report.[5]  Commerce reasoned it was necessary to take

---

[4] *See Preliminary Results* PDM at 33-36.
[5] *Id*. at 21-22.

both sets of data into consideration – the Comtrade data because they account for monthly price fluctuations and the IHS data because they are specific to solar frames.  In measuring the benefit from polysilicon, Commerce relied on a variety of third party "external" benchmark sources rather than actual imports because Commerce considers imports to be an "internal," tier one benchmark, and thus, distorted like all other domestic polysilicon transactions in China as a result of the GOC's involvement in that market.[6]  Regarding the provision of electricity for LTAR, Commerce determined that the provision of electricity was specific, and thus countervailable as AFA, given the GOC's failure to provide all information requested regarding the derivation of electricity prices.  Finally, Commerce rejected Canadian Solar's request for an EVA on the basis of insufficient record information.  Specifically, Commerce determined that Canadian Solar did not demonstrate that there was a higher customs value for all of its U.S. sales that were made through its affiliated company.

Commerce requested a voluntary remand to address three of the above decisions. Commerce did so in order to revise its explanations concerning the three decisions in accordance with revised explanations offered to the Court in other proceedings.  Specifically, Commerce requested that the following decisions be remanded:  (1) the averaging of the Comtrade data and the IHS data in the aluminum extrusions for LTAR benefit calculations; (2) the determination that the polysilicon market in China is distorted, and as such import prices are unusable as a benchmark; and (3) the determination that China's provision of electricity is a specific subsidy. Commerce requested remands of these decisions because nearly identical decisions involving very similar facts in prior reviews had already been remanded by the Court.[7]

---

[6] *Id*. at 19-20.
[7] *See, e.g.*, *Changzhou Trina Solar Energy Co., Ltd. v. United States*, 352 F. Supp. 3d 1316 (CIT 2018) (*Changzhou 3rd Review 1st Remand Order*) (first remand of the third review of this order); *see also Changzhou Trina Solar*

In addition to granting Commerce's requests for voluntary remands, the Court concluded that, as in previous remands, Commerce failed to explain why AFA was warranted with respect to the EBCP, and in order to avoid adversely affecting cooperating parties, Commerce should at least attempt verification or simply accept the respondents' statements of non-use.[8]  The Court also found that Commerce erred in not granting Canadian Solar's request for an EVA on sales that it made through an affiliated company and directed Commerce to either grant the EVA to Canadian Solar, or to clarify Commerce's calculation methodology and evidentiary requirements and provide Canadian Solar an opportunity to submit additional evidence, and reassess Canadian Solar's eligibility for an EVA.[9]  Finally, the Court upheld Commerce on several other decisions challenged by Canadian Solar.[10]  Analysis and additional background concerning the five issues remanded by the Court is provided below.

On October 26, 2021, Commerce issued Draft Remand Results, reprinted with minor changes below.[11]  On November 9, 2021, we received comments from Canadian Solar, Jinko Solar, and Shanghai BYD Co., Ltd. (Shanghai BYD).[12]  In lieu of comments, Changzhou Trina Solar Energy Co., Ltd. and its affiliates (collectively, Trina Solar) submitted a letter stating that it

---

*Energy Co., Ltd. v. United States*, Slip Op. 19-137 (CIT November 8, 2019) (*Changzhou 3rd Review 2nd Remand Order*) (second remand of the third review of this order); and *Canadian Solar Inc., et al. v. United States*, Slip Op. 20-23 (CIT February 25, 2020) (*Changzhou 4th Review Remand Order*) (first remand of the fourth review of this order).

[8] *See Remand Order* at 26-33.

[9] *Id*. at 19-26.

[10] *Id*. at 33 (the specificity finding for the aluminum extrusions for LTAR program, Commerce's chosen benchmark for the land for LTAR program, and Canadian Solar's lack of creditworthiness in 2016).

[11] *See Draft Results of Redetermination Pursuant to Court Remand, Slip Op. 21-114* (October 26, 2021) (Draft Remand Results); *see also* Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Calculations for the Draft Remand Redetermination," dated October 26, 2021.

[12] *See* Canadian Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China:  Comments on Remand Redetermination," dated November 9, 2021 (Canadian Solar Comments); *see also* Jinko Solar's Letter, "Jinko's Comments on Draft Remand, Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China," dated November 9, 2021 (Jinko Solar Comments); and Shanghai BYD's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China – BYD Comments on Draft Results of Redetermination," dated November 9, 2021 (Shanghai BYD Comments).

concurs with, and incorporates by reference, the arguments made by Jinko Solar and Canadian Solar.[13]  Our responses to all comments received follows the analysis section.

## III.   FINAL ANALYSIS

1.   Export Buyer's Credit Program

In the *Final Results*, Commerce concluded as AFA that the respondents benefitted from use of the EBCP because the GOC withheld necessary information.  We found that attempting to verify the program would not yield meaningful results, given the GOC's failure to provide information that would enable us to understand the operation of the program after the issuance of revised administrative rules by the GOC in 2013.  However, the Court rejected similar reasoning by Commerce in the prior reviews (third and fourth) of this order, as well as in other cases.[14]  In response, Commerce provided a more detailed explanation elaborating on why exactly it was necessary to fully understand the operation of the EBCP in order to verify the claims of non-use.[15]  Specifically, we explained that the GOC refused to provide Commerce with its 2013 administrative rules governing the program as well as a list of correspondent banks involved in

---

[13] *See* Trina Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China:  Letter in Lieu of Comments on Draft Remand Redetermination," dated November 9, 2021.

[14] *See Changzhou 3rd Review 1st Remand Order*, 352 F. Supp. 3d at 1326 ("Commerce provided reasoning as to why the GOC's failure to respond adequately made it impossible for it to understand fully the operation of the EBCP, but it failed to show why a full understanding of the EBCP's operation was necessary to verify non-use certifications."); *see also Guizhou Tyre Co., Ltd. v. United States*, 348 F. Supp. 3d 1261, 1271 (October 17, 2018) ("There is no ambiguity or uncertainty surrounding the use of the Program by Plaintiffs or their customers, as this information consisted of signed declarations from Plaintiffs' U.S. customers certifying non-use, and is corroborated by GOC's statements.  *See* GTC NSA Questionnaire Resp. at 13-14.  Therefore, the only gap of information on the record are facts regarding certain aspects of the *operation* of the Program.  In turn, the only factual issues potentially appropriate for facts otherwise available, § 1677e(a), and adverse inferences, § 1677e(b), are those that concern the operation of the Program, factors entirely irrelevant to Guizhou's apparent non-use.").  *Cf. Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334, 1355 (CIT 2016) (finding Commerce had offered a reasonable explanation that an understanding of how an exporter would be involved in the program was necessary to determine usage and that the GOC had failed to cooperate in providing this information, and upholding the application of AFA in determining the respondent companies had used the program).

[15] *See, e.g.*, Final Results of Redetermination Pursuant to Court Remand, *Changzhou Trina Solar Energy Co., Ltd. v. United States*, Court of International Trade Consolidated Court No. 17-00198, dated April 24, 2019 (ACCESS barcode 3825109-01) (*Changzhou 3rd Review 1st Remand Redetermination*) at 12-24 and 42-59.

the transactions.  We also noted the GOC's failure to provide other requested information, such as a sample application and other documents comprising the "paper trail" of the provision of credit under the program.[16]  Absent this information, Commerce has no assurance of its ability to differentiate ordinary commercial loans from EBCP-supported loans in the books and records of the respondents' U.S. customers, or to differentiate disbursements of funds to the respondents themselves pursuant to ordinary loans from disbursements pursuant to EBCP-supported credit. Additionally, Commerce has no guidance to follow in identifying which banks or loans to scrutinize in attempting to verify non-use.  Thus, attempting to verify non-use of the EBCP without knowing where to look, or what to look for, would be unlikely to yield accurate or meaningful results.  Nonetheless, under respectful protest, and based on the respondents' claims of non-use, we are finding the program to be not-used in order to comply with the Court's *Remand Order*.  Doing so complies with the Court's instruction to avoid adversely impacting a cooperative party.  We have removed the AFA rate from our calculations and revised the total subsidy rates applicable to the respondents accordingly.

2.    Commerce's Use of Comtrade and IHS Datasets as a Benchmark for Aluminum Extrusions

In *Changzhou 3rd Review 1st Remand Order* and *Changzhou 4th Review Remand Order*, the Court remanded Commerce's decision to average monthly Comtrade data with an annual IHS value in determining a benchmark for aluminum extrusions.  The Court expressed concerns that the Comtrade data, which reflect several types of aluminum extrusions, were not specific enough to serve as an accurate benchmark for the aluminum solar frames at issue, and that there was not a sufficient need for a monthly benchmark to warrant including the overly broad Comtrade data

---

[16] *Id*. at 21.

in the calculation.[17]  In *Changzhou 3rd Review 1st Remand Redetermination*, Commerce provided additional explanation regarding why the Comtrade data were not overly broad. However, in *Changzhou 3rd Review 2nd Remand Order*, the Court rejected Commerce's additional explanation and strongly suggested that Commerce rely solely on the IHS data.[18] Subsequently, in *Changzhou 3rd Review 2nd Remand Redetermination* and *Changzhou 4th Review Remand Redetermination*, under protest, Commerce recalculated the subsidy rate for the program relying only on the IHS data.

Although Commerce has a preference for relying on benchmark data that capture monthly price fluctuations, it is not possible to demonstrate that the monthly price fluctuations reflected in the Comtrade data are driven by variations in solar frame prices.  Furthermore, given the fact that the record (here or in previous reviews) does not indicate what exactly is included in the HTS subheadings included in the Comtrade data, nor how solar frames may differ from other types of aluminum extrusions, it is likewise not possible to adequately address factors affecting comparability.  As a result, we are relying solely on the IHS data as a benchmark for aluminum extrusions in this remand redetermination, and we have revised the subsidy calculations and rates accordingly.

3.   <u>Commerce's Rejection of Canadian Solar's Import Pricing Data in Computing a Benchmark Price for Polysilicon</u>

In *Changzhou 3rd Review 1st Remand Order*, the Court remanded Commerce's rejection of import data in determining a benchmark for solar grade polysilicon.  Commerce understood the Court's concern to be that it was unclear why prices for imports should be considered "domestic prices" (*i.e.*, internal Chinese prices), and thus, rejected as a possible "tier one"

---

[17] *Id.* at 14.
[18] *See Changzhou 3rd Review 2nd Remand Order*, Slip Op. 19-137 at 15.

benchmark (*i.e.*, internal benchmark) given the distorted market within China.[19]  Therefore, in its first remand redetermination, Commerce explained that prices for imported products must compete with prices of products sourced domestically; thus, prices for imported products are distorted along with domestic prices.[20]  However, in *Changzhou 3rd Review 2nd Remand Order* and subsequently, in *Changzhou 4th Review Remand Order*, the Court found that Commerce did not sufficiently explain how the GOC's minimal participation in the general polysilicon industry led to distorted prices for imported solar-grade polysilicon and again remanded the issue to Commerce.  In response, Commerce examined additional information on the record demonstrating a distorted market, considered several factors beyond the GOC's ownership and control of polysilicon producers, and elaborated on how the information on the record leads to the distortion conclusion.[21]  Commerce requested a voluntary remand with respect to this issue to provide the court with additional explanation as to why the record supports a distortion conclusion which renders tier-one benchmark prices unusable.

Accordingly, consistent with prior remand redeterminations, we are also undertaking a broader analysis of the solar grade polysilicon market, and based on the analysis detailed below, we continue to find that other factors in addition to the GOC's ownership and control of production lead to the conclusion that the market is distorted.  Before doing so, we placed relevant factual information on the record:  the GOC's 12th Five Year Plan for the Solar Photovoltaic Industry, the 2013 Annual Results of GCL-Poly Energy Holdings Limited (GCL Poly), GCL Poly's 2016 Annual Results, Xinte Energy's 2016 Annual Results, and relevant excerpts from Yingli Solar's and DAQO New Energy's 2016 Form 20-F filed with the U.S.

---

[19] *See Changzhou 3rd Review 1st Remand Redetermination* at 37.
[20] *Id*. at 38.
[21] *Id*., at 14-22 and 34-41.

Securities and Exchange Commission (SEC).[22]  We then provided parties an opportunity to

provide additional information and comment on the issue.[23]  On October 4, 2021, we received

such information and comments from Canadian Solar.[24]

      While the GOC provided information indicating that it owns or controls producers

accounting for a minority of the production of polysilicon,[25] it was unable to provide information

specific to solar-grade polysilicon (just as solar glass constitutes a particular type of flat glass,

solar-grade polysilicon constitutes a particular type of polysilicon, as opposed to the polysilicon

that is used generally in many types of electronics).  Consequently, Commerce relied on facts

otherwise available in determining that the polysilicon market in China was distorted because

information on the record indicated the GOC's significant involvement in the polysilicon

industry.  To clarify, Commerce did not rely on "adverse" facts available in determining that

domestic prices for solar-grade polysilicon were distorted or that the distortion affected prices

paid by Chinese buyers of imported products as well as prices paid by Chinese buyers of

domestically produced products.[26]  In particular, Commerce did not make a finding that the GOC

failed to cooperate (the GOC claimed it did not have information specific to solar-grade

polysilicon and Commerce had no reason to doubt this claim), but merely that necessary

information was not on the record.  Rather, because Commerce determined that the information

---

[22] *See* Memorandum, "Placing Information on the Record Regarding Polysilicon," dated September 28, 2021 (Commerce's Polysilicon NFI).  GCL Poly, Xinte Energy, Yingli Solar, and DAQO New Energy are among the largest Chinese manufacturers of solar-grade polysilicon and/or solar cells.
[23] *Id*.
[24] *See* Canadian Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China:  Responsive Comments and New Factual Information on Polysilicon," dated October 4, 2021 (Canadian Solar's Polysilicon NFI Comments).
[25] *See* GOC's Letter, "GOC Initial CVD Questionnaire Response:  Fifth Administrative Review of the Countervailing Duty Order on Crystalline Silicon Photovoltaic Cells, Whether or not Assembled Into Modules, from the People's Republic of China (C-570-980)," dated June 19, 2018 (GOC June 19, 2018 IQR) at 46.  The production of polysilicon by state-invested enterprises that accounts for the total domestic consumption is business proprietary in nature.
[26] *See Preliminary Results* PDM at 26-29.

provided by the GOC regarding state-owned/controlled producers of polysilicon in general was not strictly relevant to the market for solar-grade polysilicon, Commerce examined other record evidence and relied on "facts otherwise available" in making the distortion determination under 19 CFR 351.511(a)(2).[27]

Specifically, Commerce cited the following facts in support of its conclusion that the Chinese market for solar-grade polysilicon was distorted:[28]

- A WTO Dispute Settlement Panel determination that the GOC maintains WTO-inconsistent export restraints on silicon exports and contends that these restraints operate to ensure "an abundant domestic supply of silicon in China, thus artificially depressing the domestic price of polysilicon."

The relevance of this information is that a restraint on exports of silicon (the raw material input into solar-grade polysilicon) leads to an artificial abundance of the raw material in the domestic market (due to the consequent retention of supply that would otherwise be exported), lower prices (as Chinese consumers do not have to compete with consumers worldwide) for the raw material, and thus, lower prices for downstream materials, such as polysilicon.

- A 2009 *New York Times* article explaining that the GOC's State Council, or cabinet, has the ability to manage several key aspects of the solar-grade polysilicon industry, including its capacity, access to the industry, land use, and lending from state-owned commercial banks (SOCBs).

The relevance of this information is that it indicates the GOC subsidizes the domestic solar-grade polysilicon industry through the provision of land and financing, and that it might also have a special say in mergers and acquisitions, and barriers to new entrants.  Subsidization of a product, industry concentration, and entry barriers are all factors that distort resource

---

[27] In *Changzhou 3rd Review 2nd Remand Order*, the Court acknowledges that, "although it is theoretically possible that the GOC's influence over a small percentage of the general polysilicon industry results in a majority control of the production of solar-grade polysilicon, the court concludes that this possibility is too remote, without more, to serve as substantial evidence that this influence disrupts import pricing."  *See Changzhou 3rd Review 2nd Remand Order* at 20-21.

[28] *See Preliminary Results* PDM at 27.

allocation and artificially affect supply and price.  The implication of the article is that the State Council has control over aspects of the solar-grade polysilicon industry that is atypical and above the normal involvement of a government in such aspects of the economy.

- A Polysilicon Productions Data article explaining that the GOC maintains "Polysilicon Industry Access Standards," outlining rules and restrictions that prospective solar-grade polysilicon manufacturers in China must adhere to.

Again, the relevance is that the GOC takes a special interest in the solar-grade polysilicon industry, creating special entrance requirements that will affect supply and price (up or down).

Commerce thus determined as "neutral" facts available that Chinese domestic prices were distorted.  As indicated above, finding Chinese domestic prices are distorted means rejecting prices for imported products as well, because imported products must compete with sales from domestic sources.  This is Commerce's typical practice; when we find a domestic market is distorted, we also conclude that imports into that market are distorted, as well, for the reason just given.  Thus, when Commerce finds a domestic market distorted, it rejects all options for a "tier-one" benchmark, as enumerated in 19 CFR 351.511(a)(2)(i) ("actual transactions between private parties, actual imports, or, in certain circumstances, actual sales from competitively run government auctions"), because all such transactions are in competition with each other for Chinese buyers in the domestic market setting.  This inference is especially reasonable when imports account for less of domestic consumption than domestic producers.  Such is the case here.  According to the GOC, domestic producers supply 65 percent of domestic consumption whereas imports account for the remaining 35 percent.[29]

---

[29] *See Final Results* IDM; *see also* GOC June 19, 2018 IQR at 44-46.  While Canadian Solar argues that polysilicon imports account for 42 percent of domestic purchases in China during the POR, the information is derived from the China Nonferrous Metals Industry Association (the Association); however, the GOC explained that its reported data from the National Bureau of Statistics (SSB) are superior to the data from the Association because the Association only counts polysilicon producers above a certain income threshold, whereas the SSB data include all polysilicon producers regardless of income.  *See* Canadian Solar's Polysilicon NFI Comments at 4; *see also* GOC June 19, 2018 IQR at 44.

In comments submitted to the record of this remand redetermination, Canadian Solar reiterates its argument that Commerce should rely on its import prices as a tier-one benchmark because the information Commerce has placed on the record does not address the overall ownership of solar-grade polysilicon entities by the GOC, and thus, the record does not meet the Court's substantial evidence standard.[30]   Additionally, Canadian Solar submitted information which it claims demonstrates that the domestic market was "heavily influenced by an influx of competing imports" at lower prices during the period of review (POR), which consequently limited the GOC's influence in the market.[31]   However, the information cited by Canadian Solar states that "{t}he situation of polycrystalline silicon import trade in China is still grim and complicated in recent years," and further indicates that domestic production accounted for the majority of China's domestic supply from 2013 through 2017 (*i.e.*, including the 2016 POR).[32] Canadian Solar also argues that the lower prices of solar-grade polysilicon imports are not the result of competition with domestic production, but rather correlate with lower production costs resulting from superior technology, and specifically cites the cost advantage gained by foreign manufacturers which use the Modified Siemens Process.[33]   We note that record information in the GOC's 12th Five Year Plan for the Solar Photovoltaic Industry states that between 2006 and 2010 "{l}eading Chinese polycrystalline silicon enterprises have mastered key technology required by thousand-ton production capacity through a modified Siemens process."[34]   Similarly, GCL Poly has employed the modified Siemens process in its production since at least 2013.[35] Thus, contrary to Canadian Solar's claims that the Modified Siemens Process is only available to

---

[30] *See* Canadian Solar's Polysilicon NFI Comments at 2-3.
[31] *Id*. at 2-3.
[32] *Id*. at Exhibit 1, page 116.
[33] *Id*. at 6-7.
[34] *See* Commerce's Polysilicon NFI at PDF page 8.
[35] *Id*. at Attachment II, page 18.

foreign manufacturers, the record clearly demonstrates that the same process is employed by Chinese polysilicon producers as well.  As such, Canadian Solar's argument that foreign manufacturers incur lower costs due to technological cost advantages arising from the use of the Modified Siemens Process is not supported by record evidence.  Finally, Canadian Solar also argues that the evidence of distortion cited by Commerce in the *Preliminary Results* is outside of the POR and, thus, inaccurate.[36]

Notwithstanding Canadian Solar's arguments, Commerce continues to find that Canadian Solar's imports of polysilicon from unaffiliated suppliers cannot serve as an appropriate benchmark for polysilicon due to the GOC's participation in the domestic industry.  While the *Preamble* explicitly mentions substantial government ownership in the domestic industry as the general cause of distortion that renders tier-one benchmarks unusable, the record contains no indication of the GOC's ownership in the solar-grade polysilicon industry.  Further, the *Preamble* also states that the use of a tier-two benchmark is permissible, "Where it is reasonable to conclude that actual transaction prices are significantly distorted as a result of the government's *involvement* in the market."[37]  Accordingly, we have expanded our analysis to account for other factors of distortion that disrupt pricing and support our conclusion that the solar-grade polysilicon market is distorted by reason of the GOC's involvement.  On further review of the record, we find evidence for other *indicia* of market-distorting government involvement, as explained below.

---

[36] *See* Canadian Solar's Polysilicon NFI Comments at 10.
[37] *See Countervailing Duties; Final Rule*, 63 FR 65348, 65350 (November 25, 1998) (*Preamble*) at 65377 (emphasis added).  Commerce has frequently found a government's involvement in a market or industry to be distortive even when the government had little or no ownership of production; *see also, e.g.*, *Biodiesel from the Republic of Argentina, Final Affirmative Countervailing Duty Determination*, 82 FR 53477 (November 16, 2017), and accompanying IDM at 35; and *Supercalendered Paper from Canada:  Final Affirmative Countervailing Duty Determination*, 80 FR 63535 (October 20, 2015), and accompanying IDM.

Record information shows that the GOC had border measures in place that would affect industry trade, specifically that there was a 15 percent export duty imposed on polysilicon, which would have inhibited exports and, thus, presented a barrier to competition between domestic Chinese customers and world customers for polysilicon,[38] leading to downward pressure on Chinese domestic prices for all types of polysilicon, including solar-grade polysilicon.  New information placed on the record by Commerce, which is contemporaneous with the POR, also indicates that the GOC's import restrictions affected polysilicon prices.  Specifically, information from GCL-Poly's 2016 Annual Report indicates that polysilicon pricing remained stable in 2016 "as a result of Import Duty Levy on foreign import, especially those from the United States."[39]  DAQO New Energy's 2016 Financial Report also states that since 2014, the GOC suspended applications for solar-grade polysilicon imports, which led to a decline of imports.[40]

Additionally, new information submitted by Canadian Solar indicates that the GOC influences domestic prices by being directly involved in reaching agreements with foreign polysilicon manufacturers to ensure a consistent supply of imported polysilicon.[41]  This information is also included in DAQO's 2016 Annual Report which states that, "{t}he import volume from Germany and South Korea, the two largest countries in terms of China's polysilicon import volume, has not been materially impacted due to a price commitment agreement between Wacker ({the largest} polysilicon manufacturer in Germany) and the Chinese government," and low tariffs imposed on major South Korean polysilicon producers.[42]

---

[38] *See* Memorandum, "Additional Documents Memorandum," dated February 12, 2019 (Additional Documents Memorandum) at PDF 82 (citing a WTO Panel Report).
[39] *See* Commerce's Polysilicon NFI at Attachment III, page 26.
[40] *Id*. at Attachment VI, page 60.
[41] *See* Canadian Solar's Polysilicon NFI Comments at Exhibit 1 (citing a Chinese Polysilicon Market Study at 117).
[42] *See* Commerce's Polysilicon NFI at Attachment VI, page 60.

The direct involvement of the GOC in establishing contracts with fixed prices and quantities with foreign manufacturers for imports of polysilicon evinces government interference in the market and further demonstrates why import prices cannot serve as reliable benchmarks, as they are heavily influenced by the GOC.

Moreover, record information shows government industrial policies or plans in place that call for intervention in the relevant domestic industry. The GOC's 12th Five Year Plan for the Photovoltaic Industry identified the solar-grade polysilicon industry as a "Key Focus Area" for development and discusses several intervening measures intended to influence the market and create favorable conditions for the domestic industry.[43] Specifically, the document states that the GOC will: direct local governments to "resolutely curb low-level repetitive construction to avoid a mass rush into the industry, which could lead to vicious market competition,"[44] "support key polysilicon production equipment and leading enterprises,"[45] "adhere to the combination of 'led by the market and guided by the government, '"[46] and "implement differentiated policies and guide industries like polysilicon to move toward the western regions."[47] Record information from Xinte Energy's 2016 Annual Report includes a brief summary of the GOC's 13th Five-Year Plan in which it references the GOC's initiative to "accelerate energy production and consumption"[48] as well as "the state's policies of giving priority to new energy consumption," with an emphasis on the "national strategic emerging industries, wind and solar."[49] Further, Yingli Solar's 2016 Annual Report states that, "{u}nlike other companies based overseas, our company is based in China, where PV remains a *policy-driven* market. The introduction,

---

[43] *Id*. at Attachment I, page 10.
[44] *Id*. at Attachment I, page 12.
[45] *Id*. at Attachment I, page 11 and 13.
[46] *Id*. at Attachment I, page 13.
[47] *Id*.
[48] *Id*. at Attachment IV at 36.
[49] *Id*.

modification, or phasing-out of national support schemes will heavily impact the development of the PV market and related industries, and could also significantly influence our company's operations."[50]  Similarly, the 2013 financial statement of GCL Poly, the largest Chinese manufacturer of solar-grade polysilicon, states that, "due to close attention paid by the Chinese government, supportive policies were launched in waves," and as a result the Chinese market "recovered quickly in large scale."[51]  These facts demonstrate that the GOC's significant involvement in the solar-grade polysilicon industry interferes with the market, and Chinese polysilicon producers and consumers benefit from lower prices as a result.

The significance of the GOC's intervention is clearly reflected in each of the annual reports of the Chinese solar-grade polysilicon producers, which are replete with references to the GOC's "supportive policies" and demonstrate a heavy reliance on GOC subsidies.  As discussed above, GCL Poly partially attributed the recovery of the Chinese polysilicon industry to "supportive policies" implemented by the GOC and stated further that there is evidence of more supportive policies emerging from the GOC in the future.[52]  Similarly, Yingli Solar and DAQO's 2016 Annual Reports both state that "the near-term growth of the market for PV products depends in part on the availability and size of government subsidies and economic incentives."[53]

In addition, record information shows significant government financial support provided to the domestic industry, creating non-market incentives for production and pricing.  For example, DAQO's 2016 Annual Report indicates that its "other operating income" in 2016 was $5.3 million, an increase of nearly 2 million USD compared to 2015,[54] and reflects "unrestricted

---

[50] *Id*. at Attachment V, page 11 (emphasis added).  "PV" means photovoltaic(s), *i.e.*, solar cells.
[51] *Id*. at Attachment II, page 17.
[52] *Id*. at Attachment II, page 17 and 21.
[53] *Id*. at Attachment V, page 88 and Attachment VII, page 8.
[54] *Id*. at Attachment VII, page 59.

government subsidies" from GOC authorities.  DAQO's 2016 Annual Report further states that, "{w}e have utilized, and expect to continue to utilize, these subsidies to fund general operating expenses."[55]

In addition to the aforementioned supportive policies, further measures intended to develop the domestic polysilicon industry listed in the GOC's 12th Five Year Plan for the Solar Photovoltaic Industry include:  providing support to major enterprises to "grow stronger so that by 2014, leading polysilicon enterprises will reach 50,000 MT per year,"[56] "develop clean, safe, low energy consumption, high-purity, large-scale polysilicon production technology,"[57] "support the R&D and industrialization of key production equipment used for Polysilicon … in order to enhance product quality and PV conversion efficiency, and to reduce energy consumption during production, strengthen the application of locally-manufactured equipment," and "focus support on energy-conservation in polysilicon production."[58]  The operation of the GOC's supportive policies can also be gleaned through GCL Poly's 2016 annual report, which indicates the receipt of government grants totaling RMB 347 million.[59]  Moreover, a stated goal of GCL Poly was to "reduce the reliance on government subsidies,"[60] exemplifying the significant role the GOC plays in the industry, as well as highlighting the solar-grade polysilicon industry's dependence on GOC support.

Finally, a review of the record amply shows that there was distortive overcapacity in the domestic polysilicon industry, due largely to government support and intervention.  For example, Yingli Solar's 2016 Annual Report states that it is "currently facing challenges relating to over-

---

[55] *Id*. at 54.
[56] *Id.* at Attachment I, page 7.
[57] *Id*. at Attachment I, page 8.
[58] *Id*. at Attachment I, page 13.
[59] *Id.* at Attachment III, page 28.
[60] *Id.* at Attachment II, page 20.

capacity,"[61] stating further that "the price of polysilicon has decreased significantly as a result of increased industry-wide polysilicon manufacturing capacity and downward price pressure exerted by decreasing average selling prices of PV modules,"[62] leading to historically low polysilicon prices in 2016.[63]  Both GCL Poly and information submitted by Canadian Solar also acknowledged the oversupply of solar-grade polysilicon on the market,[64] which results in downward pressure on prices.[65]  Yingli Solar's 2016 Annual Report also states that the decline of PV module prices in 2016 is mainly attributed to increased capacity and decreases in Feed-In-Tariffs in China.  Similarly, Xinte Energy's 2016 Annual Report indicates that polysilicon prices are linked to the GOC's policies, and particularly to the installed capacity planned by the GOC. Xinte Energy describes this link in its annual report stating that, in the first half of 2016, polysilicon prices constantly declined; however, the GOC's "shutdown and overhauling of most polysilicon enterprises and the introduction of new notice regarding the adjustment of on-grid benchmark tariffs of new energy stimulated the terminal market to some extent, and supported the bottoming out of polysilicon prices."[66]  This demonstrates how polysilicon prices are influenced by the GOC's significant involvement.  Moreover, as noted above, the GOC maintains WTO-inconsistent export restraints on silicon exports to ensure "an abundant domestic supply of silicon in China, thus artificially depressing the domestic price of polysilicon."[67]

The comprehensive development goals delineated in the GOC's own policy documents coupled with the evidence of considerable support measures extended to the domestic industry further demonstrate the GOC's significant distortive participation in the market.  Based on the

---

[61] *Id*. at Attachment V, page 21.
[62] *Id*. at Attachment V, page 14 and 16.
[63] *Id*.
[64] *See* Canadian Solar's Polysilicon NFI Comments at Exhibit 2, page 17.
[65] *See* Additional Documents Memorandum at 85 (citing a New York Times article).
[66] *Id*. at Attachment IV, page 17.
[67] *Id*.

analysis set forth above, we continue to find that the record indicates significant government participation in the polysilicon market that distorts pricing, including import prices either directly (through, for example, the GOC's import contracts) or indirectly through the necessity of imports having to compete with domestic producers.  Accordingly, we cannot rely on Canadian Solar's reported import prices as a tier one benchmark.  Therefore, for purposes of this remand redetermination, we continue to use a "tier-two" benchmark to measure the benefit from this subsidy program.

4.      Specificity of Electricity Subsidy

In *Changzhou 3rd Review 1st Remand Order*, the Court remanded Commerce's determination that the provision of electricity was specific based on AFA.  The Court faulted Commerce for not explaining how the GOC's failure to provide information led to the specificity determination.  In response, Commerce offered additional explanation to support its determination that the provision of electricity was specific to the solar industry, which was also rejected by the Court.[68]  Subsequently, in a second remand redetermination, Commerce revised its determination finding that the program was regionally specific under section 771(5A)(D)(iv) of the Tariff Act of 1930, as amended (the Act).  In the prior remand redetermination concerning this order, Commerce again found that the program was regionally specific, and was sustained by the Court.[69]  Consistent with *Changzhou 4th Review Remand Redetermination*, Commerce requested a voluntary remand on this issue to revise its determination finding that the program was regionally specific under section 771(5A)(D)(iv) of the Act, as detailed below.

---

[68] *See Changzhou 3rd Review 2nd Remand Order*, Slip Op. 13-137 at 15.
[69] *See Changzhou 4th Review Remand Redetermination*.

There is no dispute that electricity prices vary from province to province in China.[70] What has been at issue in Commerce's numerous determinations where the provision of electricity is countervailed is why prices vary from province to province and who makes the decision – ultimately – to set or allow distinct prices in each province.  Insofar as provincial governments are solely responsible for setting prices, it is possible that there is no basis for finding the program regionally specific under section 771(5A)(D)(iv) of the Act because all recipients within the jurisdiction of the price setting authority would be paying the same prices; thus, there would be no price discrimination on the part of the authority granting the subsidy. However, insofar as the varying prices are set by authorities of the central government in Beijing, and insofar as the GOC is unable to demonstrate that such variances are in accordance with market principles or cost differences, there is, in fact, a regionally specific subsidy program, because the central Beijing authority is setting different prices in different provinces without explanation.

The GOC has claimed:

Now, the relevant provincial pricing authorities are required to take into account the overall demand and supply present in their respective electricity markets, as well as the costs of electricity generation and transmission.  The retail prices of electricity consist of four parts:  purchasing cost, transmission prices, transmission losses, and governmental surcharges.  The differences in these costs as well as other costs like coal and coal transportation prices, among others, are analyzed mainly on an enterprise as well as provincial basis, and the provincial government plays a key role in collecting cost information and formulating electricity prices for provincial are under its jurisdictions respectively.[71]

However, the GOC refused to provide key information that would allow Commerce to confirm its claims.  Specifically, the GOC did not provide:  the provincial price proposals for each of the relevant provinces that might demonstrate that the provinces are the authorities

---

[70] *See* GOC June 19, 2018 IQR at Exhibit II E.22.
[71] *See* GOC June 19, 2018 IQR at 68-69.

setting prices or that there are market – or cost-based reasons underlying the variation in prices among provinces;[72] a detailed description of the cost elements and price adjustments that were discussed between the provinces and the NDRC, which might provide further evidence for determining which authority is setting prices and why different prices have been determined for different provinces;[73] and, province-specific explanations linking particular costs to retail prices, which, once again, might indicate whether there is a market – or cost-based explanation for the variation among provinces.[74]  Without such information, Commerce cannot confirm that market and commercial principles explain the variation in electricity prices on the record among provinces and cannot determine the price-setting authority.

As discussed in the prior review of this order, the GOC claims that in April 2015, the NDRC's price setting authority was delegated to the provinces and provincial price proposals are no longer necessary.[75]  Thus, the GOC independently concluded that the information requests described above were no longer applicable.[76]  However, both NDRC Notice 3105 on Lowering Coal-Fired Electricity On-Grid Price and General Industrial and Commercial Electricity Price and NDRC Notice 748 on Adjusting Schedule of Coal-fired Power Generation Grid Purchase Price and Sale of Industrial and Commercial Electricity of Each Province (District or City), explicitly direct provinces to reduce prices and to report the enactment of those changes to the NDRC.[77]  After explaining the significance of this information in the *Preliminary Results*, we provided parties the opportunity to comment, and the GOC provided nothing in response.  Thus, despite knowing that Commerce interpreted the information as indicating the NDRC continues to

---

[72] *Id*. at 70.
[73] *Id*. at 72-73.
[74] *Id*. at 73-76.
[75] *Id*. at 70-71.
[76] *Id*. at 70.
[77] *See Preliminary Results* PDM at 29-30.

play a decisive role in setting and adjusting electricity prices, the GOC offered no comments to persuade us otherwise.  Additionally, Commerce placed the NDRC's Notice 2909 of 2004 on the record of this remand and invited parties to comment.[78]  In the prior review and remand redetermination of this order, Commerce cited information from Notice 748 as support for its determination that the program is regionally specific.  Again, no interested party provided comments on the information.

Based on our examination of NDRC Notice 2909 (2004) and the GOC's questionnaire responses, we concluded that the NDRC was still ultimately in control of the price setting system and that the 2015 changes had not affected how the system operated in practice.  Consistent with the fourth review of this order, we have also incorporated information from NDRC Notice 748 (2015) into our analysis, which likewise supports the conclusion that the authority to set electricity prices continues to rest with the NDRC.  Specifically:

- The NDRC's Notice 2909 (2004) clearly demonstrates at Appendix I that the State Council and NDRC are ultimately in charge of electricity prices;[79] *e.g.*, "electricity price shall be set under a bidding system of grid access and a market-oriented linkage mechanism of coal and electricity prices, under the Scheme of Reform of Electricity Pricing issued by State Council" (Article II of Appendix I);[80] the NDRC "shall implement coal-electricity price linkage by grid regions or price regions within a single grid region according to the change of average plate price, and shall be reported and filed to the State Council" (Article IX of Appendix I);[81] "the State Council shall authorize the National Development and Reform Commission

---

[78] *See* Memorandum, "Placing Information on the Record Regarding Electricity," dated September 24, 2021.
[79] *Id*. at Attachment I (NDRC Notice 2909).
[80] *Id*. at 3-4.
[81] *Id*. at 5.

according to the Price Law of the People's Republic of China to adopt price intervention measures when such sharp fluctuation occurs" (Article X of Appendix I).[82]

- While the text of Notice 2909 does not appear to preclude delegation of the responsibilities described above to provincial governments, such responsibilities are still ultimately in the hands of the State Council and NDRC.  Nothing on the record indicates that Notice 2909 has been superseded or repealed.[83]

- The NDRC's Notice 748 (2015) (*e.g.*, the document that implements the new system) provides further support for the conclusion that the NDRC is still the price-setting authority;[84] *e.g.*, Article 1 states that prices for electricity uploaded to the grid from coal powered plants "are to be lowered nationwide for about 2 cents per kilowatt on average … The average adjustment levels of provinces (autonomous regions and municipalities) and adjusted coal power generation

- upload benchmark prices are listed in Annex I" (the annex referenced in this text lists prices that vary by province); Articles 2 through 4 require the reduction of electricity prices for industrial and commercial users.

- Importantly, Article 6 of Notice 748 requires the provinces to report their "plans" to the NDRC for the record, thus contradicting the GOC's claims that there are no longer "proposals" that can be provided to Commerce (unless the GOC is splitting hairs over the distinction between a plan and a proposal.)[85]  Moreover, given the

---

[82] *Id*.
[83] *Id*.  Commerce specifically offered parties the opportunity during this remand redetermination to provide information concerning whether Notice 2909 was still operative law during 2016.
[84] *See* GOC June 19, 2018 IQR at Exhibit II E.22.
[85] *Id*. at Exhibit II E.23; *see also Final Results* IDM at 30.

detailed instructions from the NDRC to the provincial governments in Notices 748 and 2909, it stretches credulity to suggest that the NDRC does not have some system in place to ensure the provincial plans are in compliance with its directives or that the provinces do not have to submit their plans for approval by the NDRC.

Accordingly, Commerce concluded that the GOC's central government continues to be the price-setting authority. Moreover, the GOC still has within its possession documentation that it could have provided in response to Commerce's requests indicating how exactly the varying provincial prices are established under the direction of the NDRC – whether prices are set in accordance with normal market and commercial considerations and to what extent the NDRC might actually allow the provinces the discretion to set prices beyond Annex I of Notice 748.

Therefore, as AFA, Commerce determines that, contrary to the GOC's narrative, the provision of electricity is a countervailable subsidy program whereby the central Chinese government, through the NDRC in Beijing, sets different prices in different regions under its authority (*i.e.*, the provinces) without any commercial or market considerations, but instead for development purposes. The amount of the subsidy we infer to be the difference between what the respondent is paying, and the highest tariffs set for any province. The facts support the inference that there is a regionally specific program wherein prices are set differently between different regions within the jurisdiction of the authority providing the subsidy. As described above, the key directives of the price-setting system still originate with the NDRC (pursuant to Notices 748 and 2909) and, in fact, Annex I of the NDRC's Notice 748 provides what is at least a set of benchmark prices that vary by province. Therefore, as AFA, we infer from the fact that the NDRC is significantly involved in the setting of electricity prices that the NDRC is the authority providing the subsidy. Moreover, the schedules submitted by the GOC constitute a

24

clear factual basis for the inference that the NDRC has subsidized electricity consumers in certain regions by arbitrarily setting different prices across the provinces.[86]  Therefore, we continue to find that the provision of electricity constitutes a countervailable subsidy program.

5.    Canadian Solar's EVA

In the *Final Results*, Commerce denied Canadian Solar's request for an EVA on its sales made through an affiliated company because, Commerce concluded, Canadian Solar did not submit information that was necessary to demonstrate that it met the requirement for such an adjustment.[87]  Commerce has explained that its practice is to use the FOB sales value for the denominator in its subsidy calculations.[88]  Commerce has also explained that, however, in limited circumstances, it has adjusted the calculation of the subsidy rate when the sales value that it used to calculate the subsidy rate does not match the entered value of the subject merchandise and where the respondent can demonstrate that:  (1) the price on which the alleged subsidy is based differs from the U.S. invoiced price; (2) the exporters and the party that invoices the customer are affiliated; (3) the U.S. invoice establishes the customs value to which the countervailing duties are applied; (4) there is a one-to-one correlation between the invoice that reflects the price on which subsidies are received and the invoice with the mark-up that accompanies the shipment; (5) the merchandise is shipped directly to the United States; and (6) the invoices can be tracked as back-to-back invoices that are identical except for price.[89] Commerce has stated that these criteria ensure that "the sales value adjustment properly reflects

---

[86] *See* GOC June 19, 2018 IQR at Exhibit II.E.22.
[87] *See Final Results* IDM at 72-76.
[88] *Id.*
[89] *Id*.

an upward adjustment to the sales value of all merchandise that entered the United States, and on which Customs and Border Protection assessed dutiable value."[90]

In denying Canadian Solar an EVA in the *Final Results*, Commerce concluded that the evidence submitted by Canadian Solar, *i.e.*, one sample sale to support its claim that it qualifies for this adjustment, did not demonstrate that there was a higher customs value for all of its U.S. sales.[91] In its *Remand Order*, the Court found that the information Commerce argued was necessary did not correspond to Commerce's stated EVA methodology, and directed Commerce to either grant Canadian Solar the EVA, or to clarify Commerce's methodology and evidentiary requirements for making this adjustment and allow Canadian Solar an opportunity to submit additional evidence to demonstrate that it satisfies Commerce's requirements.[92]

Commerce has considered the options presented by the Court and is complying with the Court's *Remand Order* by granting Canadian Solar the EVA. In coming to this conclusion, Commerce finds that re-evaluating this issue would involve reopening the record and potentially analyzing new information and providing interested parties with an opportunity to comment on any new information. After careful consideration, Commerce finds that it would not be feasible to conduct such an analysis within the time constraints associated with the Court's *Remand Order*. Accordingly, we have recalculated Canadian Solar's subsidy calculations based on the application of an EVA to its total sales denominator. Additionally, to the extent that complying with the *Remand Order* would involve Commerce's reconsideration of its EVA methodology, Commerce concludes that reconsidering its EVA methodology on remand does not provide

---

[90] *Id*.
[91] *Id*.
[92] *See Remand Order* at 19-26.

notice to the respondents.[93]  With this remand redetermination, we provide parties to this proceeding notice that Commerce intends to re-evaluate its EVA methodology, as well as the circumstances under which an EVA may be granted, in a future segment of this solar cells proceeding.

## IV.   COMMENTS ON DRAFT REMAND RESULTS

**Issue 1:       EBCP Determination of Non-Use**

*Jinko Solar Comments:*

- Commerce should remove its "under respectful protest" language from its position finding the EBCP not used.[94]

- Commerce has recently changed its practice regarding the EBCP and specifically its position that usage of the EBCP cannot be verified at the respondents' U.S. customers, rendering its protestations here moot.[95]

- In the countervailing duty (CVD) investigation of *Mobile Access Equipment from China* (October 2021), Commerce conducted a paper verification of the EBCP at each of the respondents' U.S. customers and found that it could determine the non-use of this program through a review of the U.S. customers' accounting records.[96]

- Commerce's claim in the instant case and others that the EBCP cannot be verified is now demonstrably false because the EBCP can be determined through verification, and thus, a statement of non-use is now sufficient to establish non-use in a review where verification

---

[93] *See, e.g.*, *Final Results of Redetermination Pursuant to Court Order, Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*, Consol. Court No. 18-00089, dated January 27, 2020 at 14-15, available at https://access.trade.gov/resources/remands/19-122.pdf.
[94] *See* Jinko Solar Comments at 2.
[95] *Id*. at 2.
[96] *Id*. (citing Certain *Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 FR 57809 (October 19, 2021) (*Mobile Access Equipment from China*), and accompanying IDM at Comment 5.

is not undertaken.[97]  Such statements have been sufficient to establish non-use with

respect to other programs, and the EBCP is now no different.[98]

*Canadian Solar Comments:*

- Although Canadian Solar disagrees with Commerce's position that it has no assurance of its ability to differentiate ordinary commercial lending or disbursement of funds from disbursements pursuant to EBCP-supported credit, Canadian Solar nonetheless agrees with Commerce's draft remand results to remove the AFA rate for the EBCP.[99]

- Commerce's determination to remove the AFA rate previously assigned under the EBCP is consistent with Commerce's position in recent cases that have been affirmed by the CIT.[100]

*Shanghai BYD Comments:*

- Shanghai BYD supports Commerce's determination of finding the EBCP not-used.[101]

**Commerce's Position:**  Despite agreeing with Commerce's determination to find the EBCP not

used by the respondents, Jinko Solar argues that Commerce should remove its "under respectful

---

[97] *Id*. at 3.

[98] *Id*. (citing *Canadian Solar Inc. v. United States*, Consol, CIT Case No. 19-00178, Memorandum of Law in Support of Plaintiff-Intervenors' Motion for Judgement on the Agency Record (August 31, 2020), ECF 72; *Canadian Solar Inc. v. United States*, Consol, CIT Case No. 19-00178, Plaintiff-Intervenors' Reply Brief (January 26, 2021), ECF 87).

[99] *See* Canadian Solar Comments at 4-5.

[100] *Id*. (citing *Canadian Solar Inc. v. United States*, Slip Op. 20-149 (CIT October 19, 2020) at 8 (sustaining Commerce's determination upon remand to remove the benefit assigned to Canadian Solar under the EBCP based on certifications of non-use); *Clearon Corp. v. United States*, Slip Op. 21-56 (CIT May 6, 2021) (*Clearon*) at 4 (sustaining Commerce's remand redetermination that "did not support a finding that the {EBCP}… conferred a benefit" where "uncontroverted record evidence" supported a respondent's claims of non-use); *Guizhou Tyre Co. v. United States*, 415 F. Supp. 3d 1402, 1405 (CIT 2019) (*Guizhou Tyre I*) (sustaining Commerce's removal of its AFA rate from EBCP from the its calculation under protest, but disagreeing with Commerce's analysis and noting that it "remains convinced that {Commerce} has not adequately addressed what the gap in the record is (as required under the AFA statute), or, that the missing information is required to effectively verify respondent's non-use of the Program."); *Changzhou Trina Solar Energy Co. v. United States*, Slip Op. 20-108 (CIT August 4, 2020) (*Changzhou Trina III*) at 8 (sustaining "the court does not find that Commerce's decision to accept the certifications of non-use amounts to noncompliance with the remand.")).

[101] *See* Shanghai BYD Comments at 3.

protest" language from its position because such protestations are, in its view, moot in light of a recent verification of the program in *Mobile Access Equipment from China*.[102]  We disagree.  As an initial matter, Commerce is not required to update its determinations in previous cases to reflect policies adopted after those cases were concluded.  But in any event, Commerce stated in *Mobile Access Equipment from China*, that "Commerce's position continues to be that the GOC is the only party that can answer questions about the internal administration of this program and that non-use certificates cannot replace the cooperation of the GOC."[103]  Commerce was clear in that investigation that it verified non-use of the respondents' customers because of various Court opinions on the EBCP, just as we are finding non-use in this remand redetermination because of the Court's opinion and order.

Accordingly, we continue to find that the conditions particular to this review would not allow Commerce to conduct a thorough, meaningful, and accurate verification of the EBCP. Nonetheless, given the inability to verify, continuing to assign an AFA rate to the respondents for their presumed benefit and use of the EBCP in this proceeding would not comply with the Court's *Remand Order*.  Consequently, we continue to find, under respectful protest, the EBCP not used by the mandatory respondents and have removed the previously assigned AFA rate for the program from our final calculations.  As noted by Canadian Solar, this is consistent with Commerce's previous determinations that have been sustained by the Court, regardless of any difference in opinion regarding the verifiability of the EBCP.

---

[102] *See* Jinko Solar Comments at 2-3.
[103] *See Mobile Access Equipment from China* IDM at Comment 5.

**Issue 2:**      **Distortion of the Polysilicon Market**

*Canadian Solar Comments:*

- Canadian Solar disagrees with Commerce's finding that it cannot rely on its reported prices for imported polysilicon as a tier-one benchmark.[104]

- Commerce's regulations express a preference for a "market-determined price for the good or service resulting from actual transactions in the country in question."[105] Canadian Solar's reported polysilicon purchases from foreign market-economy sources fulfill Commerce's preference for a tier-one benchmark.[106]

- Commerce may only resort to a tier-two benchmark when the relevant market is distorted by government intervention.[107]

- As acknowledged by Commerce, the GOC provided data for the entire polysilicon market indicating that the companies in which the GOC maintains an ownership or membership interest do not account for the majority of total output of polysilicon in China.[108]  In *Changzhou Trina 3rd Review 2nd Remand Order*, the CIT concluded that although the GOC's influence over a small percentage of the general polysilicon industry may possibly result in a majority control of the production of solar-grade polysilicon, such possibility is too remote, without additional evidence and explanation, to support Commerce's finding that the GOC's influence distorts imports pricing.[109]

- The Court has previously upheld identical evidence to the information cited to and placed on the record of this remand by Commerce as supporting its conclusion that "various

---

[104] *See* Canadian Solar Comments at 8.
[105] *Id*. (citing 19 CFR 351.511(a)(2)(i)).
[106] *Id*.
[107] *Id*. at 9 (citing *Preamble*, 63 FR at 65348, 65377).
[108] *Id*. at 9.
[109] *Id*. (citing *Changzhou 3rd Review 2nd Remand Order*).

GOC policies together depress the domestic price of solar-grade polysilicon, including imports."[110]  However, this record differs from prior reviews such that the additional evidence placed on the record by Commerce cannot reasonably support its finding that alleged intervention by the GOC led to a distortion of domestic prices such that Commerce cannot rely on a tier-one benchmark.[111]

- In *Albemarle*, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) found that Commerce must "base its decisions on the record of the administrative processing before it."[112]  Similarly, in *Changzhou 3rd Review 1st Remand Order*, the Court stated that "{t}he purpose of administrative reviews is to reassess earlier determinations in the light of data relevant to the period of review."[113]  However, in its Draft Remand Results, Commerce ignored the key factual difference from the instant record compared to prior reviews – namely that several Chinese producers shut-down production during the tail end of the relevant POR.[114]

- As a result of lower international spot prices for polysilicon during the last quarter of the POR, many Chinese manufacturers shut down their polysilicon plants for maintenance.[115]  Any restraint on exports of silicon or the GOC's control over the domestic polysilicon industry are irrelevant when that domestic industry was shut down.[116]  Accordingly, Commerce's central argument, that import pricing is distorted because "imported

---

[110] *Id*. at 10.
[111] *Id*. at 10 (citing *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (setting forth the standard that the Court will review Commerce's determination, namely whether "a reasonable mind might accept the evidence as sufficient to support the finding").
[112] *Id*. at 10 (citing *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1356 (Fed. Cir. 2016) (*Albemarle*)).
[113] *Id*. at 10 (citing *Changzhou 3rd Review 1st Remand Order*, 352 F. Supp. 3d at 1316, 1342 (CIT 2018)).
[114] *Id*. at 10 (citing Canadian Solar's Polysilicon NFI Comments at 8).
[115] *Id*.
[116] *Id*. at 10-11.

products must compete with sales from {distorted} domestic sources," is fundamentally flawed given that for a portion of the POR there were no allegedly distorted polysilicon prices in the market.[117]  Therefore, Commerce cannot claim that the domestic market is distorted such that it was forced to reject Canadian Solar's imports of polysilicon, a statutorily preferred tier-one benchmark, in favor of a tier-two benchmark source.[118]

- To remedy its Draft Remand Results, which violate the *Remand Order* by not providing sufficient evidence establishing distortion in the domestic market as a result of intervention by the GOC, Commerce must use on Canadian Solar's import data to calculate a tier-one benchmark price.[119]

- At a minimum, Commerce must rely on Canadian Solar's import data as a benchmark price in the last quarter of the POR when there was a shut down in the domestic market, and thus, import pricing could not be distorted by competition with sales by domestic sources.[120]

*Shanghai BYD Comments:*

- The record does not support a finding that the GOC's actions distorted prices paid by Canadian Solar for polysilicon imports into China that were supplied by unaffiliated companies beyond the control and influence of the GOC.  Therefore, Shanghai BYD disagrees with Commerce's conclusion that the prices of Canadian Solar's imported polysilicon are distorted.[121]

---

[117] *Id.* at 11.
[118] *Id.*
[119] *Id.*
[120] *Id.*
[121] *See* Shanghai BYD Comments at 3-4.

**Commerce's Position:**  Based on a thorough examination of the totality of record evidence, Commerce concluded that the solar-grade polysilicon market in China is distorted by reason of the GOC's intervention.  In its comments on the Draft Remand Results, Canadian Solar contends that a two-month closure of production facilities by an unknown number of Chinese polysilicon manufacturers undermines Commerce's distortion determination.  For the reasons explained throughout this redetermination, we disagree with Canadian Solar and continue to find that the GOC's distortionary intervention in the domestic market renders tier-one benchmark prices (including Canadian Solar's reported import prices) unusable.  Accordingly, we are continuing to rely on a tier-two benchmark price to calculate the benefit provided by this program.

Canadian Solar's argument rests on a single sentence from a two-page press release which states that "many Chinese manufacturers shut down their polysilicon plants for maintenance in view of a collapsed spot price."[122]  However, Canadian Solar fails to mention that the same press release also states that "domestic production quickly recovered … to a new high in December" and that the same trend was observed in 2015 (*i.e.*, the occurrence is not unique to the relevant POR).[123]  Nevertheless, in its comments on the Draft Remand Results, Canadian Solar claims that Commerce has "ignored the key factual difference from this record as compared to prior reviews – namely, that many Chinese producers shut-down production during the tail end of the {POR},"[124] and insinuates that Commerce has merely relied on evidence presented in past litigation, without considering information specifically applicable to the POR.[125]  However, Commerce's conclusion of distortion is supported by at least 10 different sources of information, including sources examined for the first time in this redetermination,

---

[122] *See* Canadian Solar Comments at 10 (citing Canadian Solar's Polysilicon NFI Comments at Exhibit 2, page 1).
[123] *See* Canadian Solar's Polysilicon NFI Comments at Exhibit 2, page 1.
[124] *See* Canadian Solar Comments at 10
[125] *Id*.

information submitted by Canadian Solar, and information published by the GOC and Chinese polysilicon producers.  As such, our finding is consistent with the cases cited by Canadian Solar – *Maverick*, *Albemarle*, and *Changzhou 3rd Review 1st Remand Order* – because we have weighed the full facts of this proceeding in reaching our determination[126] and find the evidence sufficient to cause any "reasonable mind" to reach a similar conclusion.[127]  The fact that certain domestic producers of polysilicon shut down production facilities for a few weeks of the POR does not detract from the overwhelming evidence that the polysilicon market in China is distorted by the GOC's intervention, as detailed in the analysis section above and highlighted again below, as well as in previous litigation which has been upheld by the Court.

In *Changzhou 3rd Review 2nd Remand Order* and *Changzhou 4th Review Remand Order*, the Court found that Commerce did not sufficiently explain how the GOC's relatively small participation in the general polysilicon industry led to distorted prices for imported solar-grade polysilicon.  As noted in the analysis section above, while the *Preamble* explicitly mentions government ownership in the domestic industry as the normal indicator of distortion that renders tier-one benchmarks (including imports) unusable,[128] factors other than, or in addition to, government ownership can also support a distortion finding.[129]  Commerce's regulations nowhere state that a determination of distortion must be limited to situations in which there is majority government ownership of a specific industry.  Such a requirement would be unreasonably constraining when the objective of Commerce's analysis under 19 CFR

---

[126] *See Albemarle*, 821 F.3d at 1345, 1356; *see also Changzhou 3rd Review 1st Remand Order*, 352 F. Supp. 3d at 1316, 1342.

[127] *See Maverick*, 857 F.3d at 1353, 1359.

[128] *See* 19 CFR 351.511(a)(2) (noting that "actual transactions" comprising a tier one benchmark include prices stemming from private parties, actual imports, or in certain circumstances, sales from competitively run government auctions).

[129] *See Preamble*, 63 FR at 65377 (explaining that government induced distortion will "normally" be minimal absent majority or substantial government control over the industry in question).

351.511(a)(2) is to find an accurate measure of remuneration (accurate in the sense of market-determined) in order to determine the extent of the subsidy benefit.[130]  On this basis, in *Changzhou 3rd Review 2nd Remand Redetermination* and *Changzhou 4th Review Remand Redetermination*, Commerce examined additional information on the record which demonstrated a distorted market, considered several factors beyond the GOC's direct ownership and control of polysilicon producers, and elaborated on how the record evidence leads to a conclusion of distortion, and as a result, renders tier-one benchmarks (including imports) unusable.[131]  Commerce's additional analysis and explanation of its distortion finding was subsequently upheld by the Court.

As in *Changzhou 3rd Review 2nd Remand Redetermination* and *Changzhou 4th Review Remand Redetermination*, in the review underlying this *Remand Order*, the GOC could not provide its ownership share of the solar-grade polysilicon industry, and thus, the percentage of the solar-grade market owned by the GOC remains unknown.  Moreover, because there is no information on the record detailing what proportion of the polysilicon industry is comprised of solar-grade polysilicon production, it could be that, for example, despite low government ownership of the general polysilicon industry, government ownership is disproportionately concentrated in solar-grade polysilicon such that it would support a distortion finding.  In light of these considerations, using the ownership information for polysilicon in general as a proxy for ownership information for solar-grade polysilicon in particular would not provide a reliable basis for assessing the relative significance of government ownership.  Thus, we are not drawing

---

[130] In this regard, 19 CFR 351.511(a)(2)(i) refers to the use of a "market-determined price" as the measure of adequate remuneration and 19 CFR 351.511(a)(2)(ii) calls for relying on a tier two benchmark (*i.e.*, no more import prices or other internal prices) when "actual market-determined prices" are unavailable in the country under examination.

[131] *See Changzhou 3rd Review 2nd Remand Redetermination* at 34-41; *see also Changzhou 4th Review Remand Redetermination* at 14-22.

conclusions or adverse inferences regarding government ownership of the solar-grade polysilicon industry.  Instead, we continue to find it necessary to rely on other factors in analyzing whether the solar-grade polysilicon market in China was distorted.  For this reason, we re-opened the record and solicited additional information from interested parties regarding the solar-grade polysilicon industry in China.

Consistent with Commerce's approach to this issue in *Changzhou 3rd Review 2nd Remand Redetermination* and *Changzhou 4th Review Remand Redetermination*, Commerce expanded its analysis in this remand redetermination to account for factors beyond the GOC's direct ownership in reaching a distortion finding.  Although, as noted by Canadian Solar, Commerce's conclusion of distortion in this redetermination incorporates evidence which the Court has upheld as supporting the same conclusion in previous litigation,[132] Commerce's determination in this proceeding is also supported by ample record evidence specific to this proceeding.[133]  Specifically, in this remand redetermination, Commerce analyzed the 2016 annual results and SEC filings of four major Chinese solar-grade polysilicon and/or solar cells producers for the first time, as well as new information presented by Canadian Solar.  After reviewing the full facts of the record, we continue to find evidence for other *indicia* of the GOC's market-distorting involvement.

As explained at length in the analysis section above, the GOC's significant involvement in the solar-grade polysilicon market distorts pricing, including import prices, both directly and indirectly.  For example, the GOC's 12th Five-Year Plan for the Photovoltaic Industry identified the solar-grade polysilicon industry as a "Key Focus Area" for development and discusses several intervening measures intended to influence the market and create favorable conditions for

---

[132] *See* Commerce's Polysilicon NFI at Exhibits 1-2.
[133] *Id.*; *see also* Canadian Solar's Polysilicon NFI Comments.

the domestic industry.[134]  The impact of the GOC's favorable policies is reflected in the 2016

annual reports and SEC filings of the major Chinese solar-grade polysilicon and solar cells

producers, which reveal the GOC's significant financial support to the domestic industry and

demonstrate a heavy reliance on GOC subsidies.[135]  The consequence of the GOC's support and

intervention in the domestic polysilicon industry is distortive overcapacity, which led to

historically low polysilicon prices in 2016.[136]  It is clear from the record evidence that the solar-

grade polysilicon industry is guided and sustained by the GOC's favorable policies, and not by

purely commercial considerations.  This is corroborated by Yingli Solar's 2016 Annual Report

which states that, "{u}nlike other companies based overseas, our company is based in China,

where PV remains a *policy-driven* market."[137]  As explained above, because import prices must

compete with prices of products sourced domestically, prices for imported products also reflect

distorted prices.

     Record information also indicates that the GOC maintained import[138] and WTO-

inconsistent export duties[139] on polysilicon, including during the POR, which exert further

downward pressure on domestic prices for polysilicon in China as well as a decline in imports.

The market implications of the GOC's import and export policies are evident from the record.

For example, DAQO New Energy's 2016 Financial Report states that since 2014, the GOC

suspended applications for solar-grade polysilicon imports, which led to a decline of imports.[140]

In addition, GCL-Poly's 2016 Annual Report indicates that polysilicon pricing remained stable

in 2016 "as a result of Import Duty Levy on foreign import, especially those from the United

---

[134] *See* Commerce's Polysilicon NFI at Attachment I, page 10.
[135] *Id*. at *e.g*., Attachment V, page 88 and Attachment VII, page 8, and Attachment VII, page 59.
[136] *Id*. at Attachment V, page 14 and 16.
[137] *Id*. at Attachment V, page 11 (emphasis added). "PV" means photovoltaic(s), *i.e.*, solar cells.
[138] *Id*. at Attachment III, page 26.
[139] *Id*. at Attachment IV, page 17.
[140] *Id*. at Attachment VI, page 60.

States."[141]  Information submitted by Canadian Solar also indicates that U.S. polysilicon manufacturers have "effectively been shut out from the Chinese market due to prohibitive duty rates," while Korean manufacturers, which accounted for 50 percent of polysilicon imports in 2016, "have benefitted from low import duties," despite accusations of dumping by Chinese manufacturers.[142]  Solar-grade polysilicon originating in the European Union (EU) was also subject to countervailing and antidumping duties during the POR; however, the GOC exempted the largest EU producer of solar-grade polysilicon from duties after negotiating a price commitment agreement with the company.[143]  These facts illustrate how the GOC is effectively able to influence import prices and control the number of market participants, and thus, competition, through its uneven application of import restrictions.  Canadian Solar argues that Commerce should use its reported import prices as a tier-one benchmark, at a minimum to calculate the benefit for the last quarter of the POR.[144]  Canadian Solar contends that the fact that imports of solar-grade polysilicon increased for two months of the POR mitigates any distortive effects from the GOC's involvement in the market.[145]  Specifically, Canadian Solar states, "Commerce's central argument, that import pricing is distorted because 'imported products must compete with sales from {distorted} domestic sources' is fundamentally flawed given that for a portion of the POR there were no allegedly distorted polysilicon prices in the market."[146]  We disagree that a two-month increase in imports can erase years of documented distortion in the domestic market or eliminate all competition with domestic prices.  Canadian Solar seems to conflate a temporary shut-down of operations by an unknown number of Chinese polysilicon

---

[141] *Id*. at Attachment III, page 26.
[142] *See* Canadian Solar's Polysilicon NFI Comments at Exhibit 2, page 1.
[143] *See* Commerce's Polysilicon NFI at Attachment VI, page 53.
[144] *See* Canadian Solar Comments at 11.
[145] *Id*.
[146] *See* Canadian Solar Comments at 11.

producers with a complete shut-down of operations by all domestic manufacturers, which is not supported by any record evidence. The press release cited by Canadian Solar states that Chinese polysilicon producers shut down manufacturing facilities in September and October of 2015 and 2016 for maintenance. Temporary closures of facilities for maintenance purposes are common and expected occurrences, particularly in asset-intensive industries. In contrast to *force majeure* events which immediately and unexpectedly disrupt production, companies can account for routine maintenance in their production schedules and may continue selling products out of inventory. Moreover, as highlighted throughout this redetermination, our distortion finding is not limited to the fact that imports must compete with distorted domestic prices. Indeed, as noted above, information submitted by Canadian Solar indicates that the GOC also influences domestic prices through its direct involvement in negotiating contracts with the largest foreign manufacturers to ensure a steady supply of *imported* solar-grade polysilicon.[147] This fact evinces the GOC's significant interference in the solar-grade polysilicon market and underscores precisely why import prices cannot serve as reliable benchmarks for any month of the POR, as they are influenced directly by the GOC.

We have considered all relevant record evidence in determining whether the net effect is a distorted internal market, rendering internal purchases, whether of imported or domestically produced material, unreliable indicators of value. Thus, Commerce's finding of distortion in the solar-grade polysilicon market is based on the reasonable conclusion, from a thorough examination of the totality of record evidence, that the GOC is significantly involved in the solar-grade polysilicon market, such that all internal, tier-one prices, including purchases from domestic sources as well as imports, do not provide market-determined measures of adequate

---

[147] *See* Commerce's Polysilicon NFI at Attachment VI, page 60.

remuneration.  Consequently, we are continuing to rely on tier-two benchmark prices to calculate the benefit conferred to the respondents by this program.

**Issue 3:        Countervailability of Electricity for LTAR**

*Canadian Solar Comments:*

- In the Draft Remand Results, Commerce clarified that the Electricity for LTAR program is regionally specific pursuant to section 771(5A)(D)(iv) of the Act, which states that a subsidy is regionally specific where it "is limited to an enterprise or industry located within a designated geographical region of the authority providing the subsidy."[148]

- Commerce's regional specificity finding is unlawful because it failed to follow its statutory mandate to designate which geographic region received subsidized electricity prices.[149]

- In *A1 Tech*, the Court remanded Commerce's regional specificity determination because Commerce failed to identify a designated geographical region and found that "the statute's placement of the qualifier 'designated' before 'geographic region' would seem to require some sort of an affirmative indication of a limitation to a specified geographical region, if a subsidy is to be considered *de jure* specific on that basis."[150]

- Similarly, in *Samsung*, the Court found that section 771(5A)(D)(iv) of the Act requires that "the authority providing the subsidy limit the subsidy's availability to a designated geographical area."[151]

- Commerce's statutory requirement to designate a geographic region when making a regional specificity finding aligns with the purpose of the specificity requirement to

---

[148] *See* Canadian Solar Comments at 12.
[149] *Id*. at 12; 16.
[150] *Id*. at 13; 15 (citing *A1 Tech Specialty Steel Corp. v. United States*, 28 CIT 1486, 1511 (2004) (*A1 Tech*)).
[151] *Id*. at 13 (citing *Samsung Elecs. Co. v. United States*, 973 F. Supp. 2d 1321, 1328 (CIT 2014) (*Samsung*)).

"ensure that subsidies that are distributed very widely throughout an economy are not countervailed."[152]

- The Court has upheld Commerce's regional specificity determinations where it designates, based on supporting record evidence, a particular region in a country as receiving subsidies.[153]  The Court has also upheld Commerce's determination that a subsidy is *not* regionally specific where funding is generally available throughout the country.[154]

- Instead of designating a geographical region, Commerce hid behind AFA to infer that the "price schedules submitted by the GOC constitute a clear factual basis for the inference that the NDRC has subsidized electricity consumers in certain regions by arbitrarily setting different prices across provinces."[155]  Commerce's reliance on AFA was improper in the first instance as no gap existed in the record.[156]

- Under its AFA framework, Commerce must first find that necessary information is missing on the record or that an interested party failed to provide requested information, and then, if Commerce makes a finding of non-cooperation, it may use an adverse inference against the non-cooperative party to fill the gap in the record.[157]

- Commerce misapplied the AFA statute by failing to reach the "applicable determination" – *i.e.*, the designation of a geographical region that received subsidized electricity prices based on the information contained within the price schedules, and instead provided an

---

[152] *Id*. at 13-14 (citing *Preamble*, 63 FR at 65357, *A1 Tech*, and *Samsung*).
[153] *Id*. at 16 (citing *Samsung*; and *Royal Thai Government v. United States*, 441 F. Supp. 2d 1350, 1354-58 (CIT 2006)).
[154] *Id*. at 16 (citing *Geneva Steel v. United States*, 914 F. Supp. 563, 598 (CIT 1996)).
[155] *Id*. at 16 (citing Draft Remand Results at 24).
[156] *Id*. at 18.
[157] *Id*. at 17.

unlawfully vague determination of regional specificity.[158]  The AFA statute does not

excuse Commerce from designating a geographical region under section 771(5A)(D)(iv)

of the Act, rather, it requires that Commerce do so.[159]

- Commerce failed to conduct even a basic analysis of the price schedules submitted by the

  GOC, which on their face, demonstrate that no region in China received subsidized

  electricity prices.[160]  Even when relying on AFA, Commerce cannot disregard all record

  evidence that rebuts its adverse inference.[161]

- The Federal Circuit has held that Commerce cannot apply AFA when other existing facts

  can fill the alleged gap on the record.[162]

- In *Guizhou Tyre II*, the Court held that even when relying on AFA, Commerce must

  "show that only the withheld information can fill the gap."[163]

- In order to comply with the requirements of section 771(5A)(D)(iv) of the Act,

  Commerce must analyze the degree of availability of a subsidy within different regions of

  China, which requires an analysis of the price schedules beyond a mere cursory

  conclusion that price variation exists among the provinces.  Otherwise, Commerce cannot

  designate a region that received subsidized prices.[164]

---

[158] *Id*.
[159] *Id*. at 17.
[160] *Id*. at 19.
[161] *Id*. (citing 19 CFR 351.308(e) (Commerce cannot "decline to consider information that is submitted by an interested party and is necessary to the determination"); *Diamond Sawblades Mfrs. Coal. v. United States*, 986 F.3d 1351, 1361 (Fed. Cir. 2021) (*Diamond Sawblades*) (holding that Commerce must conduct "an information-specific consideration of probativeness rather than any blanket disregard of all information supplied by a person whenever some of the information supplied by that person is unreliable"); and *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011) (*Zhejiang Dunan*) (finding that "Commerce is empowered to use adverse inferences only in selecting from among the facts otherwise available, it may not do so in disregard of information of record that is not missing or otherwise deficient" and "The use of facts otherwise available, moreover, is only appropriate to fill gaps when Commerce must rely on other sources of information to complete the factual record.")).
[162] *Id*. at 19 (citing *Diamond Sawblades* 986 F.3d  at 11365-66; and *Zhejiang Dunan* 652 F.3d at 1348).
[163] *Id*. at 20 (citing *Guizhou Tyre Co. v. United States*, 523 F. Supp. 3d 1312, 1361 (CIT 2021) (*Guizhou Tyre II*).
[164] *Id*. at 20.

- The requirement that Commerce examine the full record, including a basic facial analysis of the price schedules on the record, is also necessary to avoid applying an adverse inference to a cooperating respondent, "if relevant information exists elsewhere on the record."[165]  Here, Canadian Solar complied fully with Commerce's requests; therefore, Commerce must avoid applying an adverse inference against Canadian Solar if other information exists elsewhere on the record.[166]  Such relevant information exists on the record given that the price schedules on their face demonstrate that any allegedly subsidized electricity prices are generally available throughout China.[167]

- An examination of the electricity price schedules on the record shows that the lowest (*i.e.*, hypothetically subsidized) electricity price varies significantly depending on user category.[168]  While Commerce may find that the electricity rates demonstrate price variation by province, they do not illustrate that any designated geographical region is subsidized, as statutorily required.[169]

- It cannot be that every province confers a benefit of lower electricity rates than every other province, yet that is the flawed logic in Commerce's analysis.[170]

- Commerce's benchmark construction, allegedly representing an "unsubsidized region," is a mix and match of the highest prices in various categories and fees from different provinces.[171]  In effect, Commerce determined that all areas in China received subsidized

---

[165] *Id*. at 20 (citing *Changzhou 3rd Review 1st Remand Order*, 352 F. Supp. 3d at 1325).
[166] *Id*. at 20-21.
[167] *Id*. at 21.
[168] *Id*. at 21-23.
[169] *Id*. at 23 (the electricity price schedules are business proprietary in nature).
[170] *Id*. at 23.
[171] *Id*. at 25.

electricity rates,[172] which demonstrates its failure to designate an unsubsidized geographical region.[173]

- Commerce's benchmark approach defies logic because if there is a unified regional electricity subsidy program, a region is either subsidized or not, but cannot be both simultaneously.[174]  Further, no actual Chinese industrial user could remain unsubsidized under Commerce's determination, which does not represent a reasonable specificity determination.[175]

- Despite the geographical spread among the respondents in this case and all other China CVD cases, Commerce has found that all respondents were subsidized under the same program.[176]

- Commerce's benchmark calculation itself is unlawful because it arbitrarily uses benchmark prices from multiple provinces to measure the subsidy benefit received by a company in one location.[177]

- Commerce provided no legal basis for using multiple benchmark prices to measure a single program, and instead, should have designated a single geographical region as the subsidized region and designated a single region as the unsubsidized region to serve as the benchmark.[178]

- Commerce's decision to use the highest provincial electricity rates in its calculation of the electricity benchmark is unlawful because it applies punitive benchmarks to a

---

[172] *Id*. at 24.
[173] *Id*. at 24; 26-27.
[174] *Id*. at 25.
[175] *Id*. at 26.
[176] *Id*. at 28.
[177] *Id*. at 31 (citing *In re Gartside v United States*, 203 F. 3d 1305, 1312 (Fed. Cir. 2000) (in determining whether an agency action is arbitrary, the "court analyzes only whether a rational connection exists between the agency's fact findings {sic} and its ultimate action")
[178] *Id*. at 32.

respondent as if it were located simultaneously in difference provinces in China, and does not rationally connect to their production of solar cells.[179]

- The Court has rejected Commerce's application of AFA based on Commerce's claim that it lacked information required to understand the operations of the EBCP.[180]  Here, Commerce similarly asserted that it could not make an underlying specificity determination due to the GOC's failure to provide information related to the operation of the program.[181]  However, such information is not required by Commerce to make its specificity determination where the price schedules submitted by the GOC establish that no single geographical region received subsidized electricity prices, and that Canadian Solar paid the published prices.[182]

- Not only is information concerning the operation of the electricity program not required for Commerce to make its specificity determination, but it also does not prevent Commerce from designating a subsidized geographical region based on an adverse inference.[183]  For example, in drawing adverse inferences from the record facts, Commerce could have designated the province with the lowest electricity prices as the designated geographical region receiving the subsidy.[184]  Although Commerce may not know with full certainty if its inference is correct, the inference needs only be reasonable and supported by the record.[185]  Designating the lowest priced regions as the ones

---

[179] *Id*. at 32-33.
[180] *Id*. at 29 (citing *Clearon* at 1339, 1354; and *Guizhou Tyre I* at 1342)
[181] *Id*. at 30.
[182] *Id*. at 31.
[183] *Id*.
[184] *Id*.
[185] *Id*.

receiving any alleged subsidy is far more reasonable than the inference Commerce relied

on in its Draft Remand Results.[186]

*Shanghai BYD Comments:*

- Shanghai BYD disagrees with Commerce's conclusion that the GOC was not responsive
  to Commerce's requests for information related to the electricity for LTAR program, or
  that it withheld key information.[187]

**Commerce's Position:** As an initial matter, we disagree with Canadian Solar and Shanghai

BYD's arguments that AFA is not warranted in this proceeding. The record clearly demonstrates

that, despite requests from Commerce, the GOC failed to provide information that is key to

understanding the variation of electricity prices in China. Sections 776(a)(1) and (2) of the Act

provide that Commerce shall, subject to section 782(d) of the Act, apply "facts otherwise

available" in reaching the applicable determination if necessary information is not on the record,

or if an interested party: withholds information requested by Commerce; fails to provide such

information by the established deadlines, or in the form and manner requested, subject to

subsections (c)(1) and (e) of section 782 of the Act; significantly impedes a proceeding; or

provides such information but the information cannot be verified as provided by section 782(i) of

the Act. Furthermore, section 776(b)(2) of the Act states that an adverse inference may include

reliance on information derived from the petition, the final determination from the

investigation, a previous administrative review, or other information placed on the record.

When selecting an AFA rate from among the possible sources of information, Commerce's

practice is to ensure that the rate is sufficiently adverse "as to effectuate the statutory purposes of

the adverse facts available rule to induce respondents to provide Commerce with complete and

---

[186] *Id.*
[187] *See* Shanghai BYD Comments at 4-5.

accurate information in a timely manner."[188]  In so doing, Commerce is not required to determine, or make any adjustments to, a countervailable subsidy rate based on any assumptions about the information an interested party would have provided if the interested party had complied with the request for information.[189]

The facts of the record clearly demonstrate that the GOC did not act to the best of its ability to comply with Commerce's requests for information related to the specificity of the provision of electricity for LTAR program.  As a result, there is insufficient information on the record to determine the specificity of the program.  Accordingly, Commerce applied an adverse inference in selecting among the facts otherwise available to fill the gap in the record created by the GOC's noncooperation.  For the reasons stated above, Commerce continues to find that the program is regionally specific because the record indicates that the GOC at the national level (*i.e.*, the NDRC) has arbitrarily set varying prices across provinces.

In its comments on the Draft Remand Results, Canadian Solar also reiterates its arguments that Commerce must designate which specific region is subsidized.[190]  Canadian Solar argues that under Commerce's AFA construct, all provinces would be considered subsidized, thereby undercutting Commerce's position that the program is regionally specific.[191]  Before addressing Canadian Solar's comments, we note that many of the same arguments were rejected by the Court in *Changzhou Trina III*.[192]  Simply put, the record indicates that prices vary on a provincial level and that the GOC is somehow involved in establishing electricity prices;

---

[188] *See, e.g.*, *Drill Pipe from the People's Republic of China:  Final Affirmative Countervailing Duty Determination, Final Affirmative Critical Circumstances Determination*, 76 FR 1971 (January 11, 2011); *see also Notice of Final Determination of Sales at Less Than Fair Value:  Static Random Access Memory Semiconductors from Taiwan*, 63 FR 8909, 8932 (February 23, 1998).
[189] *See* sections 776(c) and 776(d)(3) of the Act.
[190] *See* Canadian Solar Comments at 11-33.
[191] *Id*. at 12.
[192] *See Changzhou Trina III* at 18-25.

however, the GOC refused to provide Commerce with the complete details of its involvement. As a result, Commerce draws the adverse inference that prices in the provinces in which the respondents are located are preferential; *i.e.*, they are not the result of cost differences or other market influences, but rather, the result of a GOC policy to incentivize economic activity in particular regions. Canadian Solar misinterprets Commerce's reasoning and insists that Commerce has a statutory obligation to identify the specific region being subsidized; however, requiring Commerce to identify which provinces might actually be benefitting from such a GOC policy would be unreasonable – given the GOC's failure to provide relevant information – and would go beyond the requirements of applying AFA. As noted above, Commerce cannot identify which provinces are being subsidized by the GOC, due to the GOC's failure to provide Commerce with the requested information.

In this regard, it is critical to understand that Commerce is not finding that "low" electricity prices are, in and of themselves, a subsidy, as Canadian Solar suggests.[193] Rather, there is a subsidy to the extent that electricity prices are below prices that would be set in accordance with typical commercial and market considerations. Thus, Canadian Solar's suggestion that Commerce limit the AFA finding to the regions that have the lowest prices is not reasonable. It could be that there are actual commercial or market considerations (*e.g.*, demand, supply, cost, *etc.*) that explain the low prices in such regions, and it could be that the provinces paying the high prices would be paying even higher prices if the prices were set in accordance with market factors. Commerce cannot tell simply by looking at a list of prices by region which prices are market driven and which are subsidized, as Canadian Solar asserts. There is no reason to assume that the low prices must be the subsidized prices. The burden that Canadian Solar

---

[193] *See* Canadian Solar Comments at 31.

argues Commerce must adhere to by divining which province or provinces are receiving the beneficial rates is unreasonable, given the GOC's lack of cooperation.  We decline to adopt a standard that would prohibit Commerce from applying AFA without a detailed factual predicate for all aspects of the subsidy finding when such an analysis has become impossible precisely because of the GOC's failure to cooperate.

In applying AFA, Commerce is not required to determine the exact and actual information that would have been disclosed if the GOC had cooperated.[194]  Rather, in the absence of cooperation, Commerce must draw an inference, that while adverse, can reasonably be connected to information on the record.[195]  In this case, Commerce has concluded that the record indicates one or more provinces may be benefitting from preferential electricity rates, including the provinces in which the respondents are located. Canadian Solar also argues that Commerce's AFA construct is contrary to the legal precedent established in *Archer Daniels*, that Commerce must avoid applying an adverse inference to a cooperating respondent "if relevant information exists elsewhere on the record."[196]  However, in *Archer Daniels*, the Court found that "{I}f a foreign government fails to cooperate in a countervailing duty case, Commerce may apply {adverse facts available} even if the collateral effect is to 'adversely impact a cooperating party.'"[197]  There is no information elsewhere on the record that explains the variation of electricity prices in China or the GOC's involvement in establishing such prices.  The Court upheld Commerce's application of AFA under similar circumstances in *Archer Daniels*, finding that, "absent alternative satisfactory evidence on the

---

[194] *See* section 776(b)(1)(B) of the Act.
[195] *See* sections 776(c) and 776(d)(3) of the Act.
[196] *See* Canadian Solar Comments at 20 (citing Trina I, 352 F. Supp. 3d at 1325 (quoting *Archer Daniels Midland Co. v. United States*, 917 F. Supp. 2d 1331, 1342 (CIT 2013) (*Archer Daniels*))).
[197] *See Archer Daniels*, 917 F. Supp. 2d at 1331, 1342.

record, it is in accord with the law for Commerce to apply AFA to the GOC even though a cooperating respondent may be adversely impacted."[198]  As the Federal Circuit stated in *Fine Furniture (Shanghai)*, "{a}lthough it is unfortunate that cooperating respondents may be subject to collateral effects due to the adverse inferences applied when a government fails to respond to Commerce's questions, this result is not contrary to the statute or its purposes, nor is it inconsistent with this court's precedent."[199]  Thus, Commerce's use of AFA in this proceeding is supported by legal precedent.

Canadian Solar also takes issue with Commerce's reading of section 771(5A)(D)(iv) of the Act, which provides that a subsidy is specific where "limited to an enterprise or industry located within a designated geographical region within the jurisdiction of the authority providing the subsidy."  Canadian Solar focuses on the language "limited to an enterprise or industry," and concludes this means Commerce must identify an enterprise or industry (or group thereof) within the region that is targeted by the subsidizing authority or that is exclusively located within the region.  This interpretation is incorrect; it directly contradicts the SAA, would render section 771(5A(D)(iv) of the Act superfluous, and has no basis in any Commerce or Court precedent.  First, the SAA states, "subsidies granted by a state or province that are not limited to a specific enterprise, industry or group thereof within the state or province are not considered specific, and, therefore, are not countervailable.  However, subsidies provided by a central government to particular regions (including a province or a state) are specific regardless of the degree of availability or use within the region."[200]  Moreover, if Canadian Solar's interpretation were

---

[198] *See Archer Daniels*, 917 F. Supp. 2d at 1331, 1342.
[199] *See Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d at 1372-73 (Fed. Cir. 2014) (*Fine Furniture (Shanghai)*).
[200] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol 1 (1994) (SAA) at 932 ("Regional Specificity") (emphasis added).

correct, there would be no need for section 771(5A)(D)(iv) of the Act, because, being limited to an enterprise or industry (or group of enterprises or industries), the subsidy would already be considered specific under either section 771(5A)(D)(i) or section 771(5A)(D)(iii)(I) of the Act. For these reasons, the Court expressly rejected Canadian Solar's argument in *Changzhou Trina III*.[201]

The precedents cited by Canadian Solar are not on point. First, Canadian Solar notes that the Court has recently rejected Commerce's reliance on AFA in determining that respondents used and benefitted from the EBCP because the GOC refused to provide certain information about the operation of the EBCP, despite claims from respondents (and often certifications from their customers) that they did not use or benefit from the EBCP.[202] However, Canadian Solar's reliance on these cases is misplaced because Commerce's verification of the EBCP concerns a wholly different issue, *i.e.*, whether the respondents used the EBCP. Verifying use of a Government program is not analogous to verifying whether electric prices within a region are based on market principles. Furthermore, in the EBCP cases, the Court faulted Commerce for not sufficiently explaining why a full understanding of the operation of the EBCP is necessary to determine whether a respondent used the program.[203] Here, by contrast, Commerce articulated its need to understand how electricity prices are set in China to determine whether they are based on market principles and whether the variation in prices between regions is because of market factors. Canadian Solar claims that the missing information was not necessary for Commerce's examination because "the lowest (*i.e.*, hypothetically subsidized) electricity price varies greatly

---

[201] *See Changzhou Trina III* at 24-25.
[202] *See* Canadian Solar Comments at 30-31.
[203] *See Clearon*, 474 F. Supp. 3d at 1344 ("{Commerce} failed to explain why the information it sought from China, which it failed to provide, about the operation of the Export Buyer's Credit Program was necessary to its determination that the 'manufacture, production, or export' of {the respondent's} merchandise had been subsidized.")

depending on user category and illustrates, without inference, that there is no single province or geographical region that is receiving subsidized electricity rates."[204]   Canadian Solar again, incorrectly equates lower rates with subsidized rates, and misinterprets the record evidence.  The price schedules show that electricity prices are lower in certain regions as compared to others. Moreover, even if the price schedules showed that all Chinese users paid the same electricity prices, a full understanding of the cost elements and other factors that affected those prices would still be necessary to determine whether the provision of electricity is regionally specific, because certain regions could be paying less for electricity relative to the costs of supplying it.

Regarding *Samsung*, the case simply stands for the proposition that a regionally specific subsidy cannot be generally available throughout the jurisdiction of the subsidizing authority. That is, the subsidy has to be limited to a geographic "subset" within the authority's jurisdiction. Moreover, in *Samsung*, the Court sustained Commerce's regional specificity determination for a program limited to companies making investments in the area outside the Seoul Metropolitan area.[205]   Therefore, *Samsung* actually supports the conclusion that a subsidy need not be limited to a single region to be considered regionally specific, as long as the subsidy is limited to a subset within the authority's jurisdiction.  Referring to the investigation of *Live Cattle from Canada*, the Court found:  "It is consistent with both the Act and the instant case that Commerce found that a subsidy available throughout British Columbia and administered by the province itself was not regionally specific."[206]   Thus, this is why it was necessary for Commerce to explain to the Court in the analysis above the conclusion that the subsidizing authority in the provision of electricity is the NDRC of the central GOC.  Accordingly, Commerce considers the

---

[204] *See* Canadian Solar Comments at 23.
[205] *See Samsung*, 973 F. Supp. 2d at 1328-29.
[206] *Id*. at 1329.

information and arguments provided by Canadian Solar concerning the locations of solar cell producers throughout China to be irrelevant to the determination of whether the provision of electricity is regionally specific.

For these reasons, pursuant to sections 776(b) and 771(5A)(D)(iv) of the Act, Commerce continues to find the program regionally specific, on the basis of AFA.

**Issue 4:       Clerical Error in Canadian Solar's EVA Calculation**

*Canadian Solar Comments:*

- In the Draft Remand Results, Commerce granted Canadian Solar an EVA on its sales made through an affiliated party.  Commerce must continue to grant an EVA to Canadian Solar's sales, but it must correct an error in its EVA calculation.[207]

- The Court ordered Commerce to grant Canadian Solar the EVA, given that the evidence provided should be sufficient for Commerce to complete the EVA calculation.[208]

- In the alternative, the Court ordered Commerce to clarify its EVA calculation methodology, explain the evidence it requires for verification, provide Canadian Solar an opportunity to submit additional evidence, and reassess Canadian Solar's eligibility for an EVA.[209]

- In its Draft Remand Results, Commerce granted Canadian Solar the EVA, stating that it would not be feasible to re-evaluate its EVA methodology within the time constraints of the Court's *Remand Order*.  Commerce noted that reconsidering its EVA methodology on remand would not provide notice to the responding companies.[210]

---

[207] *See* Canadian Solar Comments at 5.
[208] *Id*.
[209] *Id*.
[210] *Id*. at 5-6.

- Commerce further noted that its remand redetermination will provide notice that it intends to reconsider its EVA methodology, and the circumstances under which an EVA may be granted, in a future segment of the solar cells proceedings.[211]

- Canadian Solar maintains that the evidence it provided should be sufficient for completing the EVA calculation and, nonetheless, agrees with Commerce's Draft Remand Results with respect to granting Canadian Solar an EVA.[212]

- In the Draft Remand Results, Commerce correctly implemented its EVA adjustment in all instances except for accounting for export sales made by certain of Canadian Solar's affiliates.[213]

- For the final results, Commerce must correct this calculation error to ensure that it is applying an EVA rate such that Canadian Solar's CVD rate is equal to its net countervailable subsidy, as required by statute.

*Shanghai BYD Comments:*

- Shanghai BYD supports Commerce's determination to grant Canadian Solar an EVA.[214]

**Commerce's Position:**  In the Draft Remand Results, Commerce stated that it considered the options presented by the Court (*i.e.*, either grant Canadian Solar the EVA or clarify Commerce's methodology requirements for making the EVA and allow Canadian Solar an opportunity to submit additional evidence to demonstrate that it satisfies Commerce's requirements), and is complying with the *Remand Order* by granting Canadian Solar the EVA.[215]  Specifically, Commerce concluded that re-evaluating this issue would involve reopening the record and

---

[211] *Id*. at 6.
[212] *Id*. at 6-7.
[213] *Id*. at 7.
[214] *See* Shanghai BYD Comments at 5.
[215] *See* Draft Remand Redetermination at 24-26.

potentially analyzing new information, and providing interested parties with an opportunity to comment on any new information.[216]  After careful consideration, Commerce finds that it would not be feasible to conduct such analysis within the time restraints associated with the Court's *Remand Order*, and is granting Canadian Solar the EVA to its sales denominators.

Additionally, to the extent that complying with the *Remand Order* would involve Commerce's reconsideration of its EVA methodology, Commerce concludes that reconsidering its EVA methodology on remand does not provide notice to the respondents.[217]  With this final remand redetermination, Commerce is providing notice to parties to this proceeding that it intends to re-evaluate its EVA methodology, as well as the circumstances under which an EVA may be granted, in a future segment of this solar cells proceeding.

With respect to Canadian Solar's comment regarding the calculation of its EVA, in reviewing this calculation we conclude that Canadian Solar's EVA calculation in the Draft Remand Results did not correctly account for export sales made by certain Canadian Solar affiliates.  Accordingly, to ensure that this sales value adjustment properly reflects an upward adjustment to the sales value for all of Canadian Solar's merchandise that entered the United States, and on which Customs and Border Protection will assess a dutiable value, we have revised Canadian Solar's EVA calculation for these final results.

---

[216] *Id.*

[217] *Id.* (citing *Final Results of Redetermination Pursuant to Court Order, Jiangsu Zhongji Lamination Materials Co., Ltd. v. United States*, Consol. Court No. 18-00089, dated January 27, 2020 at 14-15, available at https://access.trade.gov/resources/remands/19-122.pdf.).

## V.      FINAL RESULTS OF REDETERMINATION

Upon remand, we have found the EBCP to be not used notwithstanding our continued assessment that the underlying determination to rely on AFA in finding the program used was correct.  Additionally, we have granted Canadian Solar's request for an EVA.

Pursuant to the Court's granting of our requests for voluntary remand, we have recalculated the benefits provided by the provision of aluminum extrusions for LTAR by relying solely on the IHS data as a benchmark, provided additional analysis maintaining our conclusion that an external benchmark for solar-grade polysilicon is necessary, and revised our specificity analysis for the provision of electricity.  If these remand results are affirmed by the Court, we intend to issue amended final results providing the updated margins below (**in bold**):

| Company Name | Program | *Amended Final Results* (percent) | **Final Results Pursuant to Redetermination (percent)** |
|---|---|---|---|
| Jinko Solar | EBCP | 5.46 | **0.00** |
| | Aluminum Extrusions for LTAR | 1.38 | **0.00** |
| | **Total CVD Rate** | **12.70** | **5.86** |
| Canadian Solar | EBCP | 5.46 | **0.00** |
| | Aluminum Extrusions for LTAR | 0.29 | **0.00** |
| | **Total CVD Rate** | **9.70** | **3.65*[218]** |
| Non-Selected Companies: | **Total CVD Rate** | **11.76** | **5.17** |

---

[218] *Includes changes resulting from granting the EVA to Canadian Solar.

12/13/2021

X

Signed by: RYAN MAJERUS

Ryan Majerus
Deputy Assistant Secretary
   for Policy and Negotiations,
   performing the non-exclusive functions and duties of the
   Assistant Secretary for Enforcement and Compliance